**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. _____24-2057_____

CITY OF BOULDER, a home rule municipality established
under the Constitution and laws of the State of Colorado,

      Plaintiff,

v.

UNITED STATES OF AMERICA,
the FEDERAL AVIATION ADMINISTRATION, an agency of
the U.S. Department of Transportation, and
MICHAEL G. WHITAKER, in his official capacity as
Administrator of the Federal Aviation Administration,

      Defendants.

**COMPLAINT**

Plaintiff City of Boulder (the "City"), by and though its undersigned attorneys, bring this action against Defendants United States of America, the Federal Aviation Administration (the "FAA"), and Michael G. Whitaker, Administrator of the FAA, in his official capacity.

**NATURE OF THE ACTION**

1. In response to a dwindling supply of affordable housing, mounting concern regarding noise and other environmental impacts associated with aircraft operations at the Boulder Municipal Airport (the "Airport"), and potential liability arising from its ownership and operation of the Airport, the City is considering the closure and redevelopment of the Airport.

1

2. Like many public airports, the City has previously accepted grants from the FAA to maintain the Airport, and the terms of such grant agreements generally obligate the City to keep the Airport open as an airport for a maximum term of 20 years.

3. Accordingly, the City has stopped accepting grants – and has elected to carry the considerable cost of operating the Airport on its own – in order that it may lawfully close the Airport when its most recent grant agreement expires in 2040.[1]

4. But the FAA claims that because three prior grants – all accepted between 30 and 65 years ago – were for the acquisition of real property, the City is obligated to operate the Airport *in perpetuity*, unless the FAA – and only the FAA – says otherwise.

5. The FAA's position is not only inconsistent with the express terms of its grant agreements with the City but is also an unconstitutional overreach – in violation of the separation of powers doctrine, the Spending Clause, and the Fifth and Tenth Amendments – that wrests from the City its ability to provide for the public health, safety, and welfare of its citizens, and clouds the City's fee simple title to the property comprising the Airport. Declaratory and injunctive relief from this Court is required to permit the City to dispose of the Airport as it deems appropriate.

## PARTIES

### Plaintiff

6. The City is a home rule municipality established under the Constitution and laws of the State of Colorado and is located in Boulder County, Colorado. The City is the owner and

---

[1] The City previously reported that its most recent grant agreement would expire in 2041. However, as discussed below, its most recent grant under the Airport Improvement Program was accepted in May 2020. The 2021 grant agreement executed under the Coronavirus Response and Relief Supplemental Appropriations (CRRSA) Act did not operate to extend the City's grant assurance obligations.

2

operator of the Airport and the "legal sponsor" for purposes of receiving federal assistance from the FAA under the FAA's Airport Improvement Program ("AIP").

## Defendants

7. Defendant United States of America is a sovereign nation established under the Constitution of the United States and has claimed an interest in the property comprising the Airport through its agencies and officers, including the FAA.

8. Defendant FAA is the agency of the United States responsible for the oversight of airports and the administration of the AIP, as well as certain other grants-in-aid programs previously established by the FAA and its predecessor agencies.

9. Defendant Michael G. Whitaker is the Administrator of the FAA, named in his official capacity. The Administrator is responsible for administering the AIP, including through delegated authority from the U.S. Secretary of Transportation.

## JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over the claims asserted in the First Claim for Relief pursuant to the provisions of 28 U.S.C. § 1346(f) and the Quiet Title Act, 28 U.S.C. § 2409a, under which the United States has waived sovereign immunity with respect to such claims seeking adjudication of title to real property in which the United States has claimed an interest.

11. This Court has subject matter jurisdiction over the claims asserted in the Second though Fifth Claims for Relief pursuant to the provisions of 28 U.S.C. § 1331, as the claims arise under the Constitution and laws of the United States.

12. To the extent that any of the claims or allegations asserted herein arise under the laws of the State of Colorado, this Court has supplemental jurisdiction pursuant to 28 U.S.C. § 1367(a) because such claims form part of the same case or controversy.

13. This Court may issue declaratory relief pursuant to 28 U.S.C. § 2201(a).

14. Venue is proper in this Court pursuant to 28 U.S.C. § 1391(e), in that Defendant FAA is an agency of the United States which maintains an office within this District, a substantial part of the events or omissions giving rise to this action occurred in this District, and all of the property that is the subject of this action is located in this District.

15. The City has standing because it is the fee simple owner of the property comprising the Airport in which the FAA claims a perpetual interest, and because the FAA's asserted interest intrudes on the City's sovereign authority to regulate the use of land and dispose of its property. The City has elected to forego any further federal grant funds and to bear the substantial expense of maintaining the Airport in accordance with its federal obligations on its own, in order that it may choose to close and redevelop the Airport, with or without the FAA's permission, when its most recent grant agreement expires in 2040.

16. Declaratory and injunctive relief would redress the City's injuries by enabling it to exercise its sovereign authority without federal interference and by confirming the City's authority to close and dispose of the Airport when its most recent grant agreement with the FAA expires.

**FACTUAL BACKGROUND**

17. The Airport was initially developed in the 1920s as a small, dirt landing strip known as "Hayden Field" by the Silver Wing Aircraft Company.

18. In 1943, the City purchased approximately 36 acres of the property comprising Hayden Field and renamed it the Boulder Municipal Airport.

19. Beginning in 1958, the City sought to improve the Airport by lengthening the runway and acquiring additional property to expand the Airport's facilities. The City applied for and obtained a grant from the Civil Aeronautics Administration, a predecessor agency to the FAA, under the Federal Aid to Airports Program ("FAAP") to acquire property identified as "Parcel A," as well as "clear zone easements" on each end of the Airport's runway (the "1959 Grant Agreement," attached as Exhibit 1).

20. The City acquired "Parcel A" in fee simple in 1959 for $5,000 (Exhibit 2).

21. The City acquired the "clear zone easements" by order of condemnation dated March 27, 1963 (Exhibit 3). The City paid a total of $1,000 in just compensation. The eastern clear zone easement was later extinguished due to the City's acquisition in fee simple of the property underlying the eastern clean zone easement.

22. The 1959 Grant Agreement, executed on June 3, 1959, provides that it shall "remain in force and effect throughout the useful life of the facilities developed under the Project but *in any event not to exceed twenty years from the date of said acceptance*" (emphasis added).

23. Accordingly, the 1959 Agreement expired not later than June 3, 1979.

24. In 1977, the City applied for and obtained from the FAA a grant under the Airport Development Aid Program ("ADAP") to acquire an 8.45-acre parcel for the protection of aircraft on approach to the Airport's runway (the "1977 Grant Agreement," attached as Exhibit 4).

25. The City acquired such parcel in fee simple for $120,000 (Exhibit 5).

26. The 1977 Grant Agreement, executed on September 27, 1977, provides that it shall "remain in force and effect throughout the useful life of the facilities developed under the Project but *in any event not to exceed twenty years from the date of said acceptance*" (emphasis added).

27. Accordingly, the 1977 Agreement expired not later than September 27, 1997.

28. In 1991, the City undertook a project to realign the taxiway that ran alongside the Airport's runway. The City applied for and obtained from the FAA a grant under the AIP. The grant was subsequently amended to also include the City's acquisition of a necessary "construction easement" (the "1991 Grant Agreement," attached as Exhibit 6).

29. The City acquired the construction easement, permitting the City to construct and maintain a berm on the servient estate to support a taxiway on the Airport (Exhibit 7), for $5,800.

30. By this time, the FAA had adopted standard assurances that were incorporated by reference into each grant agreement. In 1980, these assurances were "revised to provide that the 20-year limitation on the effectiveness of the assurances does not apply to those affecting the use of real property acquired with Federal funds." 45 Fed. Reg. 34,782, 34,784 (May 22, 1980). Rather, the FAA stated that the assurances set forth in future grant agreements for the acquisition of land would apply in perpetuity, unless and until released by the FAA.

31. As a result, and as further explained below, the FAA takes the position that an airport sponsor which accepted a grant for the acquisition of land after 1980 remains obligated to *operate* the airport in perpetuity, unless and until released by the FAA.

32. The 1991 Grant Agreement does not contain any durational language but incorporates by reference the AIP grant assurances promulgated by the FAA. In 1991, such grant assurances provided (as they continue to provide today):

6

> The terms, conditions and assurances of the grant agreement shall remain in full force and effect throughout the useful life of the facilities developed or equipment acquired for an airport development or noise program implementation project, or throughout the useful life of the project items installed within a facility under a noise program implementation project, but in any event not to exceed twenty (20) years from the date of acceptance of a grant offer of Federal funds for the project. However, there shall be no limit on the duration of the assurance against exclusive rights or the terms, conditions, and assurances with respect to real property acquired with Federal funds.

33. The City reasonably understood the durational language "with respect to real property acquired with Federal funds" to *not* include the acquisition of the construction easement, but rather only the acquisition of land. Indeed, to the City's knowledge, the FAA had never taken the position prior to 1991 (or any other time prior to March 2024) that the federally assisted acquisition of an easement would obligate an airport sponsor to operate an airport in perpetuity.

34. The City would not and did not agree to obligate itself to operate the Airport in perpetuity in exchange for a mere $5,800 in federal assistance to acquire the easement.

35. The City executed the 1991 Grant Agreement on September 20, 1991. Accordingly, the 1991 Grant Agreement expired not later than September 20, 2011.

36. The 1959 Grant Agreement and the 1977 Grant Agreement are the only grant agreements through which the FAA provided the City funds to acquire property to be used for airport purposes. As discussed above, the 1991 Grant Agreement related to the acquisition of an off-Airport easement, not the acquisition of real property within the meaning of the grant assurances.

37. The Airport comprises several other parcels which were acquired *without* federal assistance. The City is required by its federal grant assurance obligations to maintain and

7

periodically submit for the FAA's approval an Airport Property Map, which inventories all property comprising the Airport. The most recent FAA-approved Airport Property Map is attached as Exhibit 8, and identifies each of the above-referenced parcels as follows:

    a. The property acquired pursuant to the 1959 Grant Agreement described above is identified on the Airport Property Map as Tract 1.

    b. The western clear zone easement acquired pursuant to the 1959 Grant Agreement described above is identified on the Airport Property Map as Tract 5-I.

    c. The property acquired pursuant to the 1977 Grant Agreement described above is identified on the Airport Property Map as Tract 4-I.

    d. The construction easement acquired pursuant to the 1991 Grant Agreement described above is identified on the Airport Property Map as Tract 12.

38. The FAA claims that if *any* portion of an airport is federally obligated, then the *entire* Airport, as described on the Airport Property Map, is federally obligated.

39. Notably, the construction easement acquired pursuant to the 1991 Grant Agreement is *not* described as lying within obligated Airport property boundaries.

40. The City has continuously operated the Airport in accordance with its federal grant assurance obligations. Such obligations require the City to maintain the Airport in accordance with federal standards and, in most years, the City of Boulder has accepted federal and state grant funds to help defray the substantial cost of maintaining the Airport.

41. The last FAA grant accepted by the City is dated May 21, 2020.

42. The City's grant assurance obligations require, among other things, that the Airport remains continuously open as an airport. For as long as an airport remains grant obligated, an

airport sponsor may not close the airport unless "released" from its grant assurance obligations by the FAA. The FAA has explained that it will only consider releasing an airport sponsor from such obligations where this is a net benefit to civil aviation. The FAA has further stated that it would not consider the closure of the Airport to benefit civil aviation.

43. In anticipation of the expiration of the City's grant agreements with the FAA and, with them, the FAA's authority to approve or deny closure of the Airport, the City has stopped accepting FAA grants so as not to restart the 20-year clock on its federal grant assurance obligations. The City also stopped accepting grants from the Colorado Department of Transportation, which have similar requirements expressly limited to 20 years.

44. The City's decision to forego further federal and state grant funds has substantial financial consequences. Based on a report prepared by the City's consultant, the City believes that without any federal or state grant assistance, it may cost more than $41 million to operate and manage the Airport in accordance with the City's federal grant assurance obligations through the expiration of its most recent grant agreement with the FAA, whereas with federal and state grant assistance, the Airport would be financially self-sufficient and maintain a positive net position.

45. On December 9, 2022, the FAA issued "Change 2" to FAA Order 5190.6B, *Airport Compliance Manual*, which establishes the FAA's interpretation and administration of the federal grant assurances. Change 2 added new paragraph 4.3(a) stating, ***for the very first time***, the FAA's assertion that the acceptance of *any* ADAP or AIP grant after 1980 obligates an airport sponsor to maintain its airport in perpetuity if property had *ever* been acquired with federal assistance. In other words, Change 2 establishes the FAA's position that an airport sponsor's acceptance of any

9

modern FAA grant agreement operates to revive and retroactively modify the duration of all prior grant agreements under which land was acquired for airport purposes.

46. Change 2 is inconsistent with the City's understanding as to when its federal grant assurance obligations would expire (i.e., on May 21, 2040). Indeed, prior to Change 2, the FAA's Airport Compliance Manual provided, "In cases where land was acquired with FAAP or ADAP grants, FAA should review the language of such grants when it is necessary to determine the status of the sponsor's obligations since most FAAP land grants and some ADAP grant documents do *not* impose a perpetual obligation" (emphasis added).

47. Change 2 was issued over 25 years after the expiration of the 1977 Grant Agreement, the City's last grant agreement for the acquisition of land for airport purposes.

48. Change 2 also claimed, "The public has been on notice [of the FAA's position] since at least 1980." But the FAA's 1980 modification of the ADAP grant assurances did *not* purport to retroactively modify the duration of earlier grant agreements. At most, the FAA's 1980 modification of the ADAP grant assurances stated a policy that would apply to any future grants for the acquisition of land for airport purposes.

49. In August 2023, representatives of the City met with the FAA to discuss, among other things, the City's desire to close and repurpose the Airport. The FAA indicated that it would not be willing to release the City from its grant assurance obligations and asserted that such grant assurance obligations would apply in perpetuity.

50. On January 25, 2024, the City wrote to the FAA, asking it to clarify the basis upon which the FAA asserted the grant assurances would apply in perpetuity.

10

51. FAA responded on March 20, 2024, confirming its position that because the City had accepted an AIP grant after 1980, it was obligated to maintain the Airport in perpetuity. The FAA based its conclusion on the new language contained in Change 2.

52. The City presently faces a quandary as a result of its desire to consider closing and redeveloping the Airport and the FAA's position articulated through Change 2. In order to preserve the option of closing the Airport, the City must forego any additional federal grant assistance and continue to operate the Airport in accordance with its federal obligations, at substantial expense to the City and its taxpayers, through the expiration of the most recent FAA grant agreement in 2040. But the FAA claims that the 1959 Grant Agreement, the 1977 Grant Agreement, and the 1991 Grant Agreement not only remain in effect but will *never* expire; thus, the City may find in 2040 that despite foregoing new federal grant assistance, it remains prohibited from closing the Airport, and its expenditure of significant taxpayer dollars will have been in vain. The Court's assistance is necessary to resolve the present dispute over the duration of the 1959 Grant Agreement, the 1977 Grant Agreement, and the 1991 Grant Agreement now and avoid the potentially wasteful expenditure of taxpayer funds.

### FIRST CLAIM FOR RELIEF
### (Quiet Title Action Under 28 U.S.C. § 2409a)

53. The allegations set forth in paragraphs 1 through 52 above are fully incorporated herein by reference and made part of this First Claim for Relief.

54. The City is the owner in fee simple of the property comprising the Airport, including those tracts acquired with federal assistance from the FAA and its predecessor agencies.

55. Through the FAA, the United States claims a perpetual interest in the property comprising the Airport. Specifically, the FAA claims that the assurances set forth in the 1959

Grant Agreement, the 1977 Grant Agreement, and the 1991 Grant Agreement apply in perpetuity. The FAA further claims that such assurances require the City to continue operating the Airport as an airport, unless and until the FAA releases the City from such obligation.

56. The FAA's asserted interest constitutes a clear and substantial cloud on the City's legal title to the property comprising the Airport. Unless otherwise permitted by the FAA, the City is forever prohibited from selling the property comprising the Airport or using any portion of Airport property for other than airport purposes.

57. The FAA's asserted interest is in conflict with the plain language of the 1959 Grant Agreement and 1977 Grant Agreement, each of which *expressly* expired after 20 years.

58. The 1991 Grant Agreement also expired after 20 years because the durational language regarding acquisitions of "real property" did not apply to the acquisition of an off-Airport construction easement for $5,800.

59. Insofar as the FAA attempts to retroactively impose an obligation to continue operating the Airport as an airport in perpetuity through the 1959 Grant Agreement, the 1977 Grant Agreement, and/or the 1991 Grant Agreement, the FAA's asserted interest violates the Separation of Powers doctrine and the Spending Clause of the U.S. Constitution.

60. Prior to issuing Change 2 to the Airport Compliance Manual in 2022, the FAA had never asserted that the acceptance of an ADAP or AIP grant after 1980 operated to retroactively extend the duration of a prior grant for the acquisition of real property in perpetuity. Indeed, prior to Change 2, the FAA clearly believed that "most FAAP land grants and some ADAP grant documents do *not* impose a perpetual obligation." FAA Order 5190.6B, Change 1 ¶ 4.3.

12

61. Prior to the FAA's March 2024 letter, the FAA had never asserted that the City's acquisition of a mere construction easement with federal assistance would obligate the City to operate the Airport in perpetuity, and the City did not understand the 1991 Grant Agreement to have such effect (and it did not have such effect). The FAA has routinely approved documents indicating the construction easement is not even considered part of the obligated Airport property.

62. The FAA's asserted interest places the City's fee simple title to the property comprising the Airport in dispute, and does not "peaceably coexist" with the City's present intention and course of action to preserve its authority to close the Airport.

63. The City requests that the Court quiet title in the property comprising the Airport by declaring that the 1959 Grant Agreement, 1977 Grant Agreement, and 1991 Grant Agreement have each expired, and the FAA has no continuing interest in the Airport thereunder.

## SECOND CLAIM FOR RELIEF
### (Violation of the U.S. Constitution; Separation of Powers Doctrine)

64. The allegations set forth in paragraphs 1 through 63 above are fully incorporated herein by reference and made part of this Second Claim for Relief.

65. Under the U.S. Constitution, "Congress may attach conditions on the receipt of federal funds and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon compliance by the recipient with federal statutory and administrative directives.'" *South Dakota v. Dole*, 483 U.S. 203, 206-07 (1987).

66. However, a federal agency "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986).

67. In authorizing the FAAP, ADAP, and AIP programs, under which the 1959 Grant Agreement, 1977 Grant Agreement, and 1991 Grant Agreement were respectively awarded,

Congress did not expressly authorize the FAA to impose otherwise statutorily mandated grant conditions in perpetuity with respect to land acquisitions.  Indeed, the authorizing statutes for these programs are *completely silent* as to the duration of grant agreements issued thereunder.

68. Congress did not (and could not) delegate such sweeping policymaking authority to the FAA through its silence.  As evidenced by the present controversy involving the future of the Airport, the imposition of a *permanent and irrevocable* commitment to continue operating an airport within a municipality carries significant political and economic consequences, such that Congress must "clearly" confer such authority on the FAA.  And it did not.

69. In the absence of any express or implied authority to impose the statutorily mandated grant assurances in perpetuity, the City requests that the Court declare the FAA's *ultra vires* policy with respect to the duration of grant agreements for the acquisition of land to be unconstitutional under the Separation of Powers doctrine.

**THIRD CLAIM FOR RELIEF**
**(Violation of the U.S. Constitution; Spending Clause)**

70. The allegations set forth in paragraphs 1 through 69 above are fully incorporated herein by reference and made part of this Third Claim for Relief.

71. Even where Congress lawfully delegates authority to a federal agency to impose further funding conditions, the range of permissible conditions is not unlimited.  Chief among such constitutional constraints is the requirement that funding conditions be clear and unambiguous, such that a grantee must "voluntarily and knowingly accept[] the terms of the 'contract.'" *Pennhurst State Sch. and Hosp. v. Halderman*, 451 U.S. 1 (1981).

72. The FAA's imposition of retroactive conditions necessarily violates this constitutional principle.  The City did not and could not know that by executing a grant agreement

14

for the acquisition of property in 1957, 1977, and 1991, the FAA would later assert that the City was obligated to continue operating the Airport in perpetuity.

73.     The 1959 Grant Agreement and the 1977 Grant Agreement were expressly limited to a maximum term of 20 years.  Contrary to the FAA's assertion in Change 2, the FAA's 1980 change to the standard grant assurances did not put airport sponsors on notice that the acceptance of any further grants would extend prior grant agreements for the acquisition of land in perpetuity.

74.     Although the 1991 Grant Agreement incorporated the FAA's standard grant language providing that grants for the acquisition of land were not subject to the typical 20-year term, the FAA's contemporaneous guidance referred to the perpetual obligation as only applying to the acquisition of *land*, which the City understood not to apply to the acquisition of an easement.  Indeed, prior to the FAA's March 20, 2024 letter, the agency had never claimed that the acquisition of an easement would alone obligate an airport sponsor to operate an airport in perpetuity.

75.     Moreover, the FAA did not appear to believe that the 1991 Grant Agreement obligated the City to operate the Airport in perpetuity.  The City was regularly required to submit for the FAA's approval an "Airport Property Map," which describes all of the property comprising the Airport.  Over the years, the FAA-approved Airport Property Maps have never depicted the construction easement as constituting Airport property.  Moreover, the FAA's position that grant agreements do not expire with respect to the acquisition of property is based on the notion that underlying land "always has had an unlimited useful life," which cannot be said of an easement to construct and maintain a berm; rather, its useful life expires when the berm is no longer needed to support Airport operations because the Airport has closed.

76. The City's inability to "knowingly accept" the conditions that the FAA now seeks to impose renders the FAA's position constitutionally invalid.

## FOURTH CLAIM FOR RELIEF
### (Violation of the U.S. Constitution; Anticommandeering Doctrine)

77. The allegations set forth in paragraphs 1 through 76 above are fully incorporated herein by reference and made part of this Fourth Claim for Relief.

78. Congress' legislative authority is limited to those enumerated powers set forth in the U.S. Constitution. Under the Tenth Amendment to the U.S. Constitution, all other legislative powers are reserved to the States or the people. The anti-commandeering doctrine protects this system of dual federalism by prohibiting the federal government from commandeering or otherwise requiring state or local governments to implement a federal program.

79. By asserting a perpetual interest which allows it to forever control the disposition of all property comprising the Airport, the FAA has effectively commandeered the City to continue operating the Airport for as long as the FAA – and only the FAA – determines appropriate.

80. The FAA's asserted interest violates the basic principle that the United States may not compel the City to administer a federal regulatory program and violates the Tenth Amendment rights of the City and its citizens. Indeed, as a result of the City's decision to accept federal funds *over thirty years ago*, the FAA now claims that the City is *forever* obligated to maintain the Airport, regardless of the present or future desires of the City or its citizens. Such a policy impermissibly strips from the City the fundamental right to regulate the use of its public property.

81. Moreover, the FAA's policy goes far beyond that which is necessary to protect its prior federal investment in property. Statutory provisions provide – and the City does not dispute

16

– that the City must reimburse the FAA for its proportional share of any property acquired with federal assistance in the event that it is no longer used for airport purposes.

82. By using the AIP to commandeer the City's sovereign authority over the use and disposition of its property *in perpetuity*, the FAA goes well beyond Congress' enumerated powers in violation of the Tenth Amendment.

### FIFTH CLAIM FOR RELIEF
### (Violation of the U.S. Constitution; Due Process Clause)

83. The allegations set forth in paragraphs 1 through 82 above are fully incorporated herein by reference and made part of this Fifth Claim for Relief.

84. The Fifth Amendment to the U.S. Constitution provides that "[n]o person shall be . . . deprived of life, liberty, or property without due process of law."

85. The City has an established and protected property interest in the property comprising the Airport, which it has at all times owned in fee simple.

86. By asserting a perpetual interest which allows it to control the disposition of all property comprising the Airport, the FAA has unlawfully deprived the City of its fee simple ownership in violation of the Due Process Clause.

87. The City also has a protected property interest in the terms of the 1959 Grant Agreement, the 1977 Grant Agreement, and the 1991 Grant Agreement, all of which expired not later than 20 years after their execution. The FAA's attempt to retroactively extend the duration of these agreements impairs the City's rights thereunder in violation of the Due Process clause.

## PRAYER FOR RELIEF

WHEREFORE, the City requests that the Court:

a. Declare the 1959 Grant Agreement, the 1977 Grant Agreement, and the 1991 Grant Agreement to have each expired and to be of no further force and effect;

b. Declare that the City is not obligated to keep the Airport open after the expiration of its last grant agreement with the FAA on May 21, 2040;

c. As applied to the City, declare the FAA's position described in in Paragraph 4.3(a) of Change 2 and the March 20, 2024 letter regarding the perpetual duration of the 1959 Grant Agreement, the 1977 Grant Agreement, and the 1991 Grant Agreement unconstitutional, in violation of the Separation of Powers doctrine;

d. As applied to the City, declare the FAA's position described in Paragraph 4.3(a) of Change 2 and the March 20, 2024, letter regarding the retroactive extension of the 1959 Grant Agreement, the 1977 Grant Agreement, and the 1991 Grant Agreement, by virtue of having accepted subsequent AIP grants, in excess of the FAA's statutory authority and unconstitutional, in violation of the Spending Clause and the Fifth and Tenth Amendments to the U.S. Constitution;

e. Enjoin the Defendants from taking any action to enforce the 1959 Grant Agreement, the 1977 Grant Agreement, and/or the 1991 Grant Agreement, or otherwise prevent the City from exercising its right to close the Airport after its obligations under later grant agreements expire;

f. Award the City the costs of this action and reasonable attorney's fees; and

g. Award such other and further relief as the Court determines is just and proper.

Respectfully submitted this 26th day of July, 2024, in Denver, Colorado.

By: */s/ Steven L. Osit*
Steven L. Osit
sosit@kaplankirsch.com
W. Eric Pilsk
epilsk@kaplankirsch.com
Samantha R. Caravello
scaravello@kaplankirsch.com
M. Riley Scott
rscott@kaplankirsch.com
KAPLAN KIRSCH LLP
1675 Broadway, Suite 2300
Denver, Colorado  80202
(303) 825-7000

*Attorneys for City of Boulder*