# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-02057-NYW-MEH

CITY OF BOULDER, a home rule municipality established under the Constitution and laws of the State of Colorado,

      Plaintiff,

v.

UNITED STATES OF AMERICA,
FEDERAL AVIATION ADMINISTRATION, an agency of the U.S. Department of Transportation, and
MICHAEL G. WHITAKER, in his official capacity as Administrator of the Federal Aviation Administration,

      Defendants.

---

## DEFENDANTS' MOTION TO DISMISS

---

MATTHEW T. KIRSCH
Acting United States Attorney

By: Thomas A. Isler
Assistant United States Attorney
1801 California Street, Ste. 1600
Denver, Colorado 80202
Telephone: (303) 454-0336
Email: thomas.isler@usdoj.gov
*Counsel for Defendants*

## TABLE OF CONTENTS

INTRODUCTION ................................................................................................. 3

BACKGROUND .............................................................................................. 6

ARGUMENT ................................................................................................... 10

I.    The Court should dismiss the Quiet Title Act claim (Claim 1). ............................ 10

    A.  The City does not allege facts showing that the United States has
    a property interest in the airport or that it disputes the City's title. .......... 11

    B.  The City's claim is also barred by the QTA's statute of limitations. ........ 12

II.   Threshold issues of timeliness, claim accrual, jurisdiction, and ripeness
prevent adjudication of the City's constitutional challenges. ............................ 16

    A.  The City's constitutional claims are time-barred. .................................. 16

    B.  In the alternative, to the extent the City is concerned about
    some future injury, its claims have not yet accrued. ............................. 17

    C.  The Court lacks jurisdiction over the City's claims. ............................... 18

    D.  The City's claims are not prudentially ripe. ........................................... 21

III.  The City fails to state a claim for a constitutional violation. .............................. 25

    A.    The City does not plead a separation-of-powers violation (Claim 2). ..... 25

    B.    The City fails to plead a Spending Clause violation (Claim 3). .............. 29

    C.    The City fails to plead a Tenth Amendment violation (Claim 4). ............ 32

    D.    The City fails to plead a due process violation (Claim 5). ...................... 35

CONCLUSION .............................................................................................. 37

Defendants move to dismiss the Complaint, ECF No. 1 (filed 7/26/24), pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).[1]

## INTRODUCTION

In this action, the City of Boulder ("City") seeks to enjoin the Federal Aviation Administration ("FAA") from exercising regulatory authority, at some potential point in the future, to enforce various grant agreements the City executed in 1959, 1977, and 1991 to obtain federal funding for the Boulder Municipal Airport. The City, which is the sponsor of the airport, seeks a declaration that if it wishes to close the airport at some point after 2040, it need not seek the FAA's approval to do so. *See* ECF No. 1 at 18 (seeking a declaration "that the City is not obligated to keep the Airport open after the expiration of the last grant agreement with the FAA on May 21, 2040," and seeking to "[e]njoin the Defendants from taking any action to enforce" the grant agreements "or otherwise prevent the City from exercising its right to close the Airport").

The grant agreements at issue are decades old.  Most recently, in 1991, the FAA approved a grant for the City to relocate a taxiway closer to the airport's boundary and acquire a permanent easement from private citizens on adjacent property to build an embankment to support the relocated taxiway. When the City accepted the grant to acquire that property right, it also accepted certain conditions that require the City to seek FAA approval before closing the airport. The City agreed, among other things, that: (1) it would not cause or permit any activity or action on the airport property that

---

[1]  Undersigned counsel conferred with the City's counsel regarding the defenses presented in this motion while preparing the proposed scheduling order and again via telephone on October 31, 2024. The City opposes this motion.

would interfere with its use for airport purposes; (2) it would not sell, lease, or dispose of any airport property without FAA approval; (3) it would make arrangements for the operation of the airport's aeronautical facilities whenever required; and (4) if it made a change that adversely affected the safety, utility, or efficiency of the property, the City could be forced to eliminate that adverse effect. Under the terms of the 1991 grant agreement, because the City used federal funds to acquire real property—the permanent easement to support the taxiway—these conditions had no durational limit.

The City concedes that it is obligated to operate the airport until the year 2040, based on the terms of a fourth grant agreement it executed in 2020. Whether the City *will* seek to close the airport in 2040 has not been decided and is subject to change. But the City seeks a judicial declaration that if it does choose to close the airport in 2040 or later, it may do so without seeking FAA approval for the airport closure.

The City brings a claim under the Quiet Title Act, alleging that the FAA is claiming an "interest in the property comprising the Airport" and thus improperly creating a "cloud on the City's legal title to the property . . . ."  ECF No. 1 ¶¶ 55-56. The City also brings four constitutional claims on the ground that the terms to which it agreed in the 1991 grant agreement (and earlier agreements) were unlawful or will be unlawful if the FAA must approve the closure of the airport in or after 2040.

The Court should dismiss the Complaint. First, the Court lacks jurisdiction over the Quiet Title Act claim because the City does not allege facts showing that the United States has any property interest in the airport or that there is a dispute of title between the City and the United States. The dispute here is about the FAA's regulatory authority

over any airport closure, not who is the true owner of title to the property. Further, even if a dispute of title existed, the claim is barred by the 12-year statute of limitations.

Second, the City's remaining claims fail for several threshold reasons. To the extent the claims challenge the 1991 or earlier agreements, the claims are time-barred under the six-year statute of limitations in 28 U.S.C. § 2401(a). Alternatively, to the extent the City is concerned about a future injury if it later decides to close the airport, the claims have not yet accrued because the City has yet to suffer an injury in the form of an adverse action by the FAA, and the Court also lacks jurisdiction over such claims because the City lacks standing (no injury in fact that is redressable). And even if the City had standing to assert some claim that accrued within the last six years, the Court should decline to adjudicate the claims under the doctrine of prudential ripeness, as the issues that the City seeks to resolve simply may never arise. The Court is not required to opine on these complex constitutional issues when the City's claims are speculative.

Third, the City's constitutional theories lack merit. The conditions attached to the 1991 grant agreement did not violate the separation of powers because Congress authorized the FAA to issue airport improvement grants and to develop terms or conditions for recipients. The FAA did not violate the Spending Clause when it placed conditions on the grant of federal funds requiring the City to maintain airport operations because the grant supported the general welfare and the assurances in the grant agreement were unambiguous, ratified by the City, in furtherance of federal interests, and not otherwise unconstitutional. The grant conditions do not run afoul of the Tenth Amendment's anti-commandeering principle because the City could have refused to

accept the federal funds if it did not like the conditions, but it did not. And the City fails to state a due process violation because the United States has not deprived the City of a protected property interest. Rather, in exchange for federal funding, the City knowingly agreed to use the property comprising the airport as an airport, subject to the FAA's authority over airport closures. The Court should dismiss the Complaint.

## BACKGROUND[2]

The Federal Aviation Act of 1958, as amended, gives the FAA Administrator plenary authority for the regulation of air commerce in the interests of safety, security, and development of civil aeronautics. 49 U.S.C. §§ 40101, *et seq.* Congress charged the FAA with funding airport development through grants. *Id.* § 47107. The approval of grant applications is conditioned on the receipt of written assurances from airport sponsors regarding airport operations, and the FAA has a statutory mandate to ensure airport operators comply with federal grant assurances. *Id.* §§ 47107(a), 47122.

The City has operated the Boulder Municipal Airport for 80 years and is its "sponsor" for purposes of federal grants. ECF No. 1 ¶¶ 6, 18. Over the years, the City has obtained federal grants to build and improve the airport. *See id.* ¶¶ 19, 24, 28, 41.

In 1991, the FAA awarded the City a grant through the FAA's Airport Improvement Program ("AIP") of nearly $700,000. ECF No. 1-6 at 8 (Amendment 1 to the 1991 grant agreement). One purpose of the grant was to fund the relocation of the taxiway closer to the existing property line and enable the City to acquire a permanent

---

[2] The facts set forth below are drawn from the Complaint, attachments, and documents incorporated into the Complaint.

easement from an adjacent landowner to build an embankment to support activity on the relocated taxiway. ECF No. 1 ¶¶ 6, 28-29; ECF No. 1-6 at 8; ECF No. 1-7 at 1 ("easement for the installation, construction, repair, maintenance, and reconstruction of a berm with a mass and slope adequate to provide lateral and subjacent support of an airplane taxiway," running "in perpetuity"). The City acquired the permanent easement from private landowners using 1991 grant money.[3] ECF No. 1-7 at 1; ECF No. 1 ¶¶ 28-29.

In connection with the 1991 grant, the City executed a grant agreement that included certain obligations to operate the airport, which the FAA refers to as "assurances." ECF No. 1 ¶¶ 30, 42; ECF No. 1-6 at 8-17. Among other things, the City accepted that it would "not cause or permit any activity or action thereon [the airport and all facilities] which would interfere with its use for airport purposes." *See* **Exhibit 1** at 9 ¶ B.19.a.[4] The City also accepted an obligation not to sell, lease, transfer, or dispose "of any part of its title or other interests in the property shown on Exhibit A to this application . . . for the duration of the terms, conditions, and assurances in the grant agreement without approval by the Secretary." Ex. 1 at 4-5 ¶ B.5.b. And if changes to

---

[3] Some allegations and documents refer to this easement as a "construction easement," *see* ECF No. 1 ¶¶ 28-29; ECF No. 1-6 at 10, 20, but its purpose was not to facilitate or permit construction vehicle access for the taxiway project. Rather, the Grant of Easement specifies that the easement was intended to be filled with material to support the taxiway. ECF No. 1-7 at 1.

[4] The Court may consider the grant agreement's assurances on a motion to dismiss, without converting the motion to one for summary judgment, because the assurances are incorporated into the grant application and grant agreement, which are central to, and attached to, the Complaint. *See Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009). The assurances also are referenced in the Complaint, central to the claims, and of undisputed authenticity. *See, e.g.*, ECF No. 1 ¶¶ 30, 32, 36, 37, 42, 43, 55, 73.

the airport adversely affected the safety, utility, or efficiency of the airport, the FAA could require the City to eliminate the adverse effect. *Id.* at 13-14 ¶ B.29.a-b. The 1991 grant agreement specified that "there shall be no limit on the duration of the . . . assurances with respect to real property acquired with Federal funds." *Id.* at 1 ¶ B.1.

In connection with the 1991 grant, the City acknowledged that it was acquiring real property. The City executed a "Sponsor Certification for Real Property Acquisition." ECF No. 1-6 at 15-16. In that document, the City made several representations recognizing that it was making an "acquisition of property interest." *Id.* at 15 ¶ 5; *see also id.* at 16 ¶ 7 ("Appraisals (include) (will include) valuation data to estimate the current market value for the property interest acquired on each parcel"), ¶ 9 ("A written offer to acquire each parcel (was) (will be) presented to the property owner"); ¶ 10 ("Effort (was) (will be) made to acquire each property through negotiation").

As a result of the 1991 grant agreement, the City must seek FAA review of any plan it may make in the future to shut down the airport.[5] This obligation is confirmed in the "FAA Airport Compliance Manual" (the "Manual"), cited in the Complaint. ECF No. 1 at 9 ¶¶ 45-48 & p. 18. Specifically, in FAA Order 5190.6B (2009), the FAA consolidated "guidance to FAA personnel on interpreting and administering the various commitments airport sponsors make to the U.S. Government when they accept grants of federal funds

---

[5]  The City's Complaint attaches two other grant agreements, from 1959 and 1977, which were used to acquire real property. ECF Nos. 1-1, 1-4. But, as Defendants will explain, the Court need not interpret the 1959 or 1977 grant agreements, because the City's claims succeed or fail based on the 1991 grant agreement alone. For that reason, Defendants omit discussion of those grants for purposes of this motion only.

or federal property for airport purposes."[6] **Exhibit 2** at 1. The Manual describes

mechanisms through which an airport sponsor may seek (1) release from an individual

federal obligation in regard to real property acquired with federal grant assistance, *see*

*id.* at 23 § 22.18, or (2) release from all federal obligations for the purpose of

abandoning or disposing of an entire airport, *id.* at 25-33 §§ 22.20-22.33.[7] The Manual

stated that "under AIP grants, the duration of the terms, conditions, and assurances do

not expire with respect to real property acquired with federal funds (land *and*

*appurtenances*, when applicable) . . . ." Ex. 2 at 6 § 4.6(h)(1) (emphasis added).

General obligations to operate the airport are also reflected in statutes. *See, e.g.*, 49

U.S.C. § 47107(a)(1), (a)(8), (a)(11), (a)(16)(C)-(D), (b)(1), (d).

      The AIP grant assurances thus ensure that an airport sponsor that acquired real

property with federal funds (such as the City here) must obtain FAA review of any plan

to shut down the airport. The FAA's review of a request to shut down an airport is a final

agency action that is subject to judicial review in the court of appeals. *See* 49 U.S.C.

---

[6]  The Court may consider provisions of the Manual on a motion to dismiss, as a public document whose authenticity cannot reasonably be challenged, and its contents may be accurately and readily determined from sources whose accuracy cannot reasonably be questioned. Fed. R. Evid. 201(b); *Winzler v. Toyota Motor Sales U.S.A., Inc.*, 681 F.3d 1208, 1212-13 (10th Cir. 2012); *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006). Plaintiff cites to and relies on an amended version of the Manual in the Complaint, references what a "prior" version stated, and directly seeks relief related to its provisions. *See* ECF No. 1 ¶¶ 45-48, 60, & p. 18 ¶¶ c-d. The 2009 Manual is publicly available from the FAA's website at https://www.faa.gov/documentlibrary/media/order/5190_6b.pdf (last visited Nov. 1, 2024), with excerpts attached as **Exhibit 2.**
[7]  The release mechanisms remain in Chapter 22 of the current version of the Manual, which is available at https://www.faa.gov/documentLibrary/media/Order/Order_5190.6B_Compliance_Chg3.pdf (last visited Nov. 1, 2024), excerpted in **Exhibit 3.**

§ 46110(a).[8]

The City last accepted an AIP grant from the FAA in 2020. ECF No. 1 ¶ 41. The
City acknowledges that the 2020 grant agreement obligates it to operate the airport for
twenty years, through 2040. ECF No. 1 ¶¶ 3 & n.1 & 15. The City is not seeking to close
the airport now. Nor has it decided to close the airport after 2040. Rather, it alleges that
it "is considering the closure and redevelopment of the Airport" and "may choose to
close and redevelop the Airport, with or without the FAA's permission, when its most
recent grant agreement expires in 2040." *Id.* ¶¶ 1, 15.

## ARGUMENT

## I.    The Court should dismiss the Quiet Title Act claim (Claim 1).

The City seeks to quiet title against the United States. ECF No. 1 ¶¶ 54-63. The
City claims that the FAA, by claiming that the grant assurances give it the regulatory
authority to review any proposed airport closure, amount to a claim of a property
interest. *See, e.g.*, *id.* ¶ 55. But the FAA's regulatory or contractual authority over the
airport does not give the FAA a property interest in the airport. The claim should be
dismissed for lack of jurisdiction and because it is barred by the statute of limitations.

The Quiet Title Act ("QTA") may be used "to adjudicate a disputed title to real
property in which the United States claims an interest, other than a security interest or

---

[8] "[A] person disclosing a substantial interest in an order issued by" the FAA may file "a
petition for review in the United States Court of Appeals for the District of Columbia
Circuit or in the court of appeals of the United States for the circuit in which the person
resides or has its principal place of business." 49 U.S.C. § 46110(a). To the extent the
City contends that the March 2024 letter, *see, e.g.*, ECF No. 1 ¶ 51, constitutes a final
agency action, the Court is divested of jurisdiction under § 46110(a).

water rights." 28 U.S.C. § 2409a(a); *see* 28 U.S.C. § 1346(f) (waiving sovereign

immunity for claims "under section 2409a"). "[F]or a court to have jurisdiction over a

QTA claim, the plaintiff must establish that: (1) the United States 'claims an interest' in

the property at issue; and (2) title to the property is 'disputed.'" *Kane County v. United*

*States*, 772 F.3d 1205, 1210-11 (10th Cir. 2014), *abrogated on other grounds*, *Wilkins v.*

*United States*, 598 U.S. 152 (2023). "Courts have typically equated the requirement of a

disputed title with disputed ownership." *McMaster v. United States*, 177 F.3d 936, 941

(11th Cir. 1999) (quotation marks omitted). Thus, "the words of the statute 'permit

adjudications only when the title or ownership of real property is in doubt' as between

the plaintiff and the United States." *Id.* (quoting *Cadorette v. United States*, 988 F.2d

215, 223 (1st Cir. 1993) (Breyer, J.)). The QTA is not implicated when a "'dispute

between the parties concerns the terms of a[n] ... agreement which does not call into

question the ownership of real property' vis-a-vis the two parties." *See id.* at 942.

### A.    The City does not allege facts showing that the United States has a property interest in the airport or that it disputes the City's title.

*No property interest.* The City does not plead facts showing that the United

States has a *property* interest in the land comprising the airport. The City alleges that its

"title" is clouded, in its view, because it is not free to use the land as an unregulated fee-

simple owner would. *See* ECF No. 1 ¶¶ 15, 56, 62. But the FAA's regulation of the

airport is not a property interest. A QTA claim is only for contests between parties that

claim competing property interests. *See Match-E-Be-Nash-She-Wish Band of*

*Pottawatomi Indians v. Patchak,* 567 U.S. 209, 218 (2012) (explaining that because

"quiet title" actions are between parties that claim a property interest in the property, the

QTA "cannot come into play" if the plaintiff has no claimed property interest). The QTA is not an appropriate vehicle to challenge a federal agency's regulatory authority. *See Sch. Bd. of Avoyelles Parish v. U.S. Dep't of Interior*, 647 F.3d 570, 580 (5th Cir. 2011) ("Nothing in the text of the QTA suggests that it authorizes a suit to collaterally challenge a permit issued by a federal agency."). Without alleging facts showing that the United States has a property interest in the airport land, Plaintiff fails to plead a QTA claim.

*No dispute of title.* Even assuming that the United States's regulatory authority over the airport could be viewed as a property interest in the airport, the City does not allege a dispute of *title* within the meaning of the QTA. The City does not allege an unresolved dispute of *ownership* between the City and the United States with respect to any airport property. Because the ownership of real property is not disputed by the United States, the Court lacks jurisdiction over the claim. *See, e.g.*, *Kane County*, 772 F.3d at 1212-13 (the absence of a dispute of title deprives the court of jurisdiction).

  **B. The City's claim is also barred by the QTA's statute of limitations.**

Even if the Court were to determine that the City has stated a QTA claim, it should dismiss the claim as barred by the QTA's 12-year statute of limitations. While the QTA's statute of limitations is a non-jurisdictional claims-processing rule, *Wilkins*, 598 U.S. at 165, a court can dismiss a time-barred claim under Rule 12(b)(6) when the complaint "suffice[s] to establish that ground . . . ." *Jones v. Bock*, 549 U.S. 199, 215 (2007).

An action under the QTA "shall be barred unless it is commenced within twelve

years of the date upon which it accrued," that is, from "the date the plaintiff or his predecessor interest knew or should have known of the claim of the United States." 28 U.S.C. § 2409a(g). "'Knowledge of the claim's full contours is not required. All that is necessary is a reasonable awareness that the Government claims *some* interest adverse to the plaintiff's.'" *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 599 F.3d 1165, 1176 (10th Cir. 2010); *see also Vincent Murphy Chevrolet Co., Inc. v. United States*, 766 F.2d 449, 452 (10th Cir. 1985) (same). "'[S]imply put, the limitations period is triggered when a landowner has reason to know that the government claims some type of adverse interest in that land,'" *Rio Grande*, 599 F.3d at 1177, and the statute does not require that the "government *acts* adversely" to the plaintiff's interests. *George v. United States*, 672 F.3d 942, 947 (10th Cir. 2012); *see also, e.g., Vincent Murphy*, 766 F.2d at 450-52 (holding the QTA's statute of limitations began to run once the plaintiffs learned of terms contained in a quitclaim deed that limited the land's use).

Here, the adverse interest of the United States was included in the 1991 grant assurances. The City acknowledged that it would not interfere with airport activities; that it would arrange for operating the aeronautical facilities whenever required; and that it would not sell or dispose of airport property without FAA approval. *See, e.g.*, Ex. 1 at 4-5 ¶ B.5.b, 9 ¶ B.19.a(1), 13-14 ¶¶ B.29(a)-(b). ECF No. 1-6 at 1 § 18 (acknowledgment). The assurances stated that "there shall be no limit on the duration of the . . . assurances with respect to real property acquired with Federal funds," Ex. 1 at 1 ¶ B.1, and the City acquired real property with federal funds. In short, the assurances provided for the FAA's pervasive supervision of the airport and limited the City's autonomy to make

changes. The City had reasonable awareness in 1991 of all these conditions.

The City contends that it could not have known of the United States' adverse interest in 1991 because the permanent easement was not "real property acquired with Federal funds," so it had no reason to believe that any 1991 grant assurances would survive after twenty years. *See* ECF No. 1 ¶ 74; Ex. 1 at 1 ¶ B.1. But the City's position is not supported by the Complaint.

In connection with the 1991 project application, the City certified that it was acquiring real property, even though the 1991 grant did not involve the acquisition of fee simple interest in any land. The City signed a "Sponsor Certification for Real Property Acquisition." *See* ECF No. 1-6 at 15-16 ¶¶ 5, 7, 9-10. The City certified, among other things: (1) that it had or would make a written offer to "acquire each parcel" "to the property owner"; (2) that effort had been made to "acquire each property through negotiation"; and (3) that it was making an "acquisition of property interest in noise sensitive approach zones and related areas." *Id.* at 15-16 ¶¶ 5, 9-10. The certification further referenced "[g]eneral requirements on real property acquisition and relocation assistance," in "49 CFR 24." *Id.* at 15. Those regulations, which implemented the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970, 42 U.S.C. § 4601, *et seq.*, governed the acquisition of "real property" and covered both fee interests and "[l]ess-than-full-fee interest[s] in real property," such as "*permanent . . . easements.*" *See* 49 C.F.R. § 24.101(b) & (c)(1) (emphasis added); *see also* 54 Fed. Reg. 8912-01, 8933, 1989 WL 295962 (Mar. 2, 1989) (codified at the time as § 24.101(b) and referencing "permanent easements"). The City knew or should have

known that it acquired real property and the assurances did not sunset.

Colorado law has long recognized easements as real property interests. *See*
*Upper Harmony Ditch Co. v. Carwin*, 539 P.2d 1282, 1285 (Colo. 1975) ("Here, we have
an easement which is a separate interest in real property."); *De Reus v. Peck*, 162 P.2d
404, 406 (Colo. 1945) (an easement is "an interest in land"); *Wanamaker Ditch Co. v.
Reno*, 244 P. 602, 603 (Colo. 1926) ("a water right is real property, and in the nature of
an easement"); *Kinscherff v. United States*, 586 F.2d 159, 161 (10th Cir. 1978)
("Easements are real property interests"). The City acquired an easement to construct
an embankment to support the taxiway. In doing so, the City acquired real property.

In sum, assuming that the City has pleaded a QTA claim, it accrued in 1991,
because the City was reasonably aware of the United States' adverse interest, and it
acknowledged that it acquired real property with federal funds, such that the assurances
did not expire. *See* Ex. 1 at 1 ¶ B.1, 4-5 ¶ B.5.b, 9 ¶¶ B.19.a & a(1), 13-14 ¶¶ B.29.a-b.
Because the City did not bring suit within 12 years, the QTA claim is time-barred.[9]

---

[9]  Even measuring from as late as 2009, the QTA claim is time-barred. The requirement
that property be used for its authorized purpose until no longer needed has been a
regulatory requirement since at least 1974. *See* 39 Fed. Reg. 19348, 19357 (May 31,
1974) (App. L §§ 2.a & 3a, defining real property to include "appurtenances" and stating
that the "grantee shall use the real property for the authorized purpose of the original
grant as long as needed"). The FAA reiterated its claim in 2009 that AIP grant
obligations do not expire with respect to easements ("appurtenances") acquired with
federal funds. *See* Ex. 2 at 6 § 4.6(h)(1) ("[U]nder AIP grants, the duration of the terms,
conditions, and assurances do not expire with respect to real property acquired with
federal funds (land *and appurtenances*, when applicable)") (emphasis added). Thus, the
QTA claim is barred, even if measured from 2009.

II.    **Threshold issues of timeliness, claim accrual, jurisdiction, and ripeness
prevent adjudication of the City's constitutional challenges.**

A.    **The City's constitutional claims are time-barred.**

No action may be commenced against the United States "unless the complaint is
filed within six years after the right of action first accrues." 28 U.S.C. § 2401(a). A right
of action accrues "'when the plaintiff has a complete and present cause of action'"—*i.e.*,
"'when a suit may be maintained thereon.'" *Corner Post, Inc. v. Bd. of Governors of Fed.
Rsrv. Sys.,* 144 S. Ct. 2440, 2451 (2024). When a "'plaintiff's injury is definite and
discoverable and nothing prevented plaintiff from coming forward to seek redress,'" *Ute
Distrib. Corp. v. Sec'y of Interior*, 584 F.3d 1275, 1283 (10th Cir. 2009), the plaintiff's
claim is actionable.

To the extent the City is claiming that it has a right to challenge the 1991
conditions today, the City had the same right in 1991, and its constitutional claims
accrued then for the same reasons that the QTA claim did. *See supra* Part I.B. The
1991 grant assurances stated that there would be no limit on the duration of assurances
with respect to real property acquired with federal funds, and the City acquired real
property with federal funds in the form of the permanent easement.

Even assuming for the sake of argument the claims did not accrue in 1991, they
accrued *no later* than 2009, when the FAA reiterated that AIP grant assurances did not
expire with respect to easements acquired with federal funds. Ex. 2 at 6 § 4.6(h)(1)
("[U]nder AIP grants, . . . assurances do not expire with respect to real property
acquired with federal funds (land *and appurtenances*, when applicable)") (emphasis
added); *see also* 39 Fed. Reg. at 19357 (including appurtenances in the definition of

"real property"). In addition, the Manual explained that all property listed on "an airport property map, commonly referred to as Exhibit 'A,'" *id.* at 9 § 7.19, is federally "obligated, regardless of how it was acquired or its purpose," *id.* at 11 § 22.4.b(1); *see also id.* at 19 § 22.16, and that a request to abandon, sell, or dispose of the airport must be approved by the FAA, *id.* at 11 § 22.4.a; *see also id.* at 8 § 6.11(g)(3) (the Airport Property Map identifies "grant obligated land"). Here, the City's map shows the 1991 easement as part of the obligated airport. ECF No. 1-8 ("Tract 12"). If the City has constitutional claims today, it had them no later than 2009, and the claims are barred by 28 U.S.C. § 2401(a).

**B.    In the alternative, to the extent the City is concerned about some future injury, its claims have not yet accrued.**

To the extent the City may contend that its claims are not based on the mere existence of the grant conditions, but on some future action the FAA may take based on those conditions, the City's claims are not time-barred but have yet to accrue under § 2401(a), and the City fails to state a claim. Under 28 U.S.C. § 2401(a), no cause of action exists until there is some injury, loss, or consequences. In *Corner Post*, the Supreme Court explained that a claim accrues when "damage is sustained" and not "when causes are set in motion which ultimately produce injury." 144 S. Ct. at 2451 (quotation marks omitted). "[I]f an act is not legally injurious until certain consequences occur, it is not the mere doing of the act that gives rise to a cause of action, but the subsequent occurrence of damage or loss as the consequence of the act, and *in such case no cause of action accrues until the loss or damage occurs.*" *Id.* (quotation marks omitted). Here, the City does not allege facts showing any loss or damage caused by

the grant agreements. The City fails to state a claim.

### C.     The Court lacks jurisdiction over the City's claims.

If the Court determines that the statute of limitations has not run on Claims 2-5,

then the Court should conclude that it lacks jurisdiction over the claims, because the

City has not yet been injured or because the relief is barred by sovereign immunity.

***The City lacks standing.*** To have standing, the City must show that it "has

suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent;

fairly traceable to the challenged action; and redressable by a favorable ruling.'" *Murthy*

*v. Missouri*, 144 S. Ct. 1972, 1986 (2024). The City cannot meet this test, as it has not

alleged an actual or imminent injury. The City's injury must be "certainly impending" or

there must presently be a "'substantial risk' that the harm will occur" causing the plaintiff

"to reasonably incur costs to mitigate or avoid that harm." *Clapper v. Amnesty Int'l USA*,

568 U.S. 398, 414 & n.5 (2013). An injury that is "conjectural or hypothetical" does not

suffice. *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 871 (10th Cir. 2020). To the

extent the City is concerned that the FAA might, in the future, prevent the closure of the

airport, the City has not even decided to close the airport, and the FAA has not taken

any action to prevent closure; any action would not occur for at least 16 more years.

To allege a current injury for standing purposes, the City pleads that it has

stopped applying for federal grants to support its airport operations. ECF No. 1 ¶¶ 3, 15,

44. But its strategic decision not to apply for those grants is not an injury that would be

redressed by a ruling *in its favor*. First, the City already freely committed itself to operate

the airport until 2040 in return for federal funding in 2020. Costs associated with

operating the airport are not a separate injury. If the Court were to rule for the City, those financial obligations would remain. Second, if the City were to apply for new federal grants, those grants would commit the City to continued airport operations for some new term of years, generally up to 20 years or more after the grant. *See* ECF No. 1 ¶¶ 2, 32. The City's decision not to seek grants is not an injury that the City would *avoid* if it prevailed on its claims, because accepting new grants now would *prevent* the City from unilaterally closing the airport as early as 2040. Thus, the City's decision is a strategic choice that it would make even if it prevailed on its claims.

To the extent the City's concern is that it is currently forgoing funds that it might choose *not* to forgo if the Court rules in the *government's* favor, such injury is not traceable to unlawful conduct. Courts must evaluate whether a plaintiff has shown an injury that is "fairly traceable to the defendant's allegedly *unlawful* conduct and likely to be redressed by the requested relief," *Haaland v. Brackeen*, 599 U.S. 255, 291-92 (2023) (quotation marks omitted, emphasis added), and courts must "accept as valid" a plaintiff's theory that the challenged action is unlawful. *Dep't of Educ. v. Brown*, 600 U.S. 551, 564 (2023). The City thus cannot show standing by pointing to a harm it might suffer if its own claims here *fail* because the government acted *lawfully*. Either way, the City lacks standing.

**Congress did not waive sovereign immunity.** The City does not bring a claim asking the Court to interpret the grant agreements. But in its Prayer for Relief, the City essentially seeks a declaration as to what those agreements mean. It seeks declarations that the grant agreements "have each expired" and are "of no further force

and effect" and that the agreements do not require the City "to keep the Airport open"

after 2040. *See* ECF No. 1 at 18 ¶¶ a & b. The City also seeks an injunction to prevent

the FAA from "taking any action to enforce" the agreements. *Id.* ¶ e. The City thus seeks

relief that amounts to judicial contract interpretation: do the assurances in the 1991

grant agreement (or prior agreements) obligate the City to operate the airport more than

20 years after each grant agreement was executed?

To the extent that the City seeks such contract interpretation, the Court should

find that the United States has not waived sovereign immunity. In general, the

Administrative Procedure Act waives the government's sovereign immunity for suits

seeking relief other than money damages. 5 U.S.C. § 702. But this waiver of sovereign

immunity is not effective if other statutes "'impliedly forbid[]'" such relief. *See Robbins v.*

*U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1081 (10th Cir. 2006). The Tucker Act, 28

U.S.C. § 1491, and Little Tucker Act, 28 U.S.C. § 1346(a)(2), "'impliedly forbid' federal

courts from ordering declaratory or injunctive relief" for contract claims against the

government, and "the APA thus does not waive sovereign immunity for such claims."

*Robbins*, 438 F.3d at 1082. To the extent the City seeks declarations as to the meaning

or effect of the grant agreements, or injunctive relief as to the enforcement of the

contractual terms, those claims are barred by sovereign immunity.[10]

---

[10]  The Tucker Act does not bar all contract claims. "[W]hen a party asserts that the
government's breach of contract is contrary to federal regulations, statutes, or the
Constitution, and when the party seeks relief other than money damages, the APA's
waiver of sovereign immunity applies and the Tucker Act does not preclude a federal
district court from taking jurisdiction." *Normandy Apts., Ltd. v. U.S. Dep't of Hous. & Urb.*
*Dev.*, 554 F.3d 1290, 1300 (10th Cir. 2009). But to the extent the City seeks a
declaration interpreting, or an injunction related to, the contracts, that relief is barred.

**D.      The City's claims are not prudentially ripe.**

Even if the Court were to conclude that the City has standing to assert a claim
that accrued within the past six years, the Court should determine, given the unusually
speculative nature of those claims, that the claims are prudentially unripe.[11]

"'The ripeness doctrine is 'drawn both from Article III limitations on judicial power
and from prudential reasons for refusing to exercise jurisdiction.'" *Nat'l Park Hosp. Ass'n
v. Dep't of Interior*, 538 U.S. 803, 808 (2003). One purpose of the ripeness doctrine is
"'to protect [government] agencies from judicial interference until an administrative
decision has been formalized and its effects felt in a concrete way by the challenging
parties.'" *Id.* at 807-08. The prudential ripeness doctrine asks not whether the Court has
jurisdiction to adjudicate a claim but "'whether it is appropriate for the court to undertake
the task.'" *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052,
1061 (10th Cir. 2017). Even if a plaintiff's claim presents a predominantly legal question,
the prudential ripeness doctrine counsels against adjudicating it, if the claim "'depends
upon future events that may never come to pass, or that may not occur in the form
forecasted.'" *Id.*

"Determining whether administrative action is ripe for judicial review requires
[courts] to evaluate (1) the fitness of the issues for judicial decision and (2) the hardship
to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n*, 538 U.S. at
808. A "claim is not ripe for adjudication if it rests upon contingent future events that

---

[11] "Prudential ripeness is properly analyzed under Rule 12(b)(6) rather than Rule
12(b)(1) because it does not implicate subject matter jurisdiction." *N. Mill St., LLC v. City
of Aspen*, 6 F.4th 1216, 1230 (10th Cir. 2021).

may not occur as anticipated, or indeed may not occur at all." *United States v. Cabral*, 926 F.3d 687, 693 (10th Cir. 2019) (quoting *Texas v. United States*, 523 U.S. 296, 300 (1998), quotation marks omitted). Courts may choose to decline to hear a case "while there is still time for the challenging party to 'convince the agency to alter a tentative position'" or provide the agency "'an opportunity to correct its own mistakes and to apply its expertise,' potentially eliminating the need for (and costs of) judicial review." *Am. Petroleum Inst. v. EPA*, 683 F.3d 382, 387 (D.C. Cir. 2012). A claim causes a hardship to the plaintiff when the plaintiff "faces a direct and immediate dilemma arising from" the matter being challenged. *Cabral*, 926 F.3d at 693 (cleaned up). The plaintiff "bears the burden of showing that its claims are prudentially ripe for judicial review." *N. Mill St.*, 6 F.4th at 1230.

Several factors support the Court declining to adjudicate these claims now. First, the City's claims are premised on contingent future events that may not occur as anticipated. The City does not allege that it has decided to close the airport on or after 2040 or taken concrete steps to plan or accomplish closure. *See* ECF No. 1 ¶¶ 1, 15. Absent any such determination and plan, its concerns about whether the FAA might not permit such a closure are hypothetical. This Court should refrain from issuing what might amount to an improper advisory opinion, because whether, in 2040, the City will have decided to close the airport or continue operations is unknowable.

Second, the City's concerns can be addressed through a concrete proposal to the FAA, the agency with relevant airport expertise, for release of obligations or to close the airport. The decision to authorize an airport closure is complex, encompassing many

factors, including: (1) the impact on "needed aeronautical facilities" and the "net benefit

to civil aviation"; (2) the impact on national emergency preparedness; and (3)

environmental considerations, which involve matters well outside the scope of the

present lawsuit. *See* Airport Compliance Manual, Order 5190.6B Change 3, Federal

Aviation Administration, https://www.faa.gov/documentLibrary/media/Order/Order_

5190.6B_Compliance_Chg3.pdf (last visited Nov. 1, 2024) at §§ 22.4.a(2)-(3), 22.9,

22.27, 22.28, *reproduced as* Ex. 3 at 3, 6-7, 18-19. The facts bearing on these factors

may change between now and 2040, which counsels against adjudicating this issue

now.

Third, the City does not plead facts showing that the harm it fears regarding a

perpetual obligation will even come to pass. If the City were to seek closure in the

future, and the FAA granted that request or did not otherwise step in to prevent closure,

then judicial review would be unnecessary. If the FAA were to act arbitrarily and

capriciously in denying closure, the City could obtain judicial review of the FAA's actual

decision—in a U.S. Court of Appeals—based on a complete administrative record. *See*

49 U.S.C. § 46110(a). The City does not present a dispute that will become be

unreviewable if the Court postpones judgment.

Fourth, the passage of time, or changes in administrative management, could

affect the FAA's authority or its regulatory scheme. Congress could change aviation

statutes, or the FAA could change its approach to airport closures, or courts could

announce new legal principles that would apply to the review of the FAA's statutory or

regulatory authority. It would be prudent to adjudicate these issues closer in time to

when the Court's ruling would have any real-world effect.

The City alleges that it is facing a current dilemma because it has stopped applying for federal grants. But as explained in the context of standing, the City already committed itself to operate the airport until 2040 when it accepted the AIP grant in 2020, and the City's decision not to seek new federal grants to avoid new obligations is a strategic decision the City would make even if the Court ruled in its favor. The City's alleged dilemma is not a hardship for purposes of ripeness. *See supra* Part II.C.

The City's desire to eliminate uncertainty with respect to the meaning and effect of the grant agreements is insufficient to establish ripeness. The Supreme Court rejected a similar argument in *National Park Hospitality Association*, 538 U.S. at 811. In that case, concessioners sought to resolve uncertainty regarding whether the Contract Disputes Act applied to concession contracts. *Id.* at 804-07. They claimed that resolution would help them determine whether and how to bid for government contracts that they might otherwise forgo. *Id.* at 811. The Supreme Court disagreed that "mere uncertainty as to the validity of a legal rule constitutes a hardship for purposes of the ripeness analysis." *Id.* "If we were to follow petitioner's logic, courts would soon be overwhelmed with requests for what essentially would be advisory opinions because most business transactions could be priced more accurately if even a small portion of existing legal uncertainties were resolved." *Id.* Uncertainty influencing the City's decision to apply for more AIP grants is insufficient to constitute hardship for ripeness purposes.

The Court should dismiss the claims for lack of prudential ripeness.

**III.    The City fails to state a claim for a constitutional violation.**

**A.    The City does not plead a separation-of-powers violation (Claim 2).**

The City contends that the 1991 grant conditions, under which the City agreed not to close the airport without seeking FAA review, are unconstitutional under the separation-of-powers doctrine because "Congress did not expressly authorize the FAA to impose otherwise statutorily mandated grant conditions in perpetuity with respect to land acquisitions." ECF No. 1 ¶ 67. The City contends that "Congress did not (and could not) delegate such sweeping policymaking authority to the FAA through its silence" as to "the duration of grant agreements." *Id.* ¶¶ 67-68. This claim should be dismissed because the grant conditions at issue fall well within the FAA's broad congressional authorization. Congress has expressly authorized the FAA to regulate civil aviation in this country, implement the airport improvement grant program, and modify and add assurances that further the goals of safe and efficient civil aviation, now and in the future.

An agency's authority "must stem either from an act of Congress or from the Constitution itself." *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952). "[F]or agencies charged with administering congressional statutes[,] [b]oth their power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, . . . what they do is ultra vires." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013), *abrogated on other grounds*, *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024). Proper delegation from Congress does not require express authorization of every policy detail that an agency may implement. "Congress simply

cannot do its job absent an ability to delegate power under broad general directives."

*Mistretta v. United States*, 488 U.S. 361, 372 (1989). So long as Congress "clearly

delineate[s] the general policy an agency is to achieve" and "specif[ies] the boundaries

of the delegated authority," delegation is proper. *FCC v. Fox Television Studios, Inc.*,

556 U.S. 502, 536 (2009) (cleaned up). In other words, "Congress must lay down by

legislative act an intelligible principle, and the agency must follow it." *Id.* (cleaned up).

This standard is "not demanding." *Gundy v. United States*, 588 U.S. 128, 146

(2019) (Kagan, J., plurality); *see also Bradford v. U.S. Dep't of Lab.*, 101 F.4th 707, 728

(10th Cir. 2024), *petition for cert. filed*, (U.S. Aug. 28, 2024) (No. 24-232) ("The

Supreme Court has almost never felt qualified to second-guess Congress regarding the

permissible degree of policy judgment that can be left to those executing or applying the

law.") (cleaned up). The Supreme Court has approved delegations requiring agencies to

"regulate in the 'public interest,'" "to set prices that in an agency administrator's

'judgment will be generally fair and equitable,'" and "to set air quality standards that are

'requisite to protect the public health.'" *Id.* at 729 (citing *Nat'l Broad. Co. v. United

States*, 319 U.S. 190, 216 (1943), *Yakus v. United States*, 321 U.S. 414, 421-22 (1944),

and *Whitman v. Am. Trucking Ass'ns*, 531 U.S. 457, 472 (2001)). For example, in

*Bradford*, the Tenth Circuit found no separation-of-powers violation where a statute

authorized "executive orders that 'the President considers necessary' to promote an

'economical' and 'efficient' system for procuring and supplying goods and services." *Id.*

(emphasis removed).

Here, Congress delegated to the FAA the power to require, include, or modify

assurances in airport improvement grant agreements. Congress delegated authority to the FAA "to make grants" "to maintain a safe and efficient nationwide system of public-use airports to meet the present *and future* needs of civil aeronautics." 49 U.S.C. § 2204(a) (1988) (emphasis added) (now recodified at 49 U.S.C. § 47104(a)). Congress gave the FAA discretion to approve project grant applications, contingent on receiving written assurances from the applicant on many different topics. 49 U.S.C. § 2210(a) (1988) (recodified at 49 U.S.C. § 47107(a)). Among other things, applicants must give assurance that: the airport "will be available for public use on fair and reasonable terms and without unjust discrimination," § 2210(a)(1) (1988); that proposals to temporarily close an airport for a "nonaeronautical purpose must first be approved by the Secretary," § 2210(a)(3) (1988); that airport facilities "will be available to the United States for use by Government aircraft in common with other aircraft at all times without charge," § 2210(a)(6) (1988); and that the Secretary will review and approve or disapprove modifications to airport plans, § 2210(15)(B) (1988).

Congress expressly delegated to the Secretary the authority to develop grant requirements for airport sponsors, enter into contracts with public agencies, and modify or add assurances required of sponsors. "To insure compliance with this section, the Secretary shall prescribe such project sponsorship requirements, consistent with the terms of this chapter, as the Secretary considers necessary," and to "enter into contracts with public agencies on behalf of the United States." § 2210(b) (1988). Congress further authorized the Secretary to modify and add assurances: "If the Secretary proposes to modify any assurance required of a person receiving a grant

under this chapter and in effect on or after December 30, 1987, or proposes to require
compliance with *any additional assurance* from such person, the Secretary shall first—
(1) publish notice of such proposal in the Federal Register, and (2) provide an
opportunity for comment on such proposal." § 2210(f) (1988) (emphasis added).

Congress also authorized the Secretary to attach such "terms and conditions" to
grant agreements as the Secretary considered necessary: "An offer shall be made upon
such terms and conditions as the Secretary considers necessary to meet the
requirements of this chapter and any regulations prescribed thereunder." 49 U.S.C.
§ 2211(a) (1988). "If and when an offer is accepted in writing by the sponsor, the offer
and acceptance shall compromise an agreement constituting an obligation of the United
States and the sponsor." *Id.* Elsewhere, Congress authorized the Secretary "to perform
such acts, . . . to issue and amend such orders, and to make and amend such
regulations and procedures, pursuant to and consistent with the provisions of this
chapter, *as the Secretary considers necessary* to carry out the provisions of, and to
exercise and perform the Secretary's powers and duties, under this chapter." 49 U.S.C.
§ 2218(a) (1988) (emphasis added).

In several ways, then, Congress charged the FAA with maintaining a safe and
efficient airport system that supported present and future civil and governmental
aviation needs and delegated to the FAA broad authority to approve grant applications
conditioned on assurances necessary to carry out those duties. This delegation is just
as legitimate as the delegation in *Bradford*, 101 F.4th at 729.

The FAA respected those congressional boundaries. It published assurances in

28

the Federal Register in 1980, including the language that "limitations on the duration of the covenants do not apply to the covenant against exclusive rights and real property acquired with Federal funds." 45 Fed. Reg. 34782, 34798 (May 22, 1980) ("Assurance 17"). The FAA received public comment. *See id.* at 34782. The challenged language was added to make FAA assurances "consistent with attachments N, Property Management Standards, of OMB Circular A-102 which requires that grantees use that property for the authorized purpose of the original grant as long as it is needed." *Id.* at 34784.

The FAA also respected the principles Congress enacted for the FAA to implement. The assurances themselves relate directly to real property acquired with federal grant money, the continued operation of the airport to support civil aviation, the government's future access to airport facilities, the protection of decades of federal investment in the airport, and the preservation of the Secretary's authority to approve changes to airport plans. The FAA did not act outside the scope of its delegated authority with respect to the assurances the City ratified in its project application and grant agreement. The City fails to plead a separation-of-powers violation.

> **B.      The City fails to plead a Spending Clause violation (Claim 3).**

The City contends that "[t]he FAA's imposition of retroactive conditions necessarily violates" the Spending Clause of the U.S. Constitution because the City "did not and could not know that by executing a grant agreement for the acquisition of property in 1959, 1977, and 1991, the FAA would later assert that the City was obligated to continue operating the Airport in perpetuity." ECF No. 1 ¶ 72. Regarding the

1991 grant agreement, the City alleges that "the FAA's contemporaneous guidance referred to the perpetual obligation as only applying to the acquisition of *land*, which the City understood not to apply to the acquisition of an easement." *Id.* ¶ 74. The City alleges that it did not "'knowingly accept' the conditions that the FAA now seeks to impose renders the FAA's position constitutionally invalid. *Id.* ¶ 76. But the FAA did not violate the Spending Clause because the grant supported the general welfare, and the assurances were unambiguous, furthered federal interests, and not barred by another constitutional provision.

The Spending Clause grants Congress the power to "provide for the . . . general [w]elfare of the United States." U.S. Const. art. I, § 8, cl. 1. Under this spending power, Congress, or an agency,[12] may attach conditions to the acceptance of federal funds by a state or a state's subdivision. *Deer Creek Water Corp. v. City of Okla. City*, 82 F.4th 972, 988 (10th Cir. 2023). This spending power is limited in four ways: (1) "the exercise of the spending power must be in pursuit of 'the general welfare'"; (2) the conditions on the receipt of federal funds must be "'unambiguous[], ... enabl[ing] the States to exercise their choice knowingly, cognizant of the consequences of their participation'"; (3) conditions "might be illegitimate if they are unrelated 'to the federal interest in particular national projects or programs'"; and (4) conditions may be invalid if another constitutional provision acts as "an independent bar to the conditional grant of funds." *S.*

---

[12] The same requirements apply whether Congress or a federal agency, acting under delegated authority from Congress, places the conditions on federal funds. *See City of Los Angeles v. Barr*, 929 F.3d 1163, 1175 n.6 (9th Cir. 2019) ("We see no reason why the addition of an agency middleman either expands or contracts Congress's power to 'provide for the ... general Welfare'").

*Dakota v. Dole*, 483 U.S. 203, 207-08 (1987).

These limitations are not onerous. First, on whether spending "is intended to serve general public purposes, courts should defer substantially to the judgment of Congress." *Id.* at 207. Second, on whether the conditions are sufficiently unambiguous, courts may consider the full context, including the agency's regulations and guidelines. *Okla. v. U.S. Dep't of Health & Human Servs.*, 107 F.4th 1209, 1218-19 (10th Cir. 2024), *petition for cert. filed*, (U.S. Oct. 15, 2024) (No. 24-437). Third, on whether a condition is sufficiently related to the federal interest in the program, only "reasonableness or minimum rationality" is required. *Kansas v. United States*, 214 F.3d 1196, 1199 (10th Cir. 2000). Fourth, on whether the Constitution independently bars the condition, "[t]he Tenth Amendment itself does not act as a constitutional bar; rather, the fourth restriction stands for the more general proposition that Congress may not induce the states to engage in activities that would themselves be unconstitutional." *Id.*

Here, the FAA's actions do not offend the Spending Clause. Expending funds for airport improvements supports the "general Welfare." U.S. Const., art. I § 8, cl. 1; *Mineta v. Bd. of Cnty. Commr's of the Cnty. of Del.*, No. 05-cv-0297, 2006 WL 2711559, at *6 (N.D. Okla. Sept. 19, 2006) ("Grants for airport improvement projects fall within congressional authority to spend for the general welfare."). Second, the City had notice of the assurances, both in the Federal Register and the grant application and agreement themselves, which unambiguously stated that there would be no limitation on the duration of assurances with respect to real property acquired with federal funds. *Mineta*, 2006 WL 2711559, at *6 ("the FAA clearly notified MIDA of any conditions in the

grant agreements"). At the time of the 1991 grant, there was no question that a
permanent easement constituted a real property interest; indeed, the City certified that it
was acquiring real property. *See also* 39 Fed. Reg. at 19357. Third, the assurances are
directly related to federal purposes: (1) the award of grants; (2) the improvement and
continued operations of the airport for which the FAA expended federal funds; (3)
supporting the present and future of civil aviation; (4) protecting FAA investment in the
airport; and (5) preserving airport properties for government use. Fourth, no
independent constitutional provision bars the conditions attached to the airport
improvement grant. Therefore, the City fails to plead a violation of the Spending
Clause.[13] *See Mineta*, 2006 WL 2711559, at *6 (holding that FAA assurances did not
violate the Spending Clause).

### C.    The City fails to plead a Tenth Amendment violation (Claim 4).

The City's next claim rests on the FAA's authority to review any plan by the City
to close the airport, which the City characterizes as a command by the FAA for the City
to operate the airport forever. The City claims that "[b]y asserting a perpetual interest
which allows it to forever control the disposition of all property comprising the Airport,

---

[13]  The Court need not, and therefore should not, reach the question of whether the
retroactive application of Assurance 17 to the 1959 and 1977 grant agreements violates
the Spending Clause. "[F]ederal courts have an historic obligation to avoid
unnecessarily deciding constitutional questions." *United States v. Ramos*, 695 F.3d
1035, 1047 (10th Cir. 2012) (citing *Cnty. Court of Ulster Cnty. v. Allen*, 442 U.S. 140,
154 (1979)). Because the Assurance 17 applies to the 1991 grant, and because
conditions, terms, and assurances related to the 1991 grant had no temporal limitation,
the airport remains federally obligated regardless of whether Assurance 17 applies
retroactively to the 1959 and 1977 grants. The City's obligations after the 1991 grant
agreement are not affected by the applicability of the 1959 and 1977 grants.

the FAA has effectively commandeered the City to continue operating the Airport for as long as the FAA – and only the FAA – determines appropriate." ECF No. 1 ¶ 79. "The FAA's asserted interest violates the basic principle that the United States may not compel the City to administer a federal regulatory program and violates the Tenth Amendment rights of the City and its citizens." *Id.* ¶ 80. The City contends that the FAA is "using the AIP to commandeer the City's sovereign authority over the use and disposition of its property *in perpetuity*," which "goes well beyond Congress' enumerated powers in violation of the Tenth Amendment." *Id.* ¶ 82.

The Tenth Amendment does not impose separate restrictions on Congress than the Spending Clause. Tenth Amendment and Spending Clause "claims are essentially mirror images of each other: if the authority to act has been delegated by the Constitution to Congress, then it may act pursuant to Article I; if not, the power has been reserved to the states by the Tenth Amendment." *Kansas*, 214 F.3d at 1198. Because Congress and the FAA acted within the bounds of the Spending Clause, it cannot be argued that Congress and the FAA violated the Tenth Amendment, and the Court should avoid this unnecessary constitutional question. *See Ramos*, 695 F.3d at 1047.

Regardless, the Tenth Amendment claim fails on the merits. The Tenth Amendment bars Congress from "command[ing] the States' officers, or those of their political subdivisions, to administer or enforce a federal regulatory program." *Haaland*, 559 U.S. at 281 (quoting *Printz v. United States*, 521 U.S. 898, 935 (1997)). But while Congress cannot directly regulate States, it may "fix the terms on which it shall disburse federal money to the States." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1,

17 (1981); *see also Nat'l Fed'n of Indep. Bus*. *v. Sebelius*, 567 U.S. 519, 537 (2012) ("in exercising its spending power, Congress may offer funds to the States, and may condition those offers on compliance with specified conditions," even if those "offers may well induce the States to adopt policies that the Federal Government itself could not impose"). "[L]egislation enacted pursuant to the spending power is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions." *Pennhurst*, 451 U.S. at 17. Spending Clause programs do not offend the Tenth Amendment "when a State has a legitimate choice whether to accept the federal conditions in exchange for federal funds." *Sebelius*, 567 U.S. at 578. A state lacks a legitimate choice where the choice is "impermissibly coercive." *Id.* at 580.

In the context of federal grants, "[s]tates are free to refuse to implement the conditions and to decline the grant money," *Kansas*, 214 F.3d at 1203, eliminating any anticommandeering concerns. When faced with such a choice, the federal program "does not directly compel or command the state employees to take any action whatsoever." *Id.* A state may choose to decline federal funding and avoid complying with federal conditions or accept funding and the accompanying conditions. *Id.*

Here, the City alleges that it has the ability to forgo federal funds. *See* ECF No. 1 ¶ 3 ("the City has stopped accepting grants"). That choice eliminates any anticommandeering concerns. The City had the same choice back in 1991.

No action by Congress or the FAA coerced the City into taking federal funds for the easement in 1991. The grant agreement and accompanying assurances were known to the City—published in the Federal Register, submitted with the application,

incorporated by the grant agreement, and endorsed and ratified by the City. If the City did not like the conditions attached to the grant, it could have declined to take the funds. Neither has the City alleged facts showing that the offer of $5,800 for the easement was impermissibly coercive. *See* ECF No. 1-7 at 1 (reciting the $5,800 purchase price for the easement); *see also* ECF No. 1 ¶ 34 (referring to the "*mere* $5,800 in federal assistance") (emphasis added). The grant agreement did not commandeer the City's officers; the City accepted those terms to receive federal funds.

The Court also should reject the City's characterization of the FAA's authority to review and sign off on closing a regulated airport as a perpetual affirmative obligation imposed on the City that will commandeer its conduct indefinitely into the future. There is an administrative process to seek closure of an airport outlined in the Manual, and if the City were to receive an arbitrary and capricious decision on a request for closure, it could seek judicial review in the Court of Appeals. 49 U.S.C. § 46110(a). Requiring the City to put together the *paperwork* to request closure is not itself impermissibly coercive under the Constitution. The Court should dismiss the Tenth Amendment claim.

**D.    The City fails to plead a due process violation (Claim 5).**

Finally, the City claims that "[b]y asserting a perpetual interest" in "all property comprising the Airport," "the FAA has unlawfully deprived the City of its fee simple ownership in violation of the Due Process Clause." ECF No. 1 ¶ 86. The City contends that it has a protected property interest "in the property comprising the Airport," and in the terms of the 1959, 1977, and 1991 grant agreements, "all of which expired not later than 20 years after their execution." *Id.* ¶¶ 85, 87.

The Fifth Amendment provides that "[n]o person shall be . . . deprived of life, liberty, or property without due process of law[.]" U.S. Const., amend. V. To state a claim for a procedural due process claim, "a plaintiff must establish (1) the deprivation of (2) a constitutionally cognizable liberty or property interest, (3) without adequate due process procedures." *Abdi v. Wray*, 942 F.3d 1019, 1031 (10th Cir. 2019).

Here, the City's claim fails at the first step: the City does not allege that it has suffered a deprivation. The City concedes that it is obligated to operate the airport through 2040. The City does not allege that it has sought and been denied, through a final agency action, permission to close the airport in 2040. Rather, the City alleges that it may be deprived of a property right in the future. That does not state a claim for a violation of procedural due process under the Fifth Amendment.

The claim also fails because the City adopted and ratified the assurances that obligate the airport to obtain federal funds. The City contracted away its right to unilaterally cease airport operations by taking federal funds; the government did not *deprive* the City of any right in the constitutional sense. Without alleging a deprivation of a protected property interest, the City's due process claim fails at the first step.

Additionally, the City does not allege that, prior to 1991, it possessed a protected property interest in the unilateral ability to close the airport on its property. The City alleges that the 1959, 1977, and 1991 grant agreements obligated the City in various ways for overlapping 20-year periods, and it acknowledges that other grant agreements have committed the City to operate an airport through 2040. At no time between 1959 and 1991, then, did the City—under its own theory—have a right to unilaterally close the

airport without FAA approval, and it has no such right now. Given that the City does not allege that it had a protected property interest in closing its airport without FAA approval, it cannot show that it has been deprived such a right.

Second, the City has not pleaded facts showing that it is being deprived any procedural due process. The FAA has procedures for sponsors to seek release from individual obligations or for the entire airport. *See* Ex. 2 at 25-33 §§ 22.20-22.33. The FAA's actions related to those requests are subject to judicial review. The City does not allege why these processes are constitutionally insufficient. The City fails to allege a due process violation, and the Court should dismiss the claim.

## CONCLUSION

Defendants respectfully request that the Court dismiss the Complaint.

Dated: November 1, 2024.

        MATTHEW T. KIRSCH
        Acting United States Attorney

        s/ Thomas A. Isler
        **Thomas A. Isler**
        Assistant United States Attorney
        1801 California Street, Ste. 1600
        Denver, Colorado 80202
        Telephone: (303) 454-0336
        Email: thomas.isler@usdoj.gov
        *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on November 1, 2024, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve all counsel of record:

Luis Angel Toro
Megan Riley Scott
Samantha R. Caravello
Teresa Taylor Tate
Veronique M. Van Gheem
William Eric Pilsk
Steven Lloyd Osit
*Counsel for Plaintiff*

<u>s/ Thomas A. Isler</u>
**Thomas A. Isler**
Assistant United States Attorney