**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO**

Civil Action No. 24-cv-02057-NYW-CYC

CITY OF BOULDER, a home rule municipality established under
the Constitution and laws of the State of Colorado,

       Plaintiff,

v.

UNITED STATES OF AMERICA,
THE FEDERAL AVIATION ADMINISTRATION, an agency of the
U.S. Department of Transportation, and
MICHAEL G. WHITAKER, in his official capacity as Administrator
of the Federal Aviation Administration,

       Defendants.

---

**CITY OF BOULDER'S RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS [ECF 26]**

---

Steven Lloyd Osit
Samantha R. Caravello
Megan Riley Scott
KAPLAN KIRSCH LLP
1675 Broadway, Ste. 2300
Denver, Colorado 80202
Telephone: (303) 725-8000
Email: sosit@kaplankirsch.com
Email: scaravello@kaplankirsch.com
Email: rscott@kaplankirsch.com

William Eric Pilsk
1634 Eye Street NW, Ste. 300
Washington, D.C. 20006
Telephone: (202) 955-5600
Email: eplisk@kaplankirsch.com

Luis Angel Toro
Teresa Taylor Tate
Veronique M. Van Gheem
BOULDER CITY ATTORNEY'S OFFICE
P.O. Box 791
1777 Broadway
Boulder, Colorado 80306
Telephone: (303) 441-3020
Email: torol@bouldercolorado.gov
Email: tatet@bouldercolorado.gov
Email: vangheemv@bouldercolorado.gov

*Counsel for Plaintiff*

## TABLE OF CONTENTS

TABLE OF CONTENTS.................................................................................. i

INTRODUCTION ...................................................................................... 1

ARGUMENT ............................................................................................ 3

I.      **The City states a valid Quiet Title Act claim**...................................... 3

        A.      The City has alleged a cognizable disputed property interest................... 3

        B.      The QTA claim is not barred by the statute of limitations........................... 8

II.     **The City's constitutional claims are justiciable** ............................. 13

        A.      The City's constitutional claims are not time-barred ............................... 13

        B.      The City has standing to pursue its constitutional claims......................... 14

        C.      The City's claims are prudentially ripe ...................................... 17

        D.      The United States has waived sovereign immunity ................................ 21

III.    **The City adequately states constitutional claims for relief**........................... 23

        A.      The City states a Separation of Powers violation..................................... 23

        B.      The City states a Spending Clause violation........................................... 27

        C.      The City states a Tenth Amendment violation ......................................... 30

        D.      The City states a Due Process violation ................................. 34

CONCLUSION ....................................................................................... 35

CERTIFICATE OF SERVICE ..................................................................... 37

## INTRODUCTION

Plaintiff City of Boulder (the "City") has long accepted grants from the Federal Aviation Administration ("FAA") to help pay for the capital costs of the Boulder Municipal Airport (the "Airport"). With each grant, the City expressly agreed to keep the Airport open for a term not to exceed 20 years. But in 2022, the FAA announced "Change 2" to its Airport Compliance Manual,[1] which asserted, for the first time, that the acceptance of any grant after 1980 constituted an "agree[ment] that the covenants on real property acquired with Federal funds are unlimited," notwithstanding what any of the City's decades-old grant agreements for land acquisition *actually* said. Ex. A, Change 2 ¶ 4.3.a.(1).

The FAA's motion to dismiss seeks to avoid having to answer for Change 2's extraordinary about-face. Most significantly, the FAA avers that the Court need not consider Change 2 at all, because the City expressly committed to operating the Airport forever, regardless of the future desires of its citizens or elected officials, and notwithstanding its fee simple ownership of the property comprising the Airport, in exchange for a mere $5,800 in federal assistance to acquire a "construction easement"

---

[1] The Airport Compliance Manual is an internal order "establish[ing] the policies and procedures for FAA personnel to follow in carrying out the FAA's responsibilities" with respect to airports receiving federal funds. **Exhibit A**, Order 5190.6B, Change 2 ¶ 1.1 (Dec. 9, 2022) ("Change 2"). Several prior versions of this Order are also relevant to the FAA's motion to dismiss. *See* **Exhibit B**, Order 5190.6A (Oct. 2, 1989); ECF 26-2, Order 5190.6B (Sept. 30, 2009); **Exhibit C**, Order 5190.6B, Change 1 (Nov. 22, 2021) ("Change 1"); **Exhibit D**, Order 5190.6B, Change 3 (Sept. 15, 2023) ("Change 3"). The Court may consider these documents because they are referenced in the complaint, central to the City's claims, and their authenticity is not disputed. *Smith v. United States*, 561 F.3d 1090, 1098 (10th Cir. 2009) (citations omitted).

in 1991.  But that argument is as wrong as it is implausible: not even the FAA, much less the City, has ever understood such an acquisition to carry a perpetual obligation to operate the Airport.  The FAA's reliance on the 1991 Grant Agreement is nothing more than a *post hoc* effort to evade review of a clearly unconstitutional power grab.

The City states a valid claim under the federal Quiet Title Act ("QTA").  The FAA's purported right to forever guarantee a right of access to the Airport for the benefit of the public, and prohibit the sale of Airport land or its reuse for non-airport purposes, is a property interest cognizable under the QTA.  And because the City could not know that the FAA claimed such a perpetual interest until Change 2 was published in 2022, the City's QTA claim is not time-barred.  The City is entitled to relief under the QTA, confirming that none of its prior grants established the perpetual interest that the FAA claims.

The City also states valid and justiciable constitutional claims challenging the FAA's attempted imposition of a perpetual obligation to operate the Airport through Change 2.  The City has standing because it is injured by the FAA's attempt to impose unconstitutional conditions: both retroactively, on the City's prior receipt of federal funds; and prospectively, on the City's receipt of future funds to which it is entitled.  The City's constitutional claims are also ripe: they are not contingent on some future decision of the FAA regarding the City's request to close the Airport, but rather seek to invalidate unconstitutional actions the FAA has already taken that result in redressable harm to the City.  The FAA does not enjoy immunity from these claims: the QTA waives sovereign immunity insofar as the FAA's asserted property interest violates the Constitution, or else the Administrative Procedure Act ("APA") broadly waives sovereign immunity with respect

to non-monetary remedies for unconstitutional agency action (and no other statute prevents the Court from exercising jurisdiction over the City's claims).

On the merits, and particularly at this early stage of this suit, the City has alleged facts more than sufficient to survive the FAA's motion to dismiss. The Court should deny the FAA's motion to dismiss the Complaint.

## ARGUMENT

## I. THE CITY STATES A VALID QUIET TITLE ACT CLAIM

The FAA argues that the Court lacks jurisdiction over the City's QTA claim because it is a dispute over the FAA's regulatory authority, as opposed to one over title, and because it is barred by the statute of limitations. ECF 26 at 10–15. But the FAA's claim that the "covenants on real property acquired with Federal funds are unlimited," Ex. A, Change 2 ¶ 4.3.a.(1), *is* a disputed property interest cognizable under the QTA. And the City's QTA claim is not time-barred because the City had neither actual nor constructive knowledge of this asserted interest until, at the earliest, Change 2 was quietly published by the FAA in December 2022, without public notice and comment.

### A. The City has alleged a cognizable disputed property interest.

The QTA authorizes claims "to adjudicate a disputed title to real property in which the United States claims *an interest*." 28 U.S.C. § 2409a(a) (emphasis added). The statutory pleading requirements confirm that the United States need not claim ownership of the property in dispute, but rather may claim a "right, title, or interest" therein. *Id.* § 2409a(d); *see United States v. Bedford Assocs.*, 657 F.2d 1300, 1316 (2d Cir. 1981)

(reference to the "right, title *or* interest" of the United States confirms the government's interest "need not be a 'title' or ownership interest" (emphasis added)).

Consistent with this statutory language—and contrary to the FAA's contentions, ECF 26 at 12—the Tenth Circuit has recognized that QTA actions are not limited to disputes of ownership or fee simple title. *See, e.g.*, *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 599 F.3d 1165, 1176 (10th Cir. 2010) ("[T]he United States need not assert that it holds title in fee simple to the property."); *Kinscherff v. United States*, 586 F.2d 159, 161 (10th Cir. 1978) ("The legislative history of 28 U.S.C. § 2409a indicates that Congress intended easements to be included in the real property rights adjudicated in a quiet title action.").  Indeed, courts have recognized a range of interests as giving rise to cognizable QTA claims.  *See, e.g.*, *Vincent Murphy Chevrolet Co. v. United States*, 766 F.2d 449, 451 (10th Cir. 1985) (interest by virtue of restrictions in quitclaim deeds that limited ability to use and dispose of land); *Rosette Inc. v. United States*, 141 F.3d 1394, 1396–97 (10th Cir. 1998) (interest in geothermal resources); *Leisnoi, Inc. v. United States*, 170 F.3d 1188, 1191–92 (9th Cir. 1999) (interest in property based on reserved easements); *Bedford*, 657 F.2d at 1316 (interest based on lease pursuant to which the United States occupied space in office building).[2]

_____

[2] None of the cases cited by the FAA are to the contrary.  In *Kane County v. United States*, 772 F.3d 1205, 1213 (10th Cir. 2014), the court found only that plaintiffs' evidence was insufficient to show a dispute of title.  The court did not limit the scope of "disputed title."  In *McMaster v. United States*, 177 F.3d 936, 940, 942 (11th Cir. 1999), the court declined to exercise QTA jurisdiction over "breach-of-covenant claims against the United States," where the plaintiff did not allege interference with any ownership interest.  And in *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 567 U.S. 209, 218 (2012), the Supreme Court rejected the government's argument that the QTA prevented

4

Here, the United States claims a property interest in the land comprising the Airport by virtue of the highly restrictive conditions, public and private rights of access, and restraints on alienability imposed through the grant agreements, which the FAA now claims apply in perpetuity.[3]  *See Mineta v. Bd. of Cnty. Comm'rs*, No. 05-CV-0297, 2006 WL 2711559, at *1 (N.D. Okla. Sept. 19, 2006) (describing grant assurances as restrictions on alienability).  For as long as the City remains grant-obligated, it must operate the Airport as an airport unless the FAA approves another use.  ECF 1 ¶¶ 42, 56; ECF 26-1 ¶ 19.  The City must permit public access to the Airport for aeronautical purposes, ECF 26-1 ¶ 22(a), and provide land and access to the United States for government aircraft and facilities without charge, *id.* ¶¶ 27–28.  The City may not "sell, lease, encumber or otherwise transfer or dispose of any part of its title or other interests in the property" without FAA approval.  ECF 1 ¶ 56; ECF 26-1 ¶ 5(b).  And, if the FAA does permit the City to sell grant-acquired land comprising the Airport, the FAA is entitled to receive a share of the proceeds equal to the United States' proportionate share of the fair market value acquisition of the land.  *See* ECF 1 ¶ 81; ECF 26-1 ¶ 31(b).

Crucially, courts have held that such high degree of control exercised by a granting agency over the use of grant funds creates a federal interest in property purchased with those funds.  *See, e.g.*, *In re Joliet-Will Cnty. Cmty. Action Agency*, 847 F.2d 430, 432

---

the respondent from bringing an APA challenge because the respondent did not assert a QTA claim or even any interest in the land at all.

[3] All property comprising the Airport is obligated through the duration of the grant agreements, regardless of how it was acquired.  Ex. D, Change 3 ¶ 22.4.b.(1).

(7th Cir. 1988) (explaining that where government grant funds "impose minute controls" on use of funds, grantee's ownership is merely nominal); *Affiniti Colo., LLC v. Eagle-Net All.*, 184 F. Supp. 3d 992, 996–98 (D. Colo. 2016) (concluding, based on terms of grant documents, that federal agency retained beneficial title and interest in grant-funded equipment and property).  In other words, "[p]roperty purchased with federal grant funds is treated as federal property" even when the grantee formally holds title to the property. *Mineta*, 2006 WL 2711559, at *6.  The FAA's assertion that the "covenants on real property acquired with Federal funds are unlimited," Ex. A, Change 2 ¶ 4.3.a.(1), is then clearly a disputed property interest that may be adjudicated under the QTA.

Indeed, the FAA has *itself* argued that it retains an interest in land acquired under FAA grant programs—for example, when arguing that such land must be excluded from a bankruptcy debtor's estate, because "the federal interest suffices to deem that property an asset of the federal government."  *Gaffney v. U.S. Dep't of Transp. (In re Premier Airways, Inc.)*, 303 B.R. 295, 296–97 (Bankr. W.D.N.Y. 2004); *see also Mineta*, 2006 WL 2711559, at *7 (FAA could seek equitable relief to prevent violation of grant assurances because Congress authorized the FAA "to protect federal grant funds and property interests").  Clearly, the FAA is willing to claim a property interest in federally acquired airport land when advantageous for its own objectives; it cannot now disclaim that interest to avoid answering the City's QTA claim.

At a minimum, the burdens imposed on the City's fee ownership of the Airport by virtue of the grant agreements constitute an easement in favor of the United States, which give rise to an QTA claim.  *See Waibel Ranches, LLC v. United States*, No. 22-35703,

6

2024 WL 3384233, at *2 (9th Cir. July 12, 2024) ("The QTA is the appropriate cause of action when the remedy sought pragmatically involves some type of declaration as to the ownership rights of the parties, including disputes over the right to an easement and suits seeking a declaration as to the scope of an easement," even where they arise from "contractual agreements.") (quoting *Robinson v. United States*, 586 F.3d 683, 686 (9th Cir. 2009)) (cleaned up).  For example, the City must guarantee a right of access to the Airport for the benefit of the public[4] and the United States, specifically, for the duration of the grant agreements.  ECF 26-1 ¶¶ 22(a), 27–28.  Such obligation clearly constitutes an easement cognizable under the QTA.  *See Waibel Ranches,* 2024 WL 3384233, at *1 (remanding QTA claim seeking to extinguish United States' access rights); *Kinscherff*, 586 F.2d at 161 (easements may be adjudicated in a quiet title action).

The numerous other obligations contained in the grant agreements are also well within the bounds of interests that may give rise to a QTA claim.  *See, e.g.*, *Vincent Murphy*, 766 F.2d at 451 (noting lack of dispute that restrictions on use and disposition of property were claims of the United States); *Richmond, Fredericksburg & Potomac R.R. Co. v. United States*, 945 F.2d 765, 770 (4th Cir. 1991) (analyzing use restriction, expressed as a covenant, that provided claim of United States); *Wells Fargo Bank v. Se. N.M. Affordable Hous. Corp.*, 877 F. Supp. 2d 1115, 1143–46 (D.N.M. 2012) (evaluating QTA claim based on restrictive covenants); *see also Zavislak v. Shipman*, 362 P.2d 1053,

---

[4] A right of public access is "owned" by the public agency which secures it.  *See Christensen v. United States*, No. 03-cv-0478, 2005 WL 8176050, at *4 (D. Neb. Mar. 4, 2005) (citing *Kinscherff*, 586 F.2d at 160–61).

1054, 1056 (Colo. 1969) (affirming trial court decree "removing the cloud of" restrictive covenants and quieting title to plaintiffs); *Capitol Fed. Sav. & Loan Ass'n v. Smith*, 316 P.2d 252, 253–55 (Colo. 1957) (affirming trial court decree quieting title free and clear of enforcement of unconstitutional restrictive covenant).

The FAA's brief attempt to characterize the City's QTA claim as an impermissible "challenge [to the FAA's] regulatory authority," ECF 26 at 12, should also be rejected.  In *School Board of Avoyelles Parish v. U.S. Department of Interior*, 647 F.3d 570, 580–82 (5th Cir. 2011), neither party disputed the government's ownership interest, but rather the extent of the government's regulatory authority *incident* to such ownership.  Here, the City does not challenge the FAA's exercise of such authority, but rather seeks to establish that, whatever authority the FAA has, it expires with the term of the City's last FAA grant agreement (i.e., in 2040), and does not continue in perpetuity.

**B.      The QTA claim is not barred by the statute of limitations.**

The FAA's argument that the City's QTA claim is barred by the statute of limitations is also based on a fundamental misunderstanding of the QTA.

A QTA claim must be "commenced within twelve years of the date upon which it accrue[s]."  28 U.S.C. § 2409a(g).  An action is "deemed to have accrued on the date the plaintiff or his predecessor in interest knew or should have known of the claim of the United States."  *Id.*  While the Tenth Circuit has described this trigger as an "exceedingly light one," *George v. United States*, 672 F.3d 942, 944 (10th Cir. 2012), the statute of limitations does not begin to run until "the United States has either expressly disputed title or taken action that implicitly disputes it."  *Kane*, 772 F.3d at 1212.  "[A]ctions of the United

States that merely produce some ambiguity regarding a plaintiff's title are insufficient" to start the clock. *Id.* Moreover, the issue of notice "is fact specific." *Kane Cnty. v. United States*, No. 10-cv-1073, 2024 WL 3760024, at *23 (D. Utah Aug. 9, 2024). And, on a motion to dismiss, the Court must accept the City's factual allegations as true. *Santa Fe All. for Pub. Health & Safety v. City of Santa Fe*, 993 F.3d 802, 811 (10th Cir. 2021).

As alleged in the Complaint, the City did not and could not know that the United States claimed a perpetual interest in the Airport until at least December 9, 2022 (the date the FAA published Change 2). ECF 1 ¶¶ 45–46, 50–51, 60. Prior to that date, the FAA maintained, "[i]n cases where land was acquired with FAAP or ADAP grants, FAA should review the language of such grants when it is necessary to determine the status of the sponsor's obligations since most FAAP land grants and some ADAP grant documents do *not* impose a perpetual obligation."[5] Ex. C, Change 1 ¶ 4.3 (emphasis added). The only land ever acquired by the City with federal assistance was under FAAP and ADAP, and the duration of those grant agreements was expressly limited to 20 years. ECF 1 ¶¶ 19–26. It was not until Change 2 that the FAA claimed the acceptance of *any* grant after 1980[6] would obligate a sponsor in perpetuity if such sponsor had *ever* acquired land with federal assistance. ECF 1 ¶ 45; Ex. A, Change 2 ¶ 4.3.

---

[5] The Federal Aid to Airports Program ("FAAP") and Airport Development Aid Program ("ADAP") predated the modern Airport Improvement Program ("AIP").

[6] In 1980, the FAA modified the grant assurances to provide, "there shall be no limit on the duration of . . . the terms, conditions, and assurances with respect to real property acquired with Federal funds." *Id.* ¶¶ 30–32.

Perhaps recognizing its problem, the FAA focuses on the 1991 Grant Agreement for the City to acquire a "construction easement," claiming that it obligates the City to operate the Airport in perpetuity and started the statute of limitations.[7]  But nothing in the 1991 Grant Agreement was sufficient to put the City on notice that it was signing up for a perpetual obligation to operate the Airport.  True, like all post-1980 agreements, the 1991 Grant Agreement stated there would be "no limit on the duration of the . . . assurances with respect to real property acquired with Federal funds."  ECF 1 ¶ 32.  However, the FAA's contemporaneous interpretations of that language clearly applied it only to *land*.[8]

At the time of the 1991 Grant Agreement, the FAA had just recently published Order 5190.6A, a predecessor to Change 2.  Order 5190.6A explained, "the obligations of the owner under a grant agreement remain in force throughout the useful life of the

---

[7] The FAA focuses on the 1991 Grant Agreement throughout its motion, arguing that it is alone dispositive of the City's claims.  ECF 26 at 8 n.5.  But the Court cannot avoid reaching the City's claims with respect to the 1959 and 1977 Grant Agreements, even if it determines that the 1991 Grant Agreement continues in perpetuity.  Unlike land, any number of events could extinguish the easement acquired through the 1991 Grant Agreement and the FAA's claimed interest therein.  For example, the City could acquire the underlying estate and extinguish the easement by operation of law.  *See Brush Creek Airport, L.L.C. v. Avion Park, L.L.C.*, 57 P.3d 738, 747–48 (Colo. App. 2002) (describing the merger doctrine).  The City is entitled to a declaration that the 1959 and 1977 Grant Agreements have expired and do not obligate the City to operate the Airport in perpetuity, no matter what the Court concludes as to the 1991 Grant Agreement.

[8] The FAA advances the argument that Colorado law recognizes easements as real property interests.  ECF 26 at 15.  But that classification does not help the FAA.  The durational language of the 1991 Grant Agreement applied to "real property acquired with Federal funds," ECF 26-1 ¶ B.1, not to "a *separate* interest in real property" or an "*interest* in land," ECF 26 at 15 (emphasis added) (quoting *Upper Harmony Ditch Co. v. Carwin*, 539 P.2d 1282, 1285 (Colo. 1975) and *DeReus v. Peck*, 162 P.2d 404, 406 (Colo. 1945)).

facility but no longer than 20 years, except for *land* which is obligated for the life of the airport." Ex. B, Order 5190.6A ¶ 4-5.b (emphasis added). Similarly, in discussing the circumstances under which the FAA may allow an airport to close, Order 5190.6A explained, "[E]xcept for ADAP and AIP grants for *land*, most grant agreements expire 20 years after their execution. Following the expiration of such an agreement, provided no other obligations to the Federal Government are involved, the owner may legally abandon and dispose of the airport." *Id.* ¶ 7-20.c (emphasis added). Collectively, these statements demonstrate that, unlike land, neither the FAA nor the City then understood that the acquisition of an easement would carry an obligation to maintain the Airport in perpetuity.[9]

Indeed, there is good reason for such a distinction. By the FAA's own logic, obligations may attach to land indefinitely because the "useful life" of "land" is unlimited. Ex. A, Change 2 ¶ 4.3.a.(6). But the same is not true of the 1991 easement, which allows the City to maintain a berm on the servient estate to support a taxiway on the Airport. Its useful life is limited insofar as a taxiway (or an Airport) is maintained on the dominant

---

[9] Even more contemporary documents subject to judicial notice explain, "When Federal grant funds are used to purchase *land* . . . the obligations tied to those funds do not expire, as the useful life of the land is presumed not to expire." FAA, Compliance Guidance Letter 2022-1, *The Process for the Release and Permanent Closure of Federally Obligated Airports* (Feb. 2, 2023), https://www.faa.gov/airports/airport_compliance/compliance_guidance/cgl-2022-01-permanant-airport-closures (emphasis added); *see also* Ex. A, Change 2 ¶ 4.3.a ("In regard to *land* acquired with federal assistance (e.g., FAAP, ADAP, AIP), so long as the airport sponsor has taken an ADAP or AIP grant since May 1980, the federal obligations on the acquired *land* remain in effect until released by the FAA.") (emphasis added). The City expects to further substantiate its allegation that the FAA did not consider an easement to constitute "real property" for the purposes of the durational clause through discovery. *See* ECF 1 ¶ 33.

estate.  The idea that acquiring an easement with federal assistance somehow obligated the City to forever maintain the status quo of the Airport—the *dominant* estate—would turn the very nature of an easement on its head.

The City's execution of a "Sponsor Certification for Real Property Acquisition" form is also not the smoking gun the FAA claims it to be.  As the FAA acknowledges, this certification was required in order to demonstrate compliance with the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 ("URARPAPA"), which—in sharp contrast to the FAA guidance cited above—was *expressly* applicable to "[l]ess-than-full-fee interest[s] in real property."  ECF 26 at 14 (quoting 49 C.F.R. § 24.101(b) & (c)(1)).  It is therefore not surprising that the City agreed to comply with URARPAPA.  But it is quite another thing to infer from that mere certification an obligation to be *forever* bound by the wholly separate obligations contained in the 1991 Grant Agreement.

The FAA next claims that even if the 1991 Grant Agreement was ambiguous as to its duration, the City's QTA claim accrued in 2009, when the FAA amended the durational language in the Airport Compliance Manual to clarify that "real property" included both "land and appurtenances."  *See Id.* at 15 n.9.

But in fact, that amendment only underscores the City's argument.  The FAA added the word "appurtenances" to the durational language some 18 years *after* the City executed the 1991 Grant Agreement.  The word "appurtenances" does not appear at all in Order 5190.6A, which was in effect when the City executed the 1991 Grant Agreement. *Compare* ECF 26-2, Order 5190.6B ¶ 4.6.h.(1), *with* Ex. B, Order 5190.6A ¶ 2-2.a. Ordinary canons of construction require that the Court presume the FAA intended some

substantive change through that addition.  *See Nelson v. United States*, 40 F.4th 1105,

1115 (10th Cir. 2022) (applying the rule against surplusage).  Further, the FAA did not

suggest that it would seek to apply such language retroactively, although it clearly knew

how to say so.[10]  Thus, at most, the 2009 Airport Compliance Manual suggested that any

*future* grants for the acquisition of "appurtenances" would carry the perpetual obligation

to operate an airport.  The City did not accept any such grants, and the FAA's ambiguous

2009 update did not start the clock.  *Kane*, 2024 WL 3760024, at *23.

As alleged in the Complaint, the first time the FAA so much as suggested that the

duration of the 1991 Grant Agreement was unlimited was in its March 20, 2024, letter to

the City saying so.  ECF 1 ¶¶ 51, 61.  Accordingly, the City's QTA claim is timely.

## II.    THE CITY'S CONSTITUTIONAL CLAIMS ARE JUSTICIABLE

The FAA raises a number of threshold challenges to the City's constitutional

claims.  None hold water, and the Court should consider the merits of the City's claims.

### A.    The City's constitutional claims are not time-barred.

The FAA claims the City's constitutional claims are time-barred because they were

not brought "within six years after the right of action first accrue[d]."  28 U.S.C. § 2401(a).

---

[10] For example, Congress adopted the requirement that the United States be repaid for its interest in property acquired with federal assistance in 1987.  In implementing that requirement, the FAA clearly indicated that "once an airport sponsor accepts any grant containing [that assurance], it becomes obligated to this requirement for all grant acquired land, regardless of when it was acquired."  Ex. B, Order 5190.6A ¶ 4-17.d.  The FAA did not make a similar assertion regarding the duration of *all* grant assurances, including the requirement to continue operating the Airport, until Change 2.

That is incorrect.  The City was not subject to or injured by the FAA's claim that the City must operate the Airport in perpetuity until the publication of Change 2.  *Supra* p. 9.

In *Corner Post, Inc. v. Board of Governors of the Federal Reserve System*, 144 S. Ct. 2440, 2460 (2024), the Supreme Court held that a claim does not "accrue" for the purposes of Section 2401(a) until a person has suffered an injury.  Prior to Change 2, the City was simply under an obligation to operate the Airport for no longer than 20 years from the date of its last accepted grant.  ECF 1 ¶¶ 41–52.  It was not until Change 2 that the FAA sought to apply any perpetual obligation against the City.  And it was not until the FAA's March 20, 2024, letter that the FAA asserted the 1991 Grant Agreement carried such an obligation.  *Id.* ¶¶ 33, 51; **Exhibit E**, March 20, 2024 Letter to City.[11]  Because the City had no opportunity or reason to challenge the FAA's authority to impose a perpetual obligation to operate the Airport before these dates, its claims are timely.

> **B.    The City has standing to pursue its constitutional claims.**

Contrary to the FAA's contentions, the City also satisfies all three elements[12] of the standing inquiry.  *First,* the City is injured by the FAA's attempt to retroactively impose a perpetual obligation to operate the Airport.  Change 2 purports to change the obligations

---

[11] The Court may consider this document because it is referenced in the complaint, central to the City's claims, and its authenticity is not disputed.  *Smith*, 561 F.3d at 1098.

[12] The City must show that it has "(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision."  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016).  When addressing standing at the motion-to-dismiss stage, the Court must accept all material allegations in the complaint as true and construe the complaint in the City's favor.  *Petrella v. Brownback*, 697 F.3d 1285, 1292 (10th Cir. 2012).

to which the City agreed when it accepted grants, converting a 20-year restriction on alienation to an unlimited one.  *See* ECF 1 ¶ 15.  Such interference with the City's ownership and disposition of its property is an injury for standing purposes.  *See, e.g.*, *Von Kerssenbrock-Praschma v. Saunders*, 48 F.3d 323, 325–26 (8th Cir. 1995) (holding that plaintiff was injured by statute limiting his right to dispose of his property and effectively "convert[ing his] fee simple absolute into something less"); *Mindock v. Dumars*, No. 18-cv-3240, 2019 WL 2173931, at *3 (D. Colo. May 20, 2019) (finding injury based on restrictive condition in deed interfering with alienability and value of property); *Petworth Holdings, LLC v. Bowser*, 308 F. Supp. 3d 347, 353–54 (D.D.C. 2018) (concluding that law limiting plaintiff's ability to change use of property and clouding title so as to render it unattractive to lenders caused injury for standing purposes).  It is of no matter that the City is already bound by the FAA's restrictions through 2040; the FAA's policy adds to that regulatory burden.  *See Ass'n of Am. R.Rs. v. Dep't of Transp.*, 38 F.3d 582, 585 (D.C. Cir. 1994) (rejecting argument that railroads lacked injury where they would be subject to regulation regardless of challenged action).

Further, the City's acceptance of any further FAA grant funds, to which the City is entitled by statute, *see* 49 U.S.C. § 47114(d)(2) (directing the annual apportionment of funds to general aviation airports such as the Airport), would amount to its consent to be bound by the unlawful policy expressed in Change 2.  ECF 1 ¶¶ 3, 15, 44, 52.  Being faced with an unconstitutional federal funding offer gives rise to an injury for Article III standing purposes.  *See Arizona v. Yellen*, 34 F.4th 841, 852–53 (9th Cir. 2022)

(concluding plaintiff's "theory of injury based upon having a right to an unambiguous funding offer from the federal government" was sufficient for standing purposes).

These injuries—interference with the City's ownership and disposition of its property, an extended regulatory burden, and an inability to accept federal funding free from unconstitutional conditions—are injuries the City presently faces. The City does not claim injury based on some hypothetical future FAA pronouncement that the City cannot close the airport. The FAA's attempt to mischaracterize the City's injury in an effort to make it seem remote should be rejected. ECF 26 at 18.[13]

*Second,* when the injuries actually alleged by the City are considered, it is clear those injuries are traceable to the FAA action challenged here: the City would not suffer the injuries described above but for the FAA's attempt to impose a perpetual obligation to operate the Airport through Change 2. ECF 1 ¶ 15. The FAA's suggestion that the City's injuries are not fairly traceable to its unlawful conduct is again based on mischaracterizing the City's claim of injury. ECF 26 at 19.

*Third,* declaring FAA's assertion of a perpetual obligation to operate the Airport unconstitutional would redress the City's injuries by removing the uncertainty regarding the City's title and ability to dispose of its property, eliminating the additional regulatory burden of a perpetual obligation, and permitting the City to accept new FAA grant funding—if it chooses to do so—without consenting to the unlawful condition asserted in

---

[13] For the same reasons, the Court should reject the FAA's argument that the City's claims have not yet accrued. *Id.* at 17–18.

Change 2.  *See Petworth Holdings*, 308 F. Supp. 3d at 354 (finding redressability requirement met because declaration that law imposed an unconstitutional restriction on use of property would alleviate injury by removing cloud on title).  The FAA's challenge to the redressability of the City's injuries should be rejected because it argues against claims of injury the City does not allege.  ECF 26 at 18–19; *see Petrella*, 697 F.3d at 1294 (reversing district court redressability determination that "was based on an inaccurate characterization of [plaintiffs'] injury").  Even if the City still chooses to forgo federal grant funding after prevailing in this case, its injury will have been redressed, because it will have made that choice free from the attempted imposition of an unconstitutional offer.

### C.    The City's claims are prudentially ripe.

The Court should also reject the FAA's ripeness argument.  The City is not seeking review of some hypothetical future FAA order denying it permission to close the Airport, *see* ECF 26 at 22–23, but rather FAA's assertion that the City must forever *obtain* such permission.  ECF 1 ¶¶ 64–87.  The City's claims are fit for judicial review without further factual development, and the City will suffer hardship if the Court declines to hear the City's claims now.  *See United States v. Cabral*, 926 F.3d 687, 693 (10th Cir. 2019) (prudential ripeness turns on "the fitness of the issue for judicial review," and "the hardship to the parties from withholding review" (citations omitted)).

*First*, the City's claims are fit for review: determination of the merits of the City's claims turns upon legal issues and does not depend on contingent future events and facts yet to occur.  *See id.*  The FAA's retroactive imposition of an obligation to operate the Airport in perpetuity was first announced in Change 2.  ECF 1 ¶¶ 45–51.  The City

challenges the constitutionality of that policy as it currently applies to the City, and while the City's claims may involve factual elements—for example, whether the City "knowingly accepted" the conditions now imposed, *id.* ¶¶ 71–76—these are facts that have already occurred and are not contingent on future events.

In *Cabral*, cited by the FAA, ECF 26 at 21–22, the Tenth Circuit held that a challenge to an allegedly unlawful delegation became ripe the moment the delegation occurred; it "was either proper or not—and its propriety does not depend on how (or even whether) the [delegee] might later choose to wield the delegated power." *Cabral*, 926 F.3d at 696. The same is true here. The FAA's retroactive imposition of a perpetual obligation to operate the Airport was unlawful when it happened: it was *ultra vires*, it imposed retroactive conditions the City did not knowingly accept, it commandeered the City's sovereign authority over the use and disposition of its property, and it deprived the City of its contractual rights without due process of law. ECF 1 at ¶¶ 64–87. These harms occurred when the FAA published Change 2, regardless of any further harm that could arise if the FAA denies an application from the City to close the Airport in the future. "While facts developed in the course" of an application for closure "may further reinforce" the unlawfulness of the FAA's actions, "the legal dispute on the merits would remain relatively unchanged by these factual developments," and so the City's claims are ripe. *Darren Patterson Christian Acad. v. Roy*, 699 F. Supp. 3d 1163, 1182 (D. Colo. 2023).

In an effort to manufacture a ripeness defect, the FAA argues that the City's claims cannot be heard until the City has decided to close the Airport and the FAA has denied the City's application to close. ECF 26 at 22–23. But the City does not seek to challenge

a future rejection of its application; it challenges the FAA's authority to even *require* an application after the expiration of the City's grant agreements on their terms.

Similarly, the FAA's contention that the case is not ripe for adjudication because Congress might change the law, the FAA might change its position, or courts might announce new legal principles, *id.* at 23–24, is irrelevant. There is no indication that the FAA's position is tentative, and the FAA has confirmed that the City is retroactively obligated to operate the Airport in perpetuity, based on the position articulated in Change 2. ECF 1 ¶¶ 45–51. "[W]e already know with relative certainty" that the passage of time "would not make any difference." *Fourth Corner Credit Union v. Fed. Rsrv. Bank of Kan. City*, 861 F.3d 1052, 1078 (10th Cir. 2017). This case is therefore unlike *American Petroleum Institute v. EPA*, cited by the FAA, where the agency was actively reconsidering the regulatory provisions at issue in the lawsuit, and the petitioner could argue its position to the agency in the rulemaking proceeding rather than challenging a soon-to-be-ineffective rule in court. 683 F.3d 382, 387–89 (D.C. Cir. 2012).

*Second*, the City will suffer hardship if this Court declines to adjudicate this case now. *See Cabral*, 926 F.3d at 693. "[D]eferring judicial review may pose a hardship" satisfying the ripeness test if, due to the statute of limitations, a plaintiff "could not reassert [its] claim in a future lawsuit." *Butman Family Inv. Ltd. P'ship v. Owners Ins. Co.*, No. 19-cv-01638, 2020 WL 1470801, at *7 (D. Colo. Mar. 25, 2020); *see also, e.g.*, *Water's Edge v. Affiliated FM Ins. Co.*, No. C19-1553, 2020 WL 104318, at *4 (W.D. Wash. Jan. 9, 2020) (expressing concerns about the statute of limitations and concluding that the "hardship factor weighs in favor of exercising jurisdiction to hear this case" (cleaned up)). Here, the

City has shown that its challenge to Change 2 and the duration of the property interests created by its prior grant agreements with the FAA are not presently time-barred by either the QTA's twelve-year statute of limitations or the general six-year statute of limitations for claims against the United States, *supra* pp. 13–14, but the City may be unable to make that showing in 2040, when its most recent grant agreement expires.

The FAA may argue that the City can challenge any perpetual obligation imposed through Change 2 if and when it submits a concrete proposal to the FAA to close the Airport, ECF 26 at 22–23, but this argument misses the point: such future proposal, and evaluation by the FAA, presupposes that the City *must* still obtain permission from the FAA to close the Airport after the City's most recent grant agreement expires—the very obligation the City challenges here.  In 2040, the FAA might argue the City's has waived its opportunity to challenge its obligation to obtain FAA permission by seeking FAA permission, or that the closure proposal is not the proper vehicle to adjudicate the City's challenge to Change 2.   Therefore, "dismissing the City's claims as unripe would effectively foreclose the possibility of relief—a hardship and inequity of the highest order." *In re MTBE Prods. Liab. Litig.*, 725 F.3d 65, 111 (2d Cir. 2013).

The City will suffer an additional hardship if this Court does not review its claims: because Change 2 purports to apply retroactively, and in order to preserve the option to ever close the Airport without the FAA's consent, the City must forgo new federal grant funding and operate the Airport at its sole expense.  ECF 1 ¶ 52.  If the City's claims are not adjudicated until 2040 or later, and the City ultimately does not prevail on those claims, expenditure of the City's and taxpayer funding will have been in vain.  *Id.*  The FAA argues

this is not a hardship for ripeness purposes.  ECF 26 at 24.  But the expenditure of funds that may ultimately be unnecessary or wasteful when an uncertain regulatory regime is clarified is a demonstrated hardship for ripeness purposes.  *See, e.g.*, *Pac. Gas & Elec. Co. v. State Energy Res. Conservation & Dev. Comm'n*, 461 U.S. 190, 201 (1983) (finding hardship because "postponement of decision" would require utilities to spend "millions of dollars over a number of years" in the hope of a favorable decision, but "without any certainty of recovery" if favorable decision did not ensue); *Skull Valley Band of Goshute Indians v. Nielson*, 376 F.3d 1223, 1238–39 (10th Cir. 2004) (similar); *Rocky Mountain Oil & Gas Ass'n v. Watt*, 696 F.2d 734, 743 n.11 (10th Cir. 1982) (finding hardship where withholding judicial intervention until denial of application "would require a developer to risk hundreds of thousands of dollars in nonrecoverable development costs").  It is the actual cost of regulatory uncertainty to the City and its taxpayers that poses a hardship if the Court does not review the City's claims, not the "mere existence" of that uncertainty. *Cf. Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 810–12 (2003) (mere desire to resolve regulatory uncertainty was insufficient to establish ripeness).

> **D.    The United States has waived sovereign immunity.**

The QTA provides a waiver of sovereign immunity for the City's suit.  *See Rio Grande Silvery Minnow*, 599 F.3d at 1175.  This waiver extends to the City's constitutional claims because the perpetual property interest asserted by the FAA is itself unconstitutional: the FAA's claimed authority to forever restrict the City's use of the land comprising the Airport must yield to the City's fee simple ownership of its property.  *See*

*George*, 672 F.3d at 946.  The City's constitutional claims may be adjudicated as part of the City's QTA claim, and under the QTA's sovereign immunity waiver.

Alternatively, if the Court concludes that it lacks jurisdiction to hear the City's QTA claim, the APA waives sovereign immunity with respect to the City's constitutional claims independent from its QTA claim.  5 U.S.C. § 702; ECF 26 at 20 (describing APA sovereign immunity waiver).  The exception to that waiver when other statutes "impliedly forbid" the relief sought is not implicated here.  The FAA's argument that the City seeks relief amounting to judicial contract interpretation barred by the Tucker Act and Little Tucker Act (collectively, the "Tucker Act") is based on a misreading of the City's complaint. ECF 26 at 20.  The City does not assert a contract claim seeking an interpretation of the grant agreements; rather, the City alleges that the retroactive imposition of a perpetual obligation to operate the Airport—a policy asserted outside of and decades after execution of the grant agreements at issue—is unconstitutional.  ECF 1 ¶¶ 64–87.[14]

Furthermore, the Tucker Act does not prevent the federal district courts from exercising jurisdiction when a litigant raises constitutional claims against the federal government, "even when the claims depend on the existence and terms of a contract with the government."  *Robbins v. U.S. Bureau of Land Mgmt.*, 438 F.3d 1074, 1083 (10th Cir. 2006) (quoting *Transohio Sav. Bank v. Dir., Office of Thrift Supervision*, 967 F.2d 598, 610 (D.C. Cir. 1992)); *see also Waibel Ranches*, 2024 WL 3384233, at *2 (same, for

---

[14] To the extent the Court considers the complaint to raise claims of contract interpretation barred by the Tucker Act, the City respectfully requests the opportunity to amend the complaint to clarify its claims and/or plead additional claims.

claims arising under the QTA).  For example, in *Normandy Apartments, Ltd. v. U.S. Department of Housing and Urban Development*, the court determined that a claim challenging the agency's termination of a contract as in violation of the agency's regulations did not sound in contract and could be heard in federal district court.  554 F.3d 1290, 1299–1300 (10th Cir. 2009).  The fact that the claim would not exist without the underlying contract did not "magically transform" the action into a contract claim.  *Id.* at 1300 (cleaned up).  The same is true here.  The City challenges the FAA's retroactive imposition of a perpetual obligation to operate the Airport on constitutional grounds.  These claims do not sound in contract, and the Tucker Act does not pose a bar to the applicability of the APA's waiver of sovereign immunity or this Court's jurisdiction.[15]

## III.    THE CITY ADEQUATELY STATES CONSTITUTIONAL CLAIMS FOR RELIEF

On the merits, the City adequately pleads constitutional claims for relief and seeks a declaration that Change 2, as applied to the City, is unconstitutional.

### A.    The City states a Separation of Powers violation.

Change 2 violates the separation of powers doctrine because Congress did not expressly or impliedly authorize the FAA to conscript prior recipients of FAA funding for land acquisition into forever operating their airports.

---

[15] Nor does any other statute pose such a bar.  Although the QTA provides the "exclusive means by which adverse claimants may challenge the United States' title to real property," *Rio Grande Silvery Minnow*, 599 F.3d at 1175 (citations omitted), that restriction will not apply if the Court concludes the City does not state a QTA claim, *see Patchak*, 567 U.S. at 217 (concluding that an action that did not satisfy the prerequisites for a QTA claim was not barred under the APA).

Like all federal agencies, the FAA "literally has no power to act . . . unless and until Congress confers power upon it." *La. Pub. Serv. Comm'n v. FCC*, 476 U.S. 355, 374 (1986). Agencies' "power to act and how they are to act is authoritatively prescribed by Congress, so that when they act improperly, . . . what they do is ultra vires." *City of Arlington v. FCC*, 569 U.S. 290, 297 (2013), *abrogated on other grounds*, *Loper Bright Enters. v. Raimondo*, 144 S. Ct. 2244 (2024). "[W]hen it comes to spending, the President has none of 'his own constitutional powers' to 'rely' upon." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1233–34 (9th Cir. 2018) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). Thus, particularly where Congress has delineated clear and comprehensive requirements for participation in a grant program, agencies may not "radical[ly] depart[]" from those requirements without "unmistakable" authorization. *City of Chicago v. Barr*, 961 F.3d 882, 894, 907–08 (7th Cir. 2020); *see also Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981) ("[I]f Congress intends to impose a condition on the grant of federal moneys, it must do so unambiguously.").

Change 2 violates the separation of powers doctrine because it attempts to impose a retroactive, perpetual obligation on sponsors that previously acquired land with federal assistance without any Congressional authorization to do so. ECF 1 ¶¶ 64–69.

The FAA does not and cannot dispute that Congress was silent as to the duration of the grant assurances, much less whether any such duration may be retroactively extended in perpetuity. *Id.* ¶ 67. Rather, the FAA seeks refuge in its purportedly broad delegated authority to "maintain[] a safe and efficient airport system that support[s] present and future civil and governmental aviation needs," and "require compliance with

*any additional assurance*" through notice and comment rulemaking.  ECF 26 at 28 (emphasis in original).  But there are several problems with the FAA's argument.

Initially, the FAA's argument again rests on a straw man fallacy.  The City does *not* ask the Court to consider whether the FAA acted within its delegated authority when it modified the grant assurances in 1980.  Instead, the City challenges the FAA's assertion that its pre-1980 grant agreements do not mean what they say.  For the first time, Change 2 states that an airport sponsor which accepted *any* grant since 1980 is obligated in perpetuity if it had *ever* accepted a grant for land acquisition.  ECF 1 ¶ 45.

Properly construed, the City clearly alleges a viable separation of powers claim.  Even assuming that the imposition of a retroactive, perpetual obligation was substantively within the FAA's delegated authority, the FAA did not follow Congressionally prescribed procedures.  Change 2 was simply announced.  The FAA did not provide notice in the Federal Register or provide an opportunity for public comment, as Congress specifically required to modify a grant assurance.[16]  *See* 49 U.S.C. § 47107(h).[17]  An agency's failure to conform to Congress' prescription of "*how* they are to act . . . is ultra vires" and therefore unconstitutional.  *Arlington*, 569 U.S. at 297 (emphasis added).

---

[16] Even the 1980 revision of grant assurances would have violated this command. While the FAA claims it "received public comment," ECF 26 at 29, in fact the FAA did not seek comment on this revision; it simply added it at the final rule stage without first obtaining public comment.  *Compare* 44 Fed. Reg. 46,858, 46,878 (Aug. 9, 1979) (NPRM) with 45 Fed. Reg. 34,782, 34,798 (May 22, 1980) (Final Rule).

[17] FAA's reliance on more general authority to carry out its statutory duties, ECF 26 at 28, is misplaced.  *See Chicago*, 961 F.3d at 894 (rejecting the government's reliance on similar authority as too ambiguous for Spending Clause purposes).

Even casting that error aside, Change 2's imposition of a retroactive, perpetual obligation is *not* within the FAA's delegated authority. "Congress . . . does not alter the fundamental details of a regulatory scheme in vague terms or ancillary provisions—it does not, one might say, hide elephants in mouseholes." *Chicago*, 961 F.3d at 894 (quoting *Gonzales v. Oregon*, 546 U.S. 243 (2006)). Rather, Congress must speak clearly if it desires "to assign to an agency decisions of vast 'economic and political significance.'" *Util. Air Regul. Grp. v. EPA*, 573 U.S. 302,324 (2014); *see also Chicago*, 961 F.3d at 907–08 (rejecting government's reliance on ambiguous delegated authority to prescribe funding conditions). There can be no doubt that the conscription of prior recipients of FAA funding for land acquisition into forever operating their airports would require Congress to speak with a "clear voice." *Chicago*, 961 F.3d at 907. Forcing municipalities to continue operating an airport in perpetuity, regardless of the future views of their residents or the express terms of their prior written agreements with the FAA, "implicates questions of deep economic and political significance and alters the traditional balance of federalism." *State of W. Va. v. U.S. Dep't of the Treasury*, 59 F.4th 1124, 1146 (11th Cir. 2023). It simply cannot be that Congress intended to grant the FAA such sweeping authority through legislative silence as to the duration of sponsors' obligations.

Moreover, the imposition of a retroactive, perpetual obligation is inconsistent with the legislative scheme that Congress *did* prescribe. *See City of Providence v. Barr*, 954 F.3d 23, 34–35 (1st Cir. 2020) (expressing doubt that Congress would authorize DOJ to impose funding conditions when the statutory scheme was otherwise intended to operate as a formula grant). Federal law imposes myriad requirements on the recipients of AIP

grants.  *See* 49 U.S.C. § 47107(a).  And Congress has *specifically* spoken with respect to additional requirements associated with grants for the acquisition of land.  *Id.* § 47107(c)(2).  For example, the recipient of such a grant must promise to dispose of such land at fair market value and remit a proportionate share of the proceeds to the FAA for reinvestment at another airport.  *Id.* § 47107(c)(2)(B).  If Congress intended for the FAA to also require the recipients of such grants to operate their airports forever, "it surely would have said so."  *Colorado v. U.S. Dep't of Justice*, 455 F. Supp. 3d 1034, 1050 (D. Colo. 2020).  And Congress clearly knows *how* to say so.  For example, Congress prohibited the FAA from approving an application for a grant to a "*privately* owned public-use airport" unless it "receives appropriate assurances that the airport will continue to function as a public-use airport during the economic life (that must be at least 10 years) of any facility at the airport that was developed with Government financial assistance."  49 U.S.C. § 47107(d) (emphasis added).  It would be bizarre for Congress to be so prescriptive with respect to *privately* owned airports, while intending to impose a perpetual obligation on *publicly* owned airports through its silence, particularly in light of the grave constitutional concerns, discussed below, such an obligation would entail.

Because the FAA has no power to obligate the City to operate the Airport in perpetuity without clear authorization from Congress, Change 2 is *ultra vires*.

### B.    The City states a Spending Clause violation.

Even if Congress had delegated authority to the FAA to retroactively impose perpetual obligations, the FAA's exercise of that authority violates the Spending Clause. While Congress may attach conditions to its award of funds, those conditions must be

clear and unambiguous. *South Dakota v. Dole*, 483 U.S. 203, 207–09 (1987). And the grant recipient—here, the City—must knowingly and voluntarily accept those conditions. *Pennhurst*, 451 U.S. at 17; *Arlington Cent. Sch. Dist. Bd. of Educ. v. Murphy*, 548 U.S. 291, 296 (2006) (Spending Clause requires clear notice of obligations to recipient of grant funding); *Arbogast v. Kansas*, 789 F.3d 1174, 1186 (10th Cir. 2015) (same); *Texas v. Yellen*, 105 F.4th 755, 761 (5th Cir. 2024) ("Congress has a constitutional obligation to cut a clear deal with the states when they accept federal funding").

Further, the power to condition federal funds does not confer the power to apply "postacceptance or 'retroactive' conditions." *Pennhurst*, 451 U.S. at 25. "Just as a valid contract requires offer and acceptance of its terms, the legitimacy of Congress' power to legislate under the spending power rests on whether the recipient voluntarily and knowingly accepts the terms of the contract." *Barnes v. Gorman*, 536 U.S. 181, 186 (2002) (cleaned up). Retroactive conditions are unconstitutional when Congress does not clearly express an intent to apply conditions retroactively. *Pennhurst*, 451 U.S. at 25 (retroactive conditions rob grantees of the ability to make an "informed choice").

When the City accepted federal grants for the acquisition of land in 1959 and 1977, the terms of those grant agreements were expressly limited to 20 years. ECF 1 ¶ 57. Those were the terms the City "voluntarily and knowingly accept[ed]." *Barnes*, 536 U.S. at 186. The FAA does not (and cannot) point to any document in which the City agreed to extend the term of those grant agreements. Nothing on the face of the FAA's 1980 modification of the grant assurances purported to extend the duration of prior grant agreements. *See Bowen v. Georgetown Univ. Hosp.*, 488 U.S. 204, 208 (1988)

("Retroactivity is not favored in the law.   Thus, congressional enactments and administrative rules will not be construed to have retroactive effect unless their language requires this result.").  Indeed, for more than forty years after the FAA's 1980 modification of the grant assurances, the FAA continued to maintain, "[i]n cases where land was acquired with [pre-1980] grants, FAA should review the language of such grants . . . since most FAAP land grants and some ADAP grant documents do *not* impose a perpetual obligation."  Ex. C, Change 1 ¶ 4.3 (emphasis added).

Change 2 is unconstitutional because it imposes precisely the sort of "post-acceptance or 'retroactive' conditions" prohibited under *Pennhurst* and its progeny.  Out of thin air, Change 2 baldly (and boldly) asserted, "so long as the airport sponsor has taken an ADAP or AIP grant since May 1980, the federal obligations on the acquired land remain in effect until released by the FAA."  Ex. A, Change 2 ¶ 4.3.a.

Perhaps recognizing that Change 2 is then clearly unconstitutional to the extent it claims to revive and extend in perpetuity the 1959 and 1977 Grant Agreements, the FAA asks the Court to focus instead on the 1991 Grant Agreement.  ECF 26 at 32 n.13.  But, as discussed above, the City did not understand (and had no reason to understand) the 1991 Grant Agreement to be unlimited in its duration.  *Supra* pp. 9–13.  Indeed, the FAA's insistence that the Court "consider the full context, including the agency's regulations and guidelines" in determining whether that term was "sufficiently unambiguous," is ironic. *See* ECF 26 at 31.  Here, the "full context" demonstrates it was not at all clear that the 1991 Grant Agreement for the acquisition of an easement carried with it a perpetual obligation.   Nearly all of the FAA's contemporaneous guidance stated that only the

acquisition of "land" would carry perpetual obligations. *Supra* pp. 10–11. Even now, the FAA's guidance suggests that only "the federal obligations on the acquired *land* remain in effect until released by the FAA." Ex. D, Change 3 ¶ 4.3.a. As the City alleged, the FAA had *never* taken the position prior to 2024 that the acquisition of a mere easement would carry with it a perpetual obligation to operate the entire Airport. ECF 1 ¶ 33.

*Mineta*, also cited by the FAA, puts the infirmity of the FAA's position into even starker relief. In that case, the court unsurprisingly held that defendants had clear notice that "[t]he grant agreements, which directly quote 49 U.S.C. § 47107, specifically provide the FAA a right to claim its proportionate share of funds from any sale of Airport property if the property is no longer used for airport purposes." *Mineta*, 2006 WL 2711559, at *6. By contrast, nothing in the statute or any of the City's executed grant agreements with the FAA made clear that the City would be bound in perpetuity. Because the City did not "voluntarily and knowingly accept[]" an obligation to operate the Airport in perpetuity in 1959, 1977, 1991, or any other time, Change 2 violates the Spending Clause.

### C.    The City states a Tenth Amendment violation.

The City states a Tenth Amendment violation because Change 2 leaves the City with no choice but to continue operating the Airport in accordance with federal standards for as long as the FAA—and only the FAA—determines is appropriate.

It is axiomatic that the "Federal Government may not compel the States to enact or administer a federal regulatory program." *New York v. United States*, 505 U.S. 144, 188 (1992). The government may use its grantmaking power to "encourage a State to regulate in a particular way, and influence a State's policy choices." *Nat'l Fed'n of Indep.*

*Bus. v. Sebelius*, 567 U.S. 519, 576 (2012) (citing *New York*, 505 U.S. at 166) (cleaned

up).   "But when 'pressure turns into compulsion,' [Spending Clause] legislation runs

contrary to our system of federalism."   *Id.* at 577–78 (quoting *Steward Machine Co. v.

Davis*, 301 U.S. 548, 590 (1937).   While the government may drive a hard bargain, the

City must remain free to reject federal conditions and the funding that comes along with

them.  *See Kansas v. United States,* 214 F.3d 1196, 1203 (10th Cir. 2000).

        The FAA claims the City had such a choice.   ECF 26 at 34.   But its argument

overlooks two critical distinctions between the facts of this case and that of every other

case it cites in support: Change 2 asserts through administrative fiat that the City is

*already* obligated to operate the Airport in perpetuity because of its prior receipt of funds

for land acquisition, notwithstanding that the City was never presented with (and never

made) such a choice; and Change 2 leaves the City with no opportunity to ever *extricate*

itself from a federal obligation to maintain the Airport.

        As discussed above, the City voluntarily accepted an obligation to operate the

Airport for, at most, 20 years from its acceptance of each grant agreement.  *Supra* pp. 10–

11, 28.   But Change 2 flipped the script, asserting that an airport sponsor which had at

any point accepted federal funds to acquire land, no matter what the terms of those grant

agreements actually provided, would be obligated to comply with its grant agreements in

perpetuity.   ECF 1 ¶ 45.   This is not the "typical case" where the City can "defend [its]

prerogatives by adopting 'the simple expedient of not yielding' to federal blandishments

[if it does] not want to embrace the federal policies as [its] own."  *Sebelius*, 567 U.S. at

579 (citation omitted).   Rather, Change 2 does not give the City any choice at all; it simply

"conscript[s] [the City] into the national bureaucratic army."  *FERC v. Mississippi*, 456 U.S. 742, 775 (O'Connor, J., concurring in part).  Change 2 thus "forecloses *New York*'s 'critical alternative': the option of non-participation in a federal program."  *City of Chicago v. Sessions*, 321 F. Supp. 3d 855, 870 (N.D. Ill. 2018) (quoting *New York*, 505 U.S. at 176).

Moreover, the reason why conditions imposed through Spending Clause programs do not generally offend the Tenth Amendment is because recipients have the option of *withdrawing* from their prior participation in a federal program.  *See, e.g., Guardians Ass'n v. Civil Serv. Comm'n*, 463 U.S. 582, 596 (1983) ("[C]ourts must recognize that the recipient has 'alternative choices of assuming the additional costs' of complying with what a court has announced is necessary to conform to federal law or of 'not using federal funds' and withdrawing from the federal program entirely." (citation omitted)); *Davis v. Monroe Cnty. Bd. of Educ.*, 120 F.3d 1390, 1399 (11th Cir. 1997), *rev'd on other grounds*, 526 U.S. 629 ("The freedom of recipients to decline prospectively or to terminate retrospectively a grant of federal funding ensures that they will remain responsive to the preferences of their local constituents."); *Dole*, 483 U.S. at 211 (observing that a state desiring to establish a minimum drinking age lower than 21 could simply elect to forego "a relatively small percentage of certain federal highway funds."); *Kansas*, 214 F.3d at 1203 ("In the present case, the states have a real choice, albeit a hard one, between accepting the money and the conditions or declining both.").

Here, however, Change 2 provides no opportunity for the City to *ever* withdraw from its obligation to operate the Airport.  The City may have "the ability to forgo federal

funds," but—according to the FAA—that would not allow the City to "avoid complying with federal conditions," even beyond the expiration of its most recent grant.  ECF 26 at 34.

Change 2 therefore threatens each of the fundamental principles undergirding the anti-commandeering doctrine, as recently described by the U.S. Supreme Court.  *See Murphy v. NCAA*, 584 U.S. 453, 473 (2018).  First, the "rule serves as 'one of the Constitution's structural protections of liberty,'" respecting the division of "authority between federal and state governments for the protection of individuals."  *Id.* (citations omitted).  It is well-settled that "land use and zoning decisions, even concerning land by airports, are matters of local, not federal, concern."  *Fourth Quarter Props. IV, Inc. v. City of Concord*, 127 F. App'x 648, 656 (4th Cir. 2005) (collecting cases).  Yet Change 2 forever wrests such decisions from the citizens of Boulder.  It does not matter, according to the FAA, whether the citizens of Boulder want to maintain the Airport and the burdens associated with it; they must, unless the FAA and only the FAA determines otherwise.

Second, Change 2 runs counter to the anticommandeering doctrine's "promot[ion] [of] political accountability."  *Murphy*, 584 U.S. at 473.  As the Court explained in *Sebelius*:

> Where the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision.  Spending Clause programs do not pose this danger when a State has a legitimate choice whether to accept the federal conditions in exchange for federal funds. In such a situation, state officials can fairly be held politically accountable for choosing to accept or refuse the federal offer.  But when the State has no choice, the Federal Government can achieve its objectives without accountability, just as in *New York* and *Printz*.

567 U.S. at 578 (internal quotations omitted).  The latter circumstance is present here. The City's elected representatives have no choice but to continue operating the Airport, regardless of their constituents' preferences, because the FAA says they must.

Finally, Change 2 offends the "principle prevent[ing] Congress from shifting the costs of regulation to the States."  *NCAA,* 584 U.S. at 473.  While it may at first appear that the FAA is willing to fund the burden of maintaining the Airport through future grants, in reality, the opposite is true.  Indeed, the FAA's motion to dismiss argues that a mere $5,800 in federal assistance bought the FAA's right to force the City to operate the Airport forever, *with or without* federal assistance.  In short, the City may choose only between operating the Airport it may not want with federal assistance or without.  It is this Hobson's choice that renders Change 2 unconstitutional under the Tenth Amendment.

### D.    The City states a Due Process violation.

The FAA's attempt to retroactively modify the term of the City's prior grant agreements for the acquisition of land also violates Due Process.

"Rights against the United States arising out of a contract are property rights protected from deprivation or impairment by the Fifth Amendment."  *Madera Irrigation Dist. v. Hancock*, 985 F.2d 1397, 1401 (9th Cir. 1993); *accord Robbins*, 438 F.3d at 1084. A contractual interest "is a 'property' interest for due process purposes if there are . . . rules or mutually explicit understandings that support [a] claim of entitlement to the benefit."  *Robbins*, 438 F.3d at 1085 (citations omitted).

The City clearly alleges a valid property interest.  The 1959, 1977, and 1991 Grant Agreements were supposed to have expired on their terms not later than 20 years from

their acceptance.  ECF 1 ¶¶ 22, 26, 35.  Change 2 violates due process by unilaterally abrogating the express term of those agreements and holding the City to the obligations contained therein in perpetuity.  *See White v. Padilla,* Civ. No. 21-1204, 2022 WL 17249287, at *11 (D. N.M. Nov. 28, 2022) (concluding that incarcerated individuals have a liberty interest in being released upon the expiration of their sentence and collecting cases, noting an absence of Tenth Circuit precedent).

Further, the City was afforded *no* process in the abrogation of its interest.  At no point prior to Change 2 did the FAA so much as suggest that the acceptance of any grant after 1980 would operate to extend the obligations under prior land acquisition grants indefinitely.  ECF 1 ¶¶ 45–48.  And even Change 2 did not comply with the requirement to publish notice in the Federal Register and provide an opportunity for public comment if the FAA desires to "modify[]" or "require compliance with an additional assurance." 49 U.S.C. § 47107(h)(1).  The absence of *any* process is a clear a violation of the Fifth Amendment.  *Greene v. Barrett*, 174 F.3d 1136, 1141 (10th Cir. 1999).

## CONCLUSION

For the foregoing reasons, the FAA's motion to dismiss should be denied.

Dated: January 7, 2025

<div style="margin-left: 45%;">

/s Steven Lloyd Osit
**Steven Lloyd Osit**
Samantha R. Caravello
Megan Riley Scott
1675 Broadway, Ste. 2300
Denver, Colorado 80202
Telephone: (303) 725-8000
Email: sosit@kaplankirsch.com
Email: scaravello@kaplankirsch.com
Email: rscott@kaplankirsch.com

William Eric Pilsk
1634 Eye Street NW, Ste. 300
Washington, D.C. 20006
Telephone: (202) 955-5600
Email: eplisk@kaplankirsch.com

-and-

BOULDER CITY ATTORNEY'S OFFICE

Luis Angel Toro
Teresa Taylor Tate
Veronique M. Van Gheem
P.O. Box 791
1777 Broadway
Boulder, Colorado 80306
Telephone: (303) 441-3020
Email: torol@bouldercolorado.gov
Email: tatet@bouldercolorado.gov
Email: vangheemv@bouldercolorado.gov

*Counsel for Plaintiff*

</div>

## CERTIFICATE OF SERVICE

I hereby certify that on January 7, 2025, I electronically filed the foregoing with

the Clerk of Court using the CM/ECF system, which will serve all counsel of record:

**Thomas A. Isler**
Assistant United States Attorney
1801 California Street, Ste. 1600
Denver, Colorado 80202
Telephone: (303) 454-0336
Email: thomas.isler@usdoj.gov

*Counsel for Defendants*

*s/ Steven L. Osit*
**Steven L. Osit**
*Counsel for Plaintiff*