Plaintiff's Exhibit B

ORDER

5190.6A

# AIRPORT COMPLIANCE REQUIREMENTS




OCTOBER 2, 1989

## DEPARTMENT OF TRANSPORTATION
FEDERAL AVIATION ADMINISTRATION

Distribution: A-W(PP/AS)-3; A-X(AS)-4; A-FAS-1(MAX)

Initiated By: AAS-300

# CHAPTER 2. TYPES OF AGREEMENTS

## SECTION 1. GRANT AGREEMENTS.

**2-1. SPONSOR'S OBLIGATIONS.**

a. Under the various Federal grant programs, the sponsor of a project agrees to assume certain obligations pertaining to the operation, use and maintenance of the airport. These obligations are embodied in the application for Federal assistance as sponsor's assurances and become a part of the grant offer, and bind the grant recipient upon acceptance. The grant assurances in the several development programs (Federal Airport Aid Program (FAAP), Airport Development Aid Program (ADAP), and Airport Improvement Program (AIP)) are somewhat varied; therefore, each grant agreement should be reviewed in order to determine the airport owner's obligations.

b. Some agreements contain special covenants or conditions directed to an individual situation. This Order is generally not concerned with any special conditions under which the project is to be carried out; such as withholding of funds due to nonacquisition of clear zone areas, acquisition of additional land within a prescribed time limit, etc. However, in unusual circumstances where an assurance was contained as a special covenant or condition, the interpretation in this Order will apply.

**2-2. DURATION OF GRANT AGREEMENTS.**

a. Obligations relating to the use, operation, and maintenance of the airport remain in full force and effect throughout the useful life of the facilities developed under the project but in no event to exceed 20 years. However, there shall be no limit on the duration of the assurance against exclusive rights or the terms, conditions, and assurances with respect to real property acquired with Federal funds. These provisions remain in effect so long as the airport is used as an airport. The Chief Counsel has indicated that the useful life of an airport or airport facility may be determined to have expired if it is no longer used or needed for the purpose for which it was developed, as well as if the physical life of the facility has expired. Furthermore, the duration of the Civil Rights assurances shall be as specified in the assurance.

b. The preceding subparagraph a. also applies to a private sponsor except that the useful life of project items installed within a facility or the useful life of facilities developed or equipment acquired under an airport development or noise program implementation project shall be no less than 10 years from the date of acceptance of Federal aid for the project.

**2-3. PHYSICAL LIFE OF FACILITIES.** The physical, useful life of a facility extends only for the period of time during which it is serviceable and usable with ordinary day-to-day maintenance. Reconstruction, rehabilitation, or major repair of a facility without Federal aid does not extend the duration of its useful life within the meaning of that term as used in grant agreements. When a facility needs reconstruction, rehabilitation or major repair in order that it may continue to serve the purpose for which it was developed, its useful life has expired. Regional Airports offices will make this determination. If new grants are issued for reconstruction, rehabilitation, or major repair, a new useful life period begins.

**2-4.-2-5. RESERVED**

## SECTION 2. SURPLUS PROPERTY INSTRUMENTS

**2-6. BACKGROUND.** Surplus property instruments of disposal are issued under Section 13 of the Surplus Property Act of 1944. The Act authorizes conveyance of property surplus to the needs of the Federal Government. The FAA (or its predecessor CAA) recommends to the GSA which property should be transferred for airport purposes to public agencies. Such deeds are issued by the GSA which has jurisdiction over the disposition of properties that are declared to be surplus to the needs of the Federal Government. Prior to the establishment of the GSA in 1949, instruments of disposal were issued by the WAA.

a. **Statutory Authority.** P.L. 80-289, approved July 30, 1947, amended Section 13 of the Surplus Property Act of 1944. This authorized the Administrator of WAA (now GSA) to convey to any state, political subdivision, municipality or tax-supported institution, surplus real and personal property for airport purposes without monetary consideration to the United States. These conveyances are subject to the terms, conditions, reservations and restrictions prescribed

therein. Real property cannot be transferred for airport use if a determination has been made by GSA that the highest and best use of the land is industrial. In order for any surplus real or personal property to be transferred, the FAA must determine that it is essential, suitable or desirable for the development, improvement, operations or maintenance of a public airport. This includes property needed to develop sources of revenue from nonaviation businesses at a public airport. Refer to Order 5150.2, Federal Surplus Property for Public Airport Purposes, for guidance on transferring Federal surplus property for public airport purposes.

Prior to the enactment of P.L. 80-289 surplus airport properties were conveyed to public agencies under general authority granted WAA by the Surplus Property Act. The terms and conditions subject to which surplus airport properties were conveyed under this authority were administratively established by WAA and prescribed in its Regulation No. 16, generally referred to as WAA – Reg. 16.

**b. Nonairport Property Prior to P.L. 80-289.** Prior to the enactment of P.L. 80-289, the WAA took the position that it had no authority to convey to public agencies any property other than that which had been and was intended to be used solely for operation and maintenance of the airport. This precluded the transfer of some types of buildings, facilities, and other nonairport properties comprising parts of an air base as operated by the Government.

**c. Revenue-Producing Property.** The provision in P.L. 80-289 that includes among the types of airport property, property needed to develop sources of revenue from nonaviation businesses at a public airport, constitutes specific authorization for the transfer of such properties. This is authorized where it has been determined that they are needed and will be used as sources of revenue to defray the cost of operation, maintenance and development of the airport. Originally the form of instrument used to transfer surplus airport properties under P.L. 80-289 made no distinction between obligations imposed where property was conveyed for airport use and those imposed with respect to property conveyed for revenue purposes. The FAA takes the position that each conveyance of revenue-producing property obligates the transferees to use the revenues derived from nonairport use of the property for operation, maintenance or development of the airport. If the land has been identified and agreed upon by the FAA as revenue-producing property (even if it was not so identified on the transfer document) then the revenue must be used on the airport or put into the airport fund.

**2-7. TYPES OF INSTRUMENTS OF DISPOSAL.** Three basic forms of instruments of disposal have been used to convey surplus airport properties: (1) the form used under WAA – Reg 16 prior to the amendment of the Surplus Property Act of 1944 by P.L. 80-289; (2) the form issued under P.L. 80-289 to convey real or a combination of real and related personal property; and (3) the form issued to convey only personal property. Each individual instrument of disposal must be examined to determine the particular obligations of the grantee or rights of the Government.

**a. Conditions Peculiar to Various Instruments.** Instruments of disposal under P.L. 80-289 are all substantially similar. In a few cases the National Emergency Use Provision (NEUP) has been omitted (see paragraph c. below). One or more special conditions or restrictions other than those required by law may have been included in some instruments. The instruments of disposal issued under WAA – Regulation 16, however, are not uniform. One variation in WAA – Regulation 16 instruments is the provision relating to joint military use of the airport. Some give the Government the right to unlimited use without charge, and in others the Government use may not exceed a specified percentage of the capacity of the airport if such use interferes with other authorized use of the airport.

**b. Obligation to Operate and Maintain Airport.** Practically all the WAA – Regulation 16 and P.L. 80-289 instruments conveying real and related personal property contain provisions obligating the grantees to operate and maintain the entire airport where the property is located, regardless of the amount of property conveyed by the instrument. However, instruments of disposal (SF-123) for only personal property contain provisions obligating the grantee only with respect to the use and maintenance of the specific property conveyed.

**c. National Emergency Use Provision (NEUP).** Practically all WAA – Regulation 16 and P.L. 80-289 instruments of disposal of real and related personal property also contain the NEUP under which the United States has the right to make exclusive or nonexclusive use of the airport or any portion thereof during a war or national emergency. This provision is similar in all such instruments.

**2-8. DURATION OF OBLIGATIONS.** The duration of the obligation depends upon the properties conveyed.

**a. Real Property.** All surplus airport property instruments of disposal, except those conveying only personal property, provide that the covenants assumed by the grantee regarding the use, operation and maintenance of the airport and the property transferred shall

be deemed to be covenants running with the land. Accordingly, such covenants continue in full force and effect until released under P.L. 81–311 or other applicable law.

**b. Related Personal Property.** In most cases instruments conveying real property also convey related personal property. Accountability for this property shall be its useful life not to exceed 1 year.

**c. Personal Property (Donable).** The term of a surplus airport property instrument of disposal (SF–123) conveying only personal property extends for the period of time during which it is serviceable and usable with ordinary day–to–day maintenance but no longer than 1 year. Reconstruction, rehabilitation or major repair does not extend its useful life within the meaning of that term as used in surplus property instruments. Surplus personal property that has outlived its useful life should be removed from the inventory. Such property may be disposed of by tradein on new equipment. If this is done, accountability for the new property is not required.

**2–9.–2.10. RESERVED.**

## SECTION 3. CONVEYANCES OF NONSURPLUS FEDERAL LAND

**2–11. BACKGROUND.** While Federal land which has been declared surplus is conveyed under the Surplus Property Act, federally–owned or controlled land which is not surplus may be conveyed for airport purposes under authority contained in Section 516 of the AAIA. Prior to the effective date of this Act, similar authority existed in Section 16 of the Federal Airport Act and Section 23 of the Airport and Airway Development Act of 1970. Unlike surplus property, this land may not be transferred for the specific purpose of revenue production.

**2–12. COVENANTS.** Instruments of conveyance executed under Section 516, Section 23, or Section 16 impose upon the grantees certain obligations regarding the use of the lands conveyed and the airport involved. Covenants included in the deeds or other instruments by which interests in lands are conveyed under these sections require, among other things that:

a. The grantee will use the property interest for airport purposes, and will develop that interest for airport purposes within 1 year or as set forth in the deed.

b. The airport, together with its appurtenant areas, buildings and facilities, whether or not on the land being conveyed, will be operated as a public airport on fair and reasonable terms and without discrimination.

c. The grantee will not grant or permit any exclusive right forbidden by Section 308 of the Federal Aviation Act.

d. Any subsequent transfer of the property interest conveyed will be subject to the covenants and conditions in the instrument of conveyance.

e. For Section 16 transfers the whole or any part of the property interest conveyed shall revert to the United States in the event the lands in question are not developed for airport purposes or used in a manner consistent with the terms of the conveyance.

f. In the event of a breach of any covenant or condition the grantee will, on demand, take such action as may be necessary to evidence transfer of title to the premises to the United States.

In some instances, special conditions or obligations may be imposed upon the grantee by the Government agency issuing the conveyance instrument. Therefore, it will be necessary in each case to consult the particular deed by which the lands are conveyed to determine all the conditions and covenants.

**2–13. REVERTER PROVISION.** Section 16/23/516 deeds provide for reversion to the United States in the event the lands are not developed or cease to be used for airport purposes.

**a. Section 16 Deeds.** The Federal Airport Act required that conveyances made under Section 16 "...be made on the condition that the property interest conveyed shall automatically revert to the United States..." if the land is not developed as an airport or ceases to be used for airport purposes. This provision was difficult to administer during the early years since no time limits were specified for beginning use or after ceasing use which would make the reverter operable. Beginning in the early 1960's the deeds provided that the property interest automatically reverts if the land is not developed or used for airport purposes within 3 years or if airport use ceases for a period of 6 months. The 3–year development time was changed to 5 years in 1968. At the same time, the covenants were amended to introduce a right of the Administrator, exercisable 1 year after conveyance, to repossess any part not developed for airport use. In requesting the conveyance of land for approach protection for an existing airport, the provision that the land will revert automati-

cally unless it is used for airport purposes normally was omitted. This exception was made for the reason that immediately upon acquisition the land became a part of the airport and served the approach protection purpose.

**b. Section 23/516 Conveyances.** Section 23/516 does not continue the automatic reversion of property interests contained in Section 16 but places reversion at the option of the Secretary. Section 16 transfers were made under the provisions of Federal Aviation Regulation (FAR) Part 153. The implementing regulations (FAR Part 154) require that the land be developed for airport purposes within 1 year of the conveyance. If the property is not so developed or used in a manner consistent with the terms of the conveyance, the Administrator may, at his discretion, enter and on behalf of the United States take title to all or any part of the property interests conveyed.

**c. Determination as to Exercise of Reverter.** In determining whether the reverter provision has become operable in any particular case (because of failure to develop or use the land for airport purposes or because of cessation of airport use) the deed should be examined to ascertain whether it contains applicable time limitations. If the deed does not contain such time periods, as a general rule, 1 year can be considered a reasonable time for developing or using the property for airport purposes and that 6 months of nonairport use a reasonable time for the exercise of the reverter. The regional Airports division can justify the allowance of additional time in this connection when the grantee is able to show that definite effort is being made to conform to requirements. Before a region Airports division decides to revert Section 16/23/516 property, they shall contact the Airport Safety and Operations Division (AAS-300) to discuss the proposed reversion. (See Chapter 8 for Reversion Procedures.)

**2-14. DURATION OF COVENANTS AND OBLIGATIONS.** Covenants and other provisions of Section 16/23/516 deeds continue in force and effect so long as the land is held by a public agency grantee, its successors or assigns. The FAA has no authority to release land transferred under Sections 16/23/516. If the land conveyed under a Section 16/23/516 deed is no longer used or needed for any airport purpose, FAA has no recourse but to invoke the reverter provision in accordance with the terms of the deed unless the grantee willingly agrees to its voluntary reconveyance. This does not mean, however, that land transferred for approach protection cannot be used for some secondary nonairport purpose (such as road or highway, farming, etc.) so long as such use does not interfere with the airport purposes for which it is needed. However, if the property is used for some secondary nonaeronautical purpose, a fair market value (FMV) should be received for such use and the proceeds used only for airport purposes.

**2-15.-2-17. RESERVED**

## SECTION 4. AP-4 AGREEMENTS

**2-18. BACKGROUND.**

**a.** The Development of Landing Areas National Defense (DLAND) and the Development Civil Landing Areas (DCLA) Programs were authorized by various acts during the period 1939 to 1944.

**b.** Airports developed or improved under these programs were subject to the terms and conditions of an instrument known as an AP-4 Agreement. This was an agreement between the Government and the airport sponsor under which the sponsor provided the land and the Government planned and constructed the airport improvements. Based on consideration of the type of improvements, design standards, construction methods and normal deterioration, the FAA has administratively determined that the useful life of all AP-4 improvements has expired.

**2-19. CONTINUING OBLIGATION.** Although all AP-4 Agreements have expired, such airports continue to be subject to the statutory exclusive rights prohibition (Section 308(a), Federal Aviation Act). Termination of the agreement relieves the airport owner of only the contractual obligations imposed by it. Since the airport is still one upon which Federal funds have been expended, it is subject to the exclusive rights prohibition for as long as it is operated as an airport, whether or not it remains under the control and jurisdiction of the same public agency.

# CHAPTER 4. OBLIGATIONS OF AIRPORT OWNERS

## SECTION 1. GENERAL

**4-1. PURPOSE.** This Chapter contains basic guidance for FAA personnel in interpreting and administering the various continuing commitments made to the United States by airport owners as a condition for the grant of Federal funds or the conveyance of Federal property for airport purposes. It does not cover the standards to be met by those airports certificated under FAR Part 139. Generally, it does not apply to special conditions incorporated in a grant agreement since these usually reflect specific actions to be accomplished before a project can be closed out.

**4-2. ASSIGNMENT OF OBLIGATIONS.** The airport obligations discussed in this Chapter apply to the recipients including private owners of public use airports that are signatory parties to an agreement with the Federal Government. The actual release of these parties from any such obligations is treated in Chapter 7. However, the various agreements contemplate that under certain conditions there may be a transfer of the obligations to another eligible party.

**a. Transfer to Another Eligible Recipient**

(1) Grant agreements provide that the owner/sponsor will not enter into any transaction which would deprive it of any of the rights and powers necessary to perform all of the conditions in the agreement unless the obligation to perform all such conditions is assumed by another recipient. In the case of grant agreements, the recipient must specifically be found eligible by the FAA.

(2) Surplus property instruments of disposal permit conveyance of the property but only to another transferee who assumes all of the obligations imposed on the original grantee. The airport owner must obtain FAA approval of all such transfers of obligations.

(3) Deeds of Conveyance under Section 16, 23, or 516 are made to public agencies only, but do not specifically restrict reassignments or retransfers of the property conveyed. The original donor (Federal agency) may reassign or retransfer the property to another public agency for continued airport use. The FAA should assume the lead in coordination between the affected parties.

**b. Transfer to the United States.**

(1) The FAA cannot legally prohibit an airport owner from conveying to a Federal agency any airport property which was transferred under the Surplus Property Act of 1944, as amended. The Chief Counsel has indicated that such a conveyance, whether voluntary or otherwise, does not place the conveying airport owner in default of any obligation to the United States. Such a conveyance has the effect of a complete release of the conveying owner. The procedures applicable to such transfers are covered in Chapter 7.

(2) When such a conveyance is proposed, or has been accomplished without prior notice to the FAA, and it is determined there would be or is an adverse effect on civil aviation, FAA objections should immediately be made known to both the airport owner and the Federal agency involved. If a satisfactory solution to an adverse effect on civil aviation cannot be obtained at the field office level, a full and complete report should be submitted to the Office of Airport Safety and Standards (AAS-1) without delay. The FAA shall make appropriate objection and take timely action with the Federal agency involved.

**c. Delegation of Obligations.** Airport owners subject to continuing obligations to the Federal Government may enter into arrangements which have the effect of delegating certain of these obligations to other parties. For example, an airport authority may arrange with the Public Works Department of a local municipality to meet certain of its maintenance commitments, or an airport owner may contract with a utility company to maintain airfield lighting equipment. More prevalent at small airports are arrangements in which the owner relies upon a commercial tenant or franchised operator to cover a broad range of airport operating, maintenance and management responsibilities. None of these contractual delegations of responsibility absolve or relieve the airport owner from the primary obligations to the Government. As principal party to the agreement the owner alone is accountable for conformity to its terms and conditions. Particular attention should be directed to ensure that such delegations to a proprietary enterprise do not result in a conflict of interest or a violation of the statute prohibiting certain exclusive rights. The airport owner shall not delegate its authority to one FBO to negotiate an operating agreement (lease) with another FBO. (See paragraph 6-5.)

**d. Subordination of Title.**

(1) The subordination of airport property by mortgage, easement, or other encumbrance will normally be considered as a transaction which would de-

prive the owner of the rights and powers necessary to perform the covenants in the agreement with the Government. However, the prior existence of such an encumbrance may under certain circumstances be considered as not inconsistent with the eligibility requirement for land interest in connection with the development of airport facilities under the grant program.

The Secretary is authorized to determine whether a specific encumbrance might create an undue risk of depriving the potential sponsor of the rights and powers otherwise required. Wherever it is proposed to subsequently encumber obligated airport property, a complete summary of the pertinent facts, together with recommendations of the appropriate regional Airports office, should be forwarded to the regional Airports division for determination on a case-by-case basis. The determination should be consistent with criteria for determining good land title set forth in appropriate FAA directives (see Order 5100.38, Airport Improvement Program (AIP) Handbook). A legal review of the case may be appropriate.

(2) FAA concurrence as to any such lien, mortgage or other encumbrance of airport obligated property should be predicated on a factually based and thoroughly documented determination. The possibility of foreclosure or other action adverse to the airport should be so remote to reasonably preclude the possibility that such lien, mortgage or other encumbrance will prevent the owner from fulfilling its assurances and obligations under applicable airport instruments.

**4-3.-4-4. RESERVED.**

## SECTION 2. MAINTENANCE AND OPERATION

**4-5. SCOPE OF MAINTENANCE OBLIGATION.**

**a. Agreements Involved.** Most airport agreements impose on the airport owner a continuing obligation to preserve and maintain airport facilities in a safe and serviceable condition. An exception is the transfer document conveying Federal lands under the authority of Section 16, 23, or 516. These transfers normally contemplate further development of the property involving a grant agreement imposing maintenance obligations. It is preferred that such obligations be imposed as a contractual commitment rather than a covenant running with the land. However, where a Section 516 conveyance is made under circumstances that do not involve a follow-on development agreement, the maintenance and operation assurances should be incorporated into the transfer document.

**b. Facilities to be Maintained.** This Section applies to all airport facilities shown on a current Airport Layout Plan (ALP) which were initially dedicated to aviation use (see definition in Appendix 5) by an instrument of transfer or agreement with the United States. This means that the airport owner cannot discontinue maintenance of a taxiway stub or any part of the airport until formally relieved of the maintenance obligation. The obligations of the owner under a grant agreement remain in force throughout the useful life of the facility but no longer than 20 years, except for land which is obligated for the life of the airport. When a facility is no longer needed for the purpose for which it was developed, the regional Airports division may make the determination that its useful life has expired in less than 20 years and authorize its abandonment or conversion to another compatible purpose. For private airports, the obligation extends for a minimum of 10 years. (The procedure for obtaining release from these maintenance obligations is explained in Chapter 7.)

**4-6. PHYSICAL MAINTENANCE.**

**a. Maintenance Procedures.** Generally, airport agreements require the owner or grantee to carry out a continuing program of preventive maintenance and minor repair activities which will ensure that the airport facilities are at all times in a good and serviceable condition for use in the way they were designed to be used. Such requirements may be expressed or implied in the agreement and include such things as:

(1) All structures should be checked frequently for deteriorations. Where necessary, repairs should be made.

(2) Runways, taxiways, and other common-use paved areas should be inspected at regular intervals for compliance with operational and maintenance standards. Routine repairs including crack filling and sealing shall be made to prevent progressive deterioration of the pavement.

(3) Gravel runways, taxiways, and other common-use paved areas should be inspected at regular intervals for compliance with operational and maintenance standards. Routine repairs including hole filling and grading shall be performed to prevent progressive deterioration of the operational areas.

(4) All turfed areas should be preserved through clearing, seeding, fertilizing and mowing. Turfed landing areas which are used for aircraft oper-

ations should be inspected at regular intervals to assure that there are no holes or depressions.

(5) Field lighting and VASI's must be maintained in a safe and operable condition at all times. The VASI's must be aligned on a regular basis and at times when conditions dictate.

(6) Segmented circles and wind cones should be inspected on a regular basis to ensure proper serviceability.

(7) All drainage structures should be inspected, particularly sub-drain outlets, to ensure unobstructed drainage.

(8) All approaches must be checked to assure conformance with the approach obligations incurred.

**b. Criteria for Satisfactory Compliance.**

(1) What constitutes an acceptable level of maintenance is difficult to express in measurable units. A standard yardstick of satisfactory maintenance effort will not apply in all circumstances. Grass cut to a height of 8 inches may be acceptable at some airports but it could impair safety and efficiency at others. A one-half inch crack in runway paving may be inconsequential under certain circumstances. Depending on its location, the volume of traffic, the age of the pavement, climatic and other conditions, it could be the forerunner of serious pavement failure implying an obligation to apply immediate corrective measures. The degree of maintenance effort required of an airport owner is a matter of professional judgment.

(2) Compliance with this maintenance obligation is considered satisfactory when the airport owner:

(a) Fully understands that airport facilities must be kept in a safe and serviceable condition;

(b) Has adopted and implemented a sufficiently detailed program of cyclical preventive maintenance that in the judgment of FAA is adequate to carry out this commitment; and

(c) Has available the equipment, personnel, funds and other resources including contract arrangements to effectively implement such a program.

**c. Major Repair.**

(1) The obligation to maintain the airport does not extend to major rehabilitation of a facility that has become unusable due to normal and unpreventable deterioration or through acts of God. Therefore, the restoration of a building destroyed by fire or windstorm or a major rehabilitation of a portion of the landing area inundated by floods is not included in the sponsor's maintenance obligations. Likewise, the complete resurfacing of a runway, unless it is the result of obvious neglect of routine maintenance, is not included in the sponsor's obligations. Failure to perform day-to-day maintenance may have a cumulative effect resulting in major repairs and reconstruction.

(2) The airport owner has a commitment to prevent gross overstressing of the airport pavement. If the owner is not prepared to strengthen the pavement, then its use must be limited to aircraft operations which will preclude overstressing the pavement. Should pavement failure occur because the sponsor failed to take timely corrective action after being advised of the pavement limitations, any cost required to restore the failed pavement to a satisfactory condition will not be eligible for AIP funding. Strengthening of the pavement, after correction of the failure, would be eligible for consideration for AIP funding.

## 4-7. REQUIREMENT TO OPERATE THE AIRPORT.

**a. General.** The owner of an airport developed with Federal assistance is more than a passive landlord of specialized real estate. The obligation to maintain the airport includes the responsibility to operate the aeronautical facilities and common use areas for the benefit of the public. This means, for example, that:

(1) If field lighting is installed, the owner is responsible for making arrangements for it and the associated airport beacon and lighted wind and landing direction indicators to be operated throughout each night of the year or when needed in accordance with subparagraph 4-7e below.

(2) If any part of the airport is closed or hazardous to use, the owner is responsible for providing warning to users, such as adequate marking and issuing a Notice to Airmen (NOTAM) to advise pilots of the condition.

(3) The owner should adopt and enforce adequate rules, regulations, or ordinances as necessary to ensure safety and efficiency of flight operations and to protect the public using the airport.

**b. Local Regulations.** The prime requirement for local regulations is to control the use of the airport in a manner that will eliminate hazards to aircraft and to people on the ground. For example, aircraft themselves become a hazard to other aircraft if allowed to park too close to an active runway. There should be adequate controls such as fencing and other facilities to keep motorists, cyclists, pedestrians, and animals from inadvertently wandering onto the landing area or areas designated for aircraft maneuvering. Frequently local air traffic patterns are needed to establish uniform and orderly approaches and departures from the airport. As in the operation of any public service facil-

ity, there should be adequate rules covering vehicular traffic, sanitation, security, crowd control, access to certain areas and fire protection. The fueling of aircraft, storing of hazardous materials, spray painting, etc., at a public airport should be controlled by the airport owner in the interests of protecting the public.

**c. Operations in Inclement Weather.** The obligation to maintain the airport does not impose any specific responsibility to remove snow or slush, or to provide sanding of icy pavements. The owner is responsible for providing a safe, usable facility, and where climatic conditions render airport unsafe, the owner will promptly notify airman by proper notices and, if necessary, to close all or a part of the airport until the conditions are corrected. However, the conditions should be corrected within a reasonable amount of time.

**d. Aircraft Rescue and Firefighting Responsibility.** The agreements under which airports are acquired or developed with Federal assistance do not specifically impose a responsibility to provide rescue or firefighting capabilities. Beginning in 1988 aircraft rescue and firefighting (ARFF) equipment became eligible under AIP for airports being served by air carriers using aircraft designed for more than 20 passenger seats and not certificated under FAR Part 139. Such an airport owner acquiring ARFF equipment under AIP must assure that it will maintain sufficiently trained personnel to operate the equipment; have the equipment available during scheduled operations of the air carrier; and to notify the air carriers using the airport when the equipment is not available due to being out of service for maintenance or repair.

**e. Part-Time Operation of Airport Lighting.**

(1) As noted in subparagraph 4-7a above, field lights must be operated whenever needed. This means that the lights must be on during the hours of darkness (dusk to dawn) every night, or be available for use upon demand. One effective arrangement is an attendant with authority and capability to turn on the proper lights when requested to do so by the radio or other signal. An acceptable alternative is the installation of an electronic device which permits remote activation of field lighting by radio equipment in an aircraft. (See AC 150/5340-14, Economy Approach Lighting Aids, and AC 150/5340-27, Air to Ground Radio Control of Airport Lighting Systems.)

(2) At some locations it may not be necessary to operate the lights all night. This might occur where the aeronautical demand is seasonal, or where it ceases after a certain hour each night because the airport's off airway location is not likely to be needed for emergency use. In very rare cases it may be undesirable to permit use of an airport during certain hours of darkness. An example might be where air traffic control is suspended during some part of the night and the local environment (such as obstructions or heavy enroute traffic) makes use of the airport hazardous during that period. Under such circumstance FAA may consent to a part-time operation of field lights.

## 4-8. RESTRICTIONS ON AERONAUTICAL USE OF AIRPORT.

**a. Safety and Efficiency.**

(1) While the airport owner must allow its use by all types, kinds, and classes of aeronautical activity as well as by the general public (passengers, visitors, etc.), the obligation agreements do provide for exceptions as discussed in this paragraph. When complaints are filed with FAA regarding restrictions imposed by the airport owner in the interest of safety and/or efficiency, assistance of the appropriate local Flight Standards and Air Traffic representatives should be obtained in determining the reasonableness of the restrictions. It may be appropriate to initiate an FAA airspace study to determine the efficiency and utility of the airport when considering the proposed restriction. In all cases the FAA will make the final determination of the reasonableness of the airport owner's restrictions which denied or restricted use of the airport.

(2) In the interest of safety, the airport owner may prohibit or limit any given type, kind, or class of aeronautical use of the airport if such action is necessary for the safe operation of the airport or necessary to serve the civil aviation needs of the public. This allows the imposition of reasonable rules or regulations (see paragraph 4-7b) to restrict use of the airport. For example, they may prohibit aircraft not equipped with a reasonable minimum of communications equipment from using the airport. They may restrict or deny use of the airport for student training, for taking off with towed objects, or for some other purpose deemed to be incompatible with safety under the local conditions peculiar to that airport. Agricultural operations may be excluded due to conflict with other types of operations or lack of facilities to safely handle the pesticides used in this specialized operation. (The regional enforcement office of the Environmental Protection Agency (EPA) should be contacted in cases pesticide use and control problems.) Also, designated runways, taxiways, and other paved areas may be restricted to aircraft of a specified maximum gross weight or wheel loading. Likewise, use of airport facilities by the general public may be restricted by vehicular, security, and crowd control regulations. In cases where complaints are filed with FAA, Flight Standards and Air Traffic should be consulted to help determine the reasonableness of the

airport owner's restrictions. It may be appropriate to initiate an FAA airspace study to determine the efficiency and utility of the airport when considering the proposed restriction. In all cases the FAA will make the final determination of the reasonableness of the airport owner's restrictions which denied or restricted use of the airport.

**b. Parachute Jumping.** Parachute jumping is an aeronautical use and requests to airport owners from parachute jumping clubs, organizations, or individuals to establish a drop zone within the boundaries of an airport should be evaluated on the same basis as other aeronautical uses of the airport. Any restriction, limitation, or ban against parachute jumping on the airport must be based on the grant assurance which provides that the sponsor may prohibit or limit an aeronautical use "for the safe operation of the airport or when necessary to serve the civil aviation needs of the public" (see paragraph 4–8a). Among the reasonable limitations on parachute jumping that an airport owner might require are:

(1) The airport owner designate reasonable time periods for jumping and specific areas for drop zones.

(2) Jumpers (or requesting organization) agree to pay a reasonable fee that is not unjustly discriminatory.

(3) Jumpers hold a general liability insurance policy that names the airport owner as an additional ensured party, with the amount of insurance to be reasonable and not unjustly discriminatory. The airport owner is not required to permit this activity if, in his judgment, it creates a safety hazard to the normal operations of aircraft arriving or departing from the airport, nor is the airport owner required to close the airport to provide a safe environment for the parachute jumpers. In cases where complaints are filed with FAA, Flight Standards and Air Traffic should be consulted to help determine the reasonableness of the airport owner's restrictions. It may be appropriate to initiate an FAA airspace study to determine the efficiency and utility of the airport when considering the proposed restriction. In all cases the FAA will make the final determination of the reasonableness of the airport owner's restrictions which denied or restricted use of the airport.

**c. Ultralight Vehicles.** Ultralight vehicle operations are considered an aeronautical activity (FAR Part 103) and, as such, must be normally accommodated on airports which have been developed with Federal assistance. This doesn't necessarily mean that they must be operated on conventional runways if ultralight operations can be safely accomplished at a designated ultralight operations area on the airport. An airport operator may make the determination that proposed ultralight operations are unsafe and not allow them to conduct flight operations on the airport. In cases where complaints are filed with FAA, Flight Standards and Air Traffic should be consulted to help determine the reasonableness of the airport owner's restrictions. It may be appropriate to initiate an FAA airspace study to determine the efficiency and utility of the airport when considering the proposed restriction. In all cases the FAA will make the final determination of the reasonableness of the airport owner's restrictions which denied or restricted use of the airport.

Another obligation of the airport operator is to ensure that users of the airport contribute a fair share towards the operation of the airport. The operator of an obligated airport should impose a fee for the use of airport facilities by ultralight vehicle operators. This is consistent with FAA policy provided the charges and fees are not discriminatory.

**d. Congestion.** Where the volume of air traffic is approaching or exceeding the maximum practical capacity of an airport, an airport owner may designate a certain airport in a multiple airport system (under the same ownership and serving the same community) for use by a particular class or classes of aircraft. The owner must be in a position to assure that all classes of aeronautical needs can be fully accommodated within the system of airports under the owner's control and without unreasonable penalties to any class and that the restriction is fully supportable as being beneficial to overall aviation system capacity. For example, a reliever general aviation airport in a community where the same airport sponsor owns and operates another full-service airport could restrict regularly scheduled air carrier services from the general aviation reliever airport. This might be justifiable as a means of ensuring the reliever airport's attractiveness as a general aviation facility.

However, in no case may an airport receiving air carrier service use this concept to support a total ban or prohibition on general aviation access to primary air carrier airport(s). The right for general aviation access at an air carrier airport is a long established interpretation of the assurance relating to the prohibition against discrimination of classes or types of aeronautical activities.

Any application of this specific provision should be coordinated with the Assistant Chief Counsel in the region for applicability, given a specific case under review.

Additionally, an airport does have the right to designate certain runways or other aviation use areas at the

airport to a particular class or classes of aircraft as a means of enhancing airport capacity or ensuring safety. Any such restrictions should be clearly supportable based on operational considerations and not instituted as a means of deliberately discriminating against a particular class.

**e. Temporary Closing of an Airport.**

**(1) Closing for Hazardous Conditions.** Airport owners are required to physically mark any temporary hazardous conditions and to adequately warn users through the use of NOTAMS. This implies a duty to provide similar warning notices when an airport is completely closed to air traffic as a result of temporary field conditions that make use of the airport hazardous. The basic obligation requires that prompt action be taken to restore the airport facilities to a serviceable condition as soon as possible.

**(2) Closing for Special Events.** Section 511 (a) (3) of the AAIA requires that any proposal to temporarily close the airport for nonaeronautical purposes must be approved by the FAA. For example, an airport developed or improved with Federal funds may not be closed for the purpose of using the airport facilities for special outdoor events, such as sports car races, county fairs, parades, etc., without FAA approval. However, in certain circumstances where promoting aviation awareness through such activities as model airplane flying, etc., the FAA does support the limited use of airport facilities so long as there is not total closure of the airport. In these cases safeguards need to be established to protect the aeronautical use of the airport while the nonaeronautical activities are in progress. There will be occasions when airports may be closed for brief periods of time for aeronautical purposes. Examples are: an air show designed to promote a particular segment of aviation; to celebrate an official occasion held in connection with an aviation activity such as exhibits; or annual fly–ins and aviation conventions. In such cases, airport management should be encouraged to limit the period the airport will be closed to the minimum time consistent with the activity. Such closing should be well publicized in advance including issuance of NOTAM to minimize any inconvenience to the flying public.

**(3) Closing of a Part of an Airport.** In some instances, reasons may be presented to justify the temporary use of a part of an airport for an unusual event of local significance which does not involve closing the entire airport. In such cases, all the following conditions must be met:

(a) The event is to be held in an area of the airport which is not required for the normal operation of aircraft and where the event would not interfere with the airport's normal use; or in a limited operational area of an airport having a relatively small traffic volume and where it has been determined that the event can be conducted in the area without interference with aeronautical use of the airport.

(b) Adequate facilities for the landing and takeoff of aircraft will remain open to air traffic and satisfactory arrangements are made by the owner to ensure the safe use of the facilities remaining open.

(c) Proper NOTAMS are issued in advance.

(d) Necessary steps are taken by the airport owner to ensure the proper marking of the portion of the airport to be temporarily closed to aeronautical use.

(e) The airport owner notifies in advance the appropriate Flight Standards office and any air carrier using the airport.

(f) The airport owner agrees to remove all markings and repair all damage, if any, within 24 hours after the termination of the event, or issues such additional NOTAMS as may be appropriate.

(g) The airport owner coordinates beforehand the special activities planned for the event with local users of the airport and with the Department of Defense (DOD) if there are any military activities at the airport.

(h) No obstructions determined by FAA to be hazards, such as roads, timing poles, or barricades, will be constructed for the remaining operational area of the airport.

**f. Noise and Environmental Restrictions.** Proposed airport use restrictions are becoming more common as airports respond to community concern over environmental issues and noise problems. Airport owners often propose such restrictions as a means of reducing noise impacts when they are considering alternatives to improve compatibility. This is generally done as part of an FAR Part 150, Airport Noise Compatibility Program study, or in some cases as part of an environmental impact assessment report.

Airport use restrictions: (1) must be reasonably consistent with reducing noncompatibility of land uses around the airport; (2) must not create an undue burden on interstate or foreign commerce; (3) must not be unjustly discriminatory; (4) must not derogate safety or adversely affect the safe and efficient use of airspace; (5) meet both local needs and the needs of the national air transportation system to the extent practicable; and (6) must not adversely affect any other powers or responsibilities of the FAA Administrator prescribed by the law or any other program established in accordance with the law.

Proposed Part 150 airport use restrictions will be reviewed by FAA in Washington for consistency with Federal agreements. Where there is a potential for inconsistency with a Federal agreement, the Community and Environmental Needs Division, APP-600, will coordinate the proposed restriction with AAS-300 for input. A determination on compatibility with Federal agreements will be made by AAS-300 and the Chief Counsel's office.

The airport operator is expected to analyze fully in a Part 150 program the anticipated burden on commerce of a proposed airport use restriction. FAA will make the determination on whether the burden is undue. Similar restrictions may have little impact at one airport and a great deal of impact at others, such as occurs when a restriction adversely affects airport capacity and/or excludes or limits certain users from the airport. The magnitude of both impacts must be clearly presented. An airport owner for certain justifiable environmental reasons may designate a certain airport in a multiple airport system under the same ownership and serving the same community for use by a particular class or classes of aircraft. The same concepts as discussed in subparagraph 4-8d will apply. If this is being contemplated, it must be considered on a case-by-case basis in coordination with APP-600 and AAS-300.

If Airports offices are confronted with a proposed environmental or noise restriction outside of the FAR Part 150 process where those restrictions have the potential to be contrary to a Federal agreement, the proposed restriction must be fully reviewed to determine its compatibility with Federal agreements. If there is any concern about potential incompatibility, coordination with AAS-300 and APP-600 is necessary.

An airport owner subject to Federal agreements cannot simply use environmental or noise reasons as a means not to comply with specific Federal grant agreements.

## SECTION 3. APPROACH PROTECTION AND COMPATIBLE LAND USE

### 4-9. PROTECTION OF APPROACHES.

**a. Obstructions/Airport Hazard.** The airports developed by or improved with Federal funds are obligated to prevent the growth or establishment of obstructions in the aerial approaches to the airport. The term "obstruction" refers to natural or man made objects which actually penetrate that surfaces defined in FAR Part 77, Objects Affecting Navigable Airspace, or other appropriate citation applicable to the agreement as applied to the particular airport. In agreements issued prior to December 31, 1987, airport owners agreed that insofar as it is within their power and reasonably possible, to prevent the construction, erection, alteration or growth of an obstruction. This was to be done either by obtaining the control of the land involved through the acquisition and retention of easements or other land interests or by the adoption and the enforcement of zoning regulations. Effective with the Airport and Airway Safety and Capacity Expansion Act of 1987 (P. L. 100-223) the standard approach protection assurance was changed to read:

"It will take appropriate action to assure that such terminal airspace as is required to protect instrument and visual operations to the airport (including established minimum flight altitudes) will be adequately cleared and protected by removal, lowering, relocating, marking, or lighting or otherwise mitigation of existing airport hazards and by preventing the establishing or creation of future airport hazards." (See Appendix 5 for "Airport Hazard.")

The airspace allocated will vary from airport to airport. The Regional Air Traffic, Airspace and Procedures Branch, should be contacted for guidance on application of this provision when an issue is raised.

**b. Preexisting Obstructions.**

(1) Historically, some airports were developed at locations where preexisting structures or natural terrain (for example, hill tops) would constitute an obstruction by currently applicable standards. If such obstructions were not required to be removed as a condition for a grant agreement, the execution of the agreement by the Government constitutes a recognition that the removal was not reasonably within the power of the sponsor.

(2) Also, there are many former military airports that were acquired as public airports under the Surplus Property Act, where the existence of obstructions at the time of development was considered acceptable. At such airports where obstructions in the approach cannot feasibly be removed, relocated, or lowered, and where FAA has determined them to be a hazard, consideration may be given to the displacement or relocation of the threshold.

**c. Zoning Ordinances.** One method of meeting the obligation to protect airport approaches involves appropriate height restriction zoning. Any airport owner who has the authority to adopt an ordinance restricting the height of structures in the ap-

proaches according to the standards prescribed in FAR Part 77 as applied to the particular airport should do so.

**4-10. COMPATIBLE USE OF ADJACENT LAND.** All grants issued after the enactment of P.L. 80-289 (78 Stat. 161), an amendment to the Surplus Property Act of 1944, contain an assurance that, to the extent reasonable, appropriate action including zoning will be taken to restrict the use of lands in the vicinity of the airport to activities and purposes compatible with normal airport operations.

**4-11.-4-12. RESERVED.**

## SECTION 4. AVAILABILITY ON FAIR AND REASONABLE TERMS

**4-13. GENERAL.**

**a.** The owner of any airport developed with Federal grant assistance is required to operate it for the use and benefit of the public and to make it available to all types, kinds and classes of aeronautical activity on fair and reasonable terms and without unjust discrimination. A parallel obligation is implicit in the terms of conveyance of Federal property for airport purposes under the Surplus Property Act. Land transfers under Section 16, Section 23, or Section 516 are authorized by the same statutes and for the same purposes as grants under FAAP, ADAP, and AIP and the same obligations will apply.

**b.** Grant obligations involve several distinct requirements. First, the airport and its facilities must be available for public use. The terms imposed on those who use the airport and its services, including rates and charges, must be fair, reasonable, and applied without unjust discrimination, whether by the owner or by a licensee or tenant who has been granted rights to offer services or commodities normally required at the airport. The terms and conditions which the owner imposes on those offering services and commodities to the public which are related to aeronautical activity must be fair and reasonable and applied without unjust discrimination. (See paragraph 4-15d.)

**4-14. TERMS APPLIED TO AIRPORT USERS.**

**a. Rentals Fees and Charges.** The obligation of airport management to make an airport available for public use does not preclude the owner from recovering the cost of providing the facility through fair and reasonable fees, rentals or other user charges "...which will make the airport as self-sustaining as possible under the circumstances existing at the particular airport...."

(1) Each air carrier using such airport (whether as a tenant, nontenant, or subtenant of another air carrier tenant) shall be subject to such nondiscriminatory and substantially comparable rates, fees, rentals, and charges with respect to facilities directly and substantially related to providing air transportation and other such nondiscriminatory and substantially comparable rules, regulations, and conditions as are applicable to all such air carriers which make similar use of such airport and which utilize similar facilities, subject to reasonable classifications such as tenant or nontenant, and signatory carriers and nonsignatory carriers. Such classification or status as tenant or signatory shall not be unreasonably withheld by any airport provided an air carrier assumes obligations substantially similar to those already imposed on air carriers in such classification or status.

(2) Each FBO at any airport shall be subject to the same rates, fees, rentals, and other charges as are uniformly applicable to all other FBO's making the same or similar uses of such airport utilizing the same or similar facilities.

(3) Each air carrier using such airport shall have the right to service itself or to use any FBO that is authorized by the airport or permitted by the airport to serve any air carrier at such airport.

(4) Normally, the FAA will not question the fairness of rates and charges established by the owner or the comparability of the rates, fees, rentals and other charges as applied to and among air carriers, FBO's and other tenants for the same or similar space and/or services unless complaints have been made alleging that specific practices are unfair or unreasonable. Before an investigation is initiated by the FAA, the charge should be supported by factual evidence produced by the complainant.

(5) The basis for rates and charges is usually related to costs incurred by the airport owner. Rarely can it be established that an actual or proposed rate is so high that it would recover to the owner an amount unreasonable and in excess of costs. More often the FAA will be required to determine whether the rate structure, as applied, will result in discrimination.

(6) In evaluating established fees, rates, and charges for users of an airport no part of the Federal share of an airport development project for which a grant is made shall be included in the rate base.

**b. Methods of Assessing User Charges.** The collection of a fee or charge for public use of a runway, tiedown area, or other facility may be accomplished through a direct toll or landing fee imposed on individual users or through indirect means. The airport owner may find it practical to grant use privileges simultaneously by contract, permit, or the direct assessment of fees. In most instances, an indirect recovery of fair use charges in the form of fuel flowage, hangar rentals, percentages of gross volume of business, or through other arrangements may be the most practical method for many collections. A locally based aviation enterprise may have a lease, or contract, under which it will pay an agreed rental for the hangars and other premises it occupies plus a variable payment (related to fuel gallonage, volume of business, flight operations, etc.) for the use of the landing area by its own aircraft and those of its customers. Other visiting aircraft, such as scheduled or unscheduled air taxis, which are not covered by such a contract may be required to pay a fee or charge to cover their use of public facilities.

**c. Charges Made by Airport Tenants and Concessionaires.** At most airports the provision of fuel, storage, aircraft service, etc., is best accomplished by profit motivated private enterprise. It is the responsibility of the airport owner, in negotiating the privilege to offer these services and commodities at the airport, to retain sufficient control over the operation to guarantee that the patrons will be treated fairly. The owner may not have this control if, by contract or otherwise, he/she surrenders the right to approve rates, fees, and charges imposed for essential aeronautical services. In this connection, note the discussion of leasing principles in Section 1, Chapter 6. It should be understood that the obligation of the airport owner to ensure availability of services to the public on fair and reasonable terms is limited to aeronautical activities. There is no commitment in a grant agreement or deed with the United States that the prices charged by taxis, limousines, restaurants, motels, and other terminal area nonaeronautical concessions will be controlled.

**d. Terms and Conditions Applied to Tenants Offering Aeronautical Services.** Apart from the Civil Rights Assurances and the assurances relating to the offering of aeronautical services to the public, the FAA is not normally involved with the establishment of rates and fees to be paid by a tenant or concessionaire to an airport owner. However, in overseeing the airport owner's implementation of the assurance in subparagraph a. above, the FAA shall ensure that:

**(1) At air carrier airports:**

(a) As a tenant, the air carrier shall enjoy the same classification and status as any other tenant air carrier serving that airport as to rates, fees, charges, rules, regulations, and conditions covering all aeronautical activities at that airport provided the air carrier assumes obligations similar to those already imposed on the other tenant air carriers.

(b) An air carrier who is willing to sign a contract (signatory carrier) with the airport and assume appropriate financial obligations may be granted a lower fee schedule. If an air carrier is unwilling or if it is infeasible because of infrequent operations or other reasons to sign such a contract, the air carrier may then be charged the higher noncontract rates.

(c) In respect to a contractual commitment, a sponsor may charge different rates to similar users of the airport if the differences can be justified as nondiscriminatory and such charges are substantially comparable. These conclusions must be based upon the facts and circumstances involved in every case.

(d) Differences in values of properties involved and the extent of use made of the common use facilities are factors to be considered. Seldom will each user have properties of the same value nor will their use of the common facilities be the same. However, the airport in order to justify noncomparable rates must show that the differences are substantial.

(e) All leases with a term of 5 years or more should contain an escalation provision for periodic adjustments based on a recognized economic index. Future lessees may expect like treatment in that their leases will have a built-in escalation provision. This is in accordance with the sponsor assurance "...to make the airport as self-sustaining as possible under the circumstances ...."

(f) Each air carrier using the airport shall have the right to service itself or to use any FBO that is authorized by the airport or permitted by the airport to serve any air carrier at the airport.

**(2) At general aviation airports:**

(a) If one operator rents office and/or hangar space and another builds its own facilities, this would provide justification for different rental and fee structures. These two operators would not be considered essentially similar as to rates and charges even though they offer the same services to the public.

(b) If one FBO is in what is considered a prime location and another FBO is in a less advantageous area, there could logically be a differential in the fees and charges to reflect this advantage of location. This factor would also influence the rental value of the property.

(c) If one FBO is providing primary commercial services (sale of aviation fuel and oil, providing tiedown and aircraft parking facilities, ramp services and some capability for minor aircraft repairs) and another FBO is conducting a flight training program, or aircraft sales, or a specialty such as avionics repair and service, these FBO's may not be considered essentially similar. They may have dissimilar requirements, i.e., space requirements, building construction, or location. Therefore, different rates may be acceptable, although the rates must be equitable.

(d) If the FAA determines that the FBOs at an airport are making the same or similar uses of such airport facilities, then such FBO leases or contracts entered into by an airport owner (subsequent to July 1, 1975) shall be subject to the same rates, fees, rentals and other charges.

(e) As an aid to uniformity in rates and charges applicable to aeronautical activities on the airport, management should establish minimum standards to be met as a condition for the right to conduct an aeronautical activity on the airport (Chapter 3, Section 3).

(f) All leases with a term exceeding 5 years shall provide for periodic review of the rates and charges for the purpose of any adjustments to reflect the then current values, based on an acceptable index. This periodic lease review procedure will facilitate parity of rates and charges between new FBO services coming on the airport and long-standing operators. It will also assist in making the airport as self-sustaining as possible under the circumstances existing at that particular airport.

(g) In the case of a new general aviation airport, it is frequently necessary for the airport owner to offer reduced rental rates and other inducements to obtain an FBO recognizing that it may well be a non-profit venture during the pioneering period. To avoid a depressed rate scale for the future, the airport owner should be encouraged to provide the "incentive rate" only during the pioneer period. The pioneer period should be established for a specific period of time and ending on a specified date. Future operators coming on the airport following the pioneer period may be expected to pay the comparable standard rates and charges based on then current value.

(h) Except for exercise of the proprietary rights by the airport owner, any terms or conditions in an agreement between an airport owner and an aeronautical activity requiring the activity to procure fuel or other supplies and services from a specific source would be an unreasonable restraint on the use of the airport and, in certain cases, could be viewed as a grant of an exclusive right. Where an airport owner retains for itself the proprietary right to operate the fuel farm, all FBOs may be required to obtain fuel from the airport owner. However, if an FBO is running the fuel farm for the airport owner, another FBO cannot be required to obtain fuel from the airport owner's agent. In neither of these cases is the airport operator or the FBO obligated to sell fuel to an individual, corporate or other type operator performing self-fueling.

**4-15. AVAILABILITY OF LEASED SPACE.** The prime obligation of the owner of a federally-assisted airport is to operate it for the use and benefit of the public. The public benefit is not assured merely by keeping the runways open to all classes of users. While the owner is not required to construct hangars and terminal facilities, it has the obligation to make available suitable areas or space on reasonable terms to those who are willing and otherwise qualified to offer flight services to the public (i.e., air carrier, air taxi, charter, flight training, crop dusting, etc.) or support services (i.e., fuel, storage, tie down, flight line maintenance, etc.) to aircraft operators. This means that unless it undertakes to provide these services itself, the airport owner has a duty to negotiate in good faith for the lease of such premises as may be available for the conduct of aeronautical activities. Since the scope of this obligation is frequently misunderstood the following guidance is offered:

**a. Servicing of Aircraft.** All grant agreements contain an assurance that the sponsor will not exercise or grant any right or privilege which would have the effect of preventing the operator of an aircraft from performing any services on its own aircraft with its own employees. This is not to be interpreted as a positive obligation on the sponsor to lease space to every aircraft operator using the airport. It means simply that an aircraft operator, otherwise entitled to use the landing area, may tiedown, adjust, repair, refuel, clean and otherwise service its own aircraft, provided it does so with its own employees in accordance with reasonable rules or standards of the sponsor relating to such work. The assurance establishes a privilege (to service one's own aircraft) but does not, by itself, compel the sponsor to lease such facilities which may be necessary to exercise that right. (See paragraph 3-9e for additional details regarding restrictions on self-service.)

**b. Facilities Not Providing Service to the Public.** Most airport owners are anxious to lease available property to those willing to construct their own hangars and aircraft support facilities. However, the airport owner is not obligated by agreements with the Government to provide space unless the activity offers services to the public or support services actually needed by those aircraft operators otherwise entitled

to use the public landing areas. Thus, a local company operating its own aircraft for business purposes, a private flying club, or an aircraft manufacturing company seeking a site for a production plant may be a desirable and compatible tenant. However, the airport owner is not obligated to lease airport premises for these purposes if adequate facilities are otherwise available. This problem is rare and usually arises when an aircraft operator, unable to arrange satisfactory terms for hangar space and service with an existing fixed base operator, seeks to construct its own facilities. The obligation to operate an airport for the use and benefit of the public requires that reasonable provision be made for essential support services for those who use it. Therefore, when neither the airport owner nor the tenant FBOs can provide adequate storage, fueling, and other basic services to an airport user, the user may not be denied the right to lease space, if available, on reasonable terms to install such facilities at its own expense.

**c. Activities Offering Services to the Public.** If adequate space is available on the airport, and if the airport owner is not providing the service, it is obligated to negotiate on reasonable terms for the lease of space needed by those activities offering flight services to the public, or support services to other flight operators, to the extent that there may be a public need for such services. A willingness by the tenant to lease the space and invest in the facilities required by reasonable standards shall be construed as establishing the need of the public for the services proposed to be offered.

**d. Air Carrier Airport Access.** Since the passage of the Airline Deregulation Act of 1978, there has been an influx of air carriers into airports. Many of these airports were operating at capacity prior to passage of the Act insofar as counter, gate, and ramp space were concerned. New carriers wishing to serve the airport were faced with the prospect of no facilities being available. In some instances, space was made available from carriers established on the airport. However, in other cases, no space was made available and the carrier was denied access to the airport.

It was determined by the Office of Chief Counsel that a carrier may not be denied access to an airport solely based on the nonavailability of currently existing facilities and that some arrangements for accommodation must be made if reasonably possible. This can result in a complex situation which may not be easily resolved.

If an airport refuses to apply for a FAR Part 139 Airport Operating Certificate when there is clear evidence that an air carrier desires to serve the location, this fact alone does not indicate a violation of the grant agreement assurances. The regional Airports and Legal offices should determine the basis and justification for exclusion of the air carrier in the same manner as they would in other potential violation issue.

In some cases, a recommendation to the airport operator to provide temporary facilities, such as a mobile ticket office and gate facilities might relieve the situation. If it appears that the airport operator cannot possibly provide space, then the FAA in concert with the airport operator must develop a solution to the problem.

Should air carrier access situations develop at airports and where no solution developed at the region is feasible, AAS-300 should be notified. AAS-300 will coordinate with the regional Airports division and Chief Counsel for a viable solution to the problem.

**4-16. CIVIL RIGHTS.** The regional and headquarters Offices of Civil Rights are responsible for matters pertaining to the enforcement of the Civil Rights assurances and provisions included in the all grant agreements. For additional information see AC 150/5100-15, Civil Rights Requirements for the Airport Improvement Program (AIP).

## SECTION 5. USE OF AIRPORT PROPERTY

### 4-17. ADHERENCE TO AIRPORT LAYOUT PLAN AND AIRPORT PROPERTY MAP

**a. Airport Layout Plan (ALP).** An ALP, which is required by statute (previously required by assurance) depicts the entire property and identifies the present facility and the plans for future development. The FAA requires an approved ALP as a prerequisite to the grant of AIP funds for airport development or the modification of the terms and conditions of a surplus property instrument transfer. The approval must be by the FAA and represents the concurrence of the FAA in the conformity of the plan to all applicable design standards and criteria. It also reflects the agreement between FAA and the airport owner as to the proposed allocation of areas of the airport to specific operational and support functional usage. The approved ALP thus becomes an important instrument for controlling the subsequent development of airport facilities. Any construction, modification, or improvement that is inconsistent with such a plan requires FAA approval of a revision to the ALP.

**b. Airport Property Map (Exhibit A).** The airport property map, also called the Exhibit A to the grant agreement, is a required document to be submitted with the application for a grant and delineates all the property owned or to be acquired by the airport owner. Whether or not the Federal Government participates in the cost of acquiring any or all such land, it relies on this map in any subsequent grant of funds. Any land identified on the Exhibit A may not thereafter be disposed of or used for other than those purposes without FAA consent.

**c. Land Inventory Map.** There is a need to track land acquired with Federal funds for accountability purposes for compliance matters. If any grant acquired land is found to be excess to airport needs, present and future, the sponsor is required to dispose of the excess land and return the Federal share of the FMV to the Trust Fund. This land identification should show how and under what Federal grant or other Federal assistance program the land was acquired. The inventory will satisfy the FAA's requirement to maintain an inventory of land acquired with Federal assistance. (Appendix 7 is a suggested procedure for maintaining such inventory.) In disposing of such land the requirements of paragraph 7-19b apply. If the Exhibit A discussed above satisfies the land accountability requirement, there is no need for a separate land inventory map. Airport noise compatibility land acquisitions should be identified separately (see paragraph 4-17e).

**d. Grant Land No Longer Needed for Airport Purposes.** With the passage of The Airport and Airway Safety and Capacity Expansion Act of 1987, P.L. 100-223, Section 511a(14) provides: If the airport operator or owner receives a grant before, on, or after December 30, 1987, for the purchase of land for airport purposes (other than noise compatibility purposes).

(1) the owner or operator will, when the land is no longer needed for airport purposes, dispose of such land at FMV;

(2) the owner or operator may trade land no longer needed for airport purposes for land to be used for airport purposes. If the difference in FMV in the two parcels results in a cash difference paid to the airport owner or operator, then that portion of the proceeds of such trade which is proportionate to the United States share of the cost of acquisition of such land will be paid to the Secretary for deposit in the Trust Fund. If additional cost results from the trade it may be eligible under AIP;

(3) such disposition will be subject to the retention or reservation of any interest or right therein necessary to ensure that such land will only be used for purposes which are compatible with noise levels associated with the operation of the airport;

(4) that portion of the proceeds of such disposition which is proportionate to the United States share of the cost of acquisition of such land will be paid to the Secretary for deposit in the Trust Fund; and

(5) if the old airport is being disposed of as a result the construction of a new airport, the sale land of the old airport will be treated as a "trade-in" on the cost of the new airport. (See paragraph 7-20b.)

Once an airport sponsor accepts any grant containing this assurance, it becomes obligated to this requirement for all grant acquired land, regardless of when it was acquired.

When reviewing the sponsor's request for Federal assistance, or when conducting periodic compliance oversight reviews, the FAA must review the current ALP and the Land Inventory Map (paragraph c above) to determine whether any land acquired with Federal assistance is no longer needed for airport purposes. Airport purposes could include land that, with documentation, can be justified for noise compatibility purposes. The land need not be required for the same aeronautical purpose for which it was originally acquired.

Additionally, land that was acquired for airport development in conjunction with a larger purchase may now be serving related airport support uses (such as a hotel or aviation related commercial uses which have a direct need to be located on the airport) and therefore need not be disposed of. If the land continues to provide aeronautical benefit through noise compatibility (such as within a projected 75Ldn) or where the land is contained within a larger property boundary that clearly is justified for airport purposes, disposition of such land will not be required. Judgment may determine that it is inappropriate to carve small specific parcels out of an airport property that for all reasonable purposes is already functioning as an airport unit.

In all cases the long-term future aeronautical need always must be considered. If the ALP does not reflect a future airport need for the grant acquired land, the airport sponsor should be advised in writing by FAA that the current ALP does not establish an airport purpose (existing or future) for the land acquired by Federal grant funds and reminded of the subject assurance. Before giving notice to dispose of the land the airport owner will be given 90 days to provide sufficient documentation to FAA to justify retention of the land for airport purposes. If such justification (including a revised ALP) is not provided to the FAA within the prescribed 90-day period, the airport owner should be no-

tified in writing of the necessity to dispose of such land at FMV (subject to the provisions contained in the language stated above). There may be compelling reasons such as a depressed real estate market that would justify FAA's concurrence in a delayed disposal. In these cases FAA should obtain a marketing analysis and plan from the sponsor. Subsequent review may be required. (See paragraph 7-19 for disposal procedures.) In complex situations, the airport owner may be given a reasonable extension (up to an additional 90 days) to provide the required justification.

**e. Airport Noise Compatibility Land.** With the passage of The Airport and Airway Safety and Capacity Expansion Act of 1987, P.L. 100-223, Section 511a(13) provides: If the airport operator or owner receives a grant before, on, or after December 30, 1987, for the purchase of land for airport noise compatibility purposes.

(1) the owner or operator will, when the land is no longer needed for such purposes, dispose of such land at FMV at the earliest practicable time;

(2) such disposition will be subject to the retention or reservation of any interest or right therein necessary to ensure that such land will only be used for purposes which are compatible with noise levels associated with the operation of the airport and any height restrictions that are necessary to protect the airport; and

(3) that portion of the proceeds of such disposition which is proportionate to the United States share of the cost of acquisition of such land will, at the discretion of the Secretary.

(a) be paid to the Secretary for deposit in the Trust Fund; or

(b) be reinvested in an approved noise compatibility project as prescribed by the Secretary. Any airport accepting a grant containing this assurance obligates the airport to this requirement for *all* grant land acquired for noise compatibility regardless of when it was acquired.

When reviewing the airport sponsor's request for Federal assistance, or when conducting periodic compliance oversight reviews, the FAA must review the current ALP, the Land Inventory Map, and any Part 150 study or supporting noise compatibility information to determine whether any grant acquired noise land is no longer needed for such purposes. Land within an existing or projected 75 Ldn noise contour that has been acquired for noise compatibility purposes need not be required for disposal. Generally, because of the high level of noise associated with the contour, there is justification for it to remain under control of the airport as noise land. Land within a 65 Ldn can be retained only if it can be justified as land need for airport development.

Before giving notice to dispose of the land in accordance with the provisions of the Act (cited above), the airport owner will be advised in writing that the justification is insufficient to support the noise compatible use for the land and be given 90 days to provide sufficient documentation to FAA to justify retention of the land for noise compatibility and sufficient time to complete any Part 150 noise study that is in progress. There may be cases where the land is no longer needed for noise compatibility purposes but is needed for other airport purposes consistent with Order 5100.38 or the guidance provided in paragraph d. above. The FAA may allow retention for these purposes.

Where FAA has determined the land should be disposed of because there is no continuing need to retain fee title ownership, the airport owner should be notified in writing of the necessity to dispose of such land at FMV at the earliest practicable time. See Chapter 7, Section 5 for disposal procedures.

There may be compelling reasons, such as a depressed real estate market, that would justify FAA's concurrence in a delayed disposal. In these cases FAA should obtain a marketing analysis and plan from the sponsor. Subsequent review may be required.

**f. Compliance Requirements.** Continued adherence to an ALP is a compliance obligation of the airport owner. The erection of any structure or any alteration in conflict with the plan as approved by the FAA may constitute a violation of these obligations. With the passage of the Airport and Airway Safety and Capacity Expansion Act of 1987 (December 30, 1987), the ALP assurance language was strengthened. If the airport owner makes a change in the airport or its facilities which FAA has determined will adversely affect safety, utility or efficiency of any federally-owned or leased or funded property on or off the airport, and which is not in conformity with the FAA approved ALP, FAA may require:

(1) the airport eliminate the adverse effect; or

(2) bear the cost of rectifying the situation.

The airport owner may not abandon or suspend maintenance on any operational facility currently reflected on an approved plan as being available for operational use. The conversion of any area of airport land to a substantially different use than that shown in an approved layout plan could adversely affect the safety, utility, or efficiency of the airport and constitute a violation of the obligation assumed. For example, the con-

struction of a corporate hangar on a site identified on the ALP for future apron and taxiway would be considered as a departure from the controlling ALP which impairs the utility of the airport and a violation of sponsor obligations. When making a periodic compliance review of an ALP, consider whether grant-acquired land is still needed for airport purposes, particularly when it is separated from the airport property by a highway or railway.

**g. Authorization for Interim Use.**

(1) The FAA may approve the interim use of aeronautical property for nonaviation purposes until such time as it is needed for its primary purpose. Such approval shall not have the effect of releasing the property from any term, condition, reservation, restriction or covenant of the applicable compliance agreement. To avoid any misunderstanding, the document issued by the FAA approving interim use must so indicate.

(2) FAA approval for an interim use should be granted only if it is determined that such property will not be needed for any aviation use during the short-term period contemplated. Any option to renew an interim-use lease/agreement should be conditioned on obtaining a new FAA determination that the property will not be needed for any aviation use during the proposed renewal period. Investment by the interim user is at its risk and shall not be a factor in considering any renewal of a lease or use agreement.

(3) FAA shall condition its consent to an interim use on an agreement from the airport owner to apply the income from such use to the development, operation, and maintenance of airport facilities.

**h. Concurrent Use.** Aeronautical property may be used for a compatible nonaviation purpose while at the same time serving the primary purpose for which it was acquired, such as the concurrent use of runway clear zone land for low growing crops. Care must be taken when considering recreational use so as not to create a future 4(f) environmental problem. This is clearly beneficial to the airport. The primary purpose is served and the concurrent use should generate FMV revenue to be used for airport purposes.

**i. Excess Odd Parcels.** Section 16/23/516 deeds as well as grant funded land acquisition may include land in excess of that requested by the airport owner or recommended by the FAA for airport purposes. This usually happens because of property descriptions and title requirements of the controlling agency to avoid severance of odd parcels or areas that would have limited value or use by themselves. Use of such excess areas for nonaviation purposes may be approved as specified in a. and b. above.

**j. Conformance to FAA Criteria and Standards.** Any facilities developed with grant funds must be constructed to the then current applicable FAA design standards and must conform to the approved ALP in effect at the time of the grant. Improvements, alterations or additions to an airport which are accomplished without Federal aid should be designed to FAA standards, but this is not mandatory. However, any improvement or modification, regardless of how it is financed, must conform to the ALP unless the FAA can determine that it does not adversely affect the safety, utility or efficiency of an airport.

**k. LEASING GENERAL AVIATION APRON CONSTRUCTED WITH FEDERAL ASSISTANCE.** The airport owner has the responsibility for the management and operation of the airport and ultimately must assure that it is operated in accordance with all aspects of the grant assurances. The airport owner can not abrogate these responsibilities. Therefore, the airport owner should not enter into unconditional leasing of apron areas constructed with Federal airport grant assistance because this could result in reducing the airport owners ability to carry out their obligations under their agreements with the Federal Government.

(1) **Management Agreements.** The airport owner may in reality only want an FBO to manage tie-down spaces, maintain the apron area, remove snow, and similar functions. Since the relationship between the airport owner and anyone conducting management duties should be that of principal/agent, a management agreement rather than a lease is the appropriate means of accomplishing what the airport owner wants accomplished. Such an agreement should clearly specify the responsibilities and provide for acceptable practices such as nondiscriminatory waiting lists for tie-down spaces and a designated itinerant tie-down area to protect public availability. The tie-down fee schedule should be established by or approved by the airport owner.

(2) **Lease Agreements.** Tie-downs or spaces on the apron can be leased by the airport owner to individual aircraft owners and/or to the FBO for space necessary to serve the needs of their aircraft in their business. Also, the apron area in the immediate vicinity of an FBO can be leased to the FBO to permit the exercise of a propriatorship over the public-use ramp area. Apron areas can be leased provided the terms of the lease will not restrict the airport owner from carrying out their grant obligations. In general the lease should contain provisions which will ensure that the public will be served by the lessee in a manner equal to that which the airport owner is required to provide under the grant agreement. A demonstrated immediate need for the space to be leased

shall be documented by the FBO to preclude attempts to limit competition or to create an exclusive right. Any area to be placed under lease shall not result in an activity or use contrary to the approved airport layout plan (ALP).

(a) Public–use areas such as airport taxiways and self–fueling areas must not be included in the lease area. However, apron taxilanes used only for maneuvering on the leased apron may be included in the lease area. If airport fueling or self–fueling facilities are included within the area to be leased, provisions must be made for the right of public access to both..

(b) The lease shall provide conditions to assure that the area will be suitably maintained in a safe and serviceable condition; that snow or ice will be promptly removed; that services will be provided on a fair, equal and not unjustly discriminatory basis; and that charges for services will be fair, reasonable, and not unjustly discriminatory.

(c) Any lease arrangement shall protect availability for the public use, including nondiscriminatory practices for assignment of tie–down space and provide for the accommodation of itinerant users.

(d) The lease shall preclude the lessee from requiring that users of the leased area must secure goods and services only from that FBO. However, the lease need not require that a competitor must be allowed to enter the leased area to perform a service, including fueling, provided that there is adequate capability for the user to freely secure that service at another location on the airport. The competitor, however, must be allowed to assist the user of a disabled aircraft in placing the aircraft in a condition so as it can be taxied or towed away from the leased area.

(e) In no case shall an FBO be leased more apron space than that for which an immediate demonstrated need has been shown. Where there is only one FBO on an airport and there is more apron space than required for that operation, just that space actually required should be leased to the existing fixed base operator. This will ensure that apron space will be available for a future tenant, if requested.

(f) The person leasing the apron will not prohibit or restrict those using the area for tie–down from servicing their own aircraft. (Assurance 22f reference only.)

i. **Installation of Portable Hangars and Sun Shades on Federally–Funded Aprons.** At some locations around the country, airport sponsors have permitted the installation of portable hangars (i.e., hangars which can be readily removed and which do not require a foundation or footings) and sun shades on aprons constructed with airport grant–in–aid funds. Accordingly, FAA policy is as follows:

(1) The installation of portable hangars and sun shades on an existing federally–funded apron is not permissible except in the instances where, in the judgment of the Airports field office, changes in airport use patterns since construction of the apron are such that the apron or that portion of it proposed for the portable hangar and sun shade location is no longer needed for its original purpose. The approved ALP must show the apron area as being appropriately converted to portable hangar and/or sun shade use without having an adverse impact on the safety and efficiency of the airport.

(2) The FAA determination to permit installation of portable hangars and sun shades in exceptional instances will be conditioned on the requirement that any hangar or sun shade installed be removed within 30 days written notice from the FAA and will be based on the following considerations:

(a) The sponsor's proposal should be supported by a use plan for the installation of the portable hangars and/or sun shades.

(b) The proposed portable hangar and/or sun shade area must be in accordance with the approved ALP.

(c) Hangars and/or sun shades will be located so as not to constrain the flow of aircraft traffic any more than would exist in an aircraft tie–down area.

(d) Prior notice on FAA Form 7460–1, Notice of Proposed Construction, or through other similar notice procedure, must be given to the appropriate Airports field office of the intent to erect each structure or group of structures being installed concurrently and FAA concurrence must be received.

(e) Hangars and/or sun shades must be specifically designed for ready removal (no foundation or footings required).

(f) Hangars and/or sun shades will not cause damage to the apron. Any damage beyond normal wear and tear must be repaired by the sponsor at its expense.

(g) Hangar is designed to accommodate one aircraft.

(h) Hangar and/or sun shade design must meet local building codes.

(3) Where portable hangars and/or sun shades have been installed on federally–funded aprons without prior FAA concurrence, Airports field offices, at their

discretion, may either make an after–the–fact determination on the present utility of the affected apron as in paragraph (2) above, or may seek a remedy including:

(a) Requiring the sponsor to have portable hangars and/or sun shades removed from the apron;

(b) Seeking reimbursement for the Federal share of apron construction costs; (i.e., cost of apron replacement); or

(c) Recovering the Federal share of apron construction costs in a future project.

**4–18. USE OF SURPLUS PROPERTY.**

**a. General.** Surplus airport properties conveyed under the authority of the Surplus Property Act, as amended by P.L. 80–289, impose upon the grantee certain continuing obligations that are generally more comprehensive than the covenants and conditions discussed in previous parts of this section. Most of the surplus properties were developed as military installations and comprise a physical plant that frequently exceeds, or at least differs from, the type of development that would be undertaken to meet the demonstrable civil aviation needs of a typical community. P.L. 80–289 authorizes the conveyance of property over and above the required aeronautical facilities in order to permit the grantees to have a source of continuing airport revenue. To assure that this is accomplished, the FAA insists that surplus properties associated with a public airport including revenue generated therefrom be used to support the development, maintenance and operation of the aeronautical facilities. (See paragraph f. below.)

**b. Obligations Run with the Land.** There is a further distinction between the obligations assumed under a grant project and those assumed by the recipient of a surplus airport. Grant agreements are contracts with the Government relating to airport facilities. These run for a maximum specified term of years, or for the time the land is used for an airport, whereas the covenants of a surplus airport conveyance are in fact restrictions and encumbrances which condition the title to the land. Thus, every acre of a surplus airport is held in trust for a specific purpose and usage. The Surplus Property Act provides that property shall not be used, leased, sold, salvaged or disposed of for other than airport purposes without the consent of the Administrator. This reflects a degree of administrative flexibility to adjust the usage in a surplus property deed for specific areas of a surplus airport within the spirit, intent and objectives of the law.

**c. Authorized Land Use.** The FAA is required to assure itself that surplus land conveyed for aeronautical purposes is so used and that land conveyed for revenue purposes is actually used or available to produce revenue for the continued development, maintenance and operation of the aeronautical facilities. With the passage of time the aeronautical needs of any community will change. Therefore, the FAA is authorized to approve changes in the use of surplus airport property, including the conversion of aeronautical to revenue production and vice versa. It may relieve the recipient of its obligation to maintain parts of the airport that are no longer required for aeronautical usage within the foreseeable future. Under certain circumstances, it may grant a complete release for sale or disposal if the resulting proceeds are applied to further develop, maintain and operate the airport or other NPIAS airports which it owns as approved by the FAA. Conditions and procedures governing the release of surplus property from any of the terms and conditions of the deed are contained in Chapter 7.

**d. Reduction or Change in Aviation Use Property.** Changes in aviation needs may make it desirable to convert dedicated aviation use property to revenue–production property. The conversion may receive FAA approval provided the present/future civil aviation needs are met or assured and the public benefit in civil aviation is enhanced. In all such conversions, FAA shall require assurance that all such converted property will be used to produce FMV for civil airport purposes consistent with the original conveyance and in support of the owner's endeavor to make the airport as self–sustaining as possible.

**e. Land Use Plans.** In order to determine that all property on a surplus airport is being used as intended by the applicable law, it is necessary for the recipient to have inventory accountability. The most effective means for maintaining such a current inventory is the "land–use plan." This is a scaled layout of the entire property indicating the current use approved for each identifiable segment or area including that land which FAA has approved for revenue production. If this plan is to serve as the land inventory plan it should indicate the acquisition source of all airport land (i.e., surplus, grant purchase, etc.). For ease, it may be incorporated on an Exhibit A or on an ALP or developed as a separate document.

**f. Leasing of Surplus Airport Properties.** Section 1, Chapter 6 contains guidance on evaluating leases or use agreement covering aeronautical facilities at a public airport. It assists FAA personnel in advising airport owners about contracts or agreements which could affect the owner's prime responsibility to control public facilities and to make them available on fair and reasonable terms without discrimination.

(1) At airports which include Federal surplus property acquired for airport purposes, there is a further obligation to ensure that such property, if not needed to directly support an aviation use, is available for use to produce income for the airport. There is no violation of the covenants in the conveyance document (or deed) if the airport owner is unable to arrange for productive use of such property. However, when used, it must produce income for the airport. This means that any lease or other rental arrangement covering the use of surplus property at an airport must assure that the fair rental value of the property will accrue to the airport and be available to meet airport expenses. Such property may not be rented at a discount to support community nonprofit organizations or to subsidize nonairport objectives.

(2) Where revenue production land has remained undeveloped while comparable off airport land is being developed, reasonable market incentives should be considered to promote interest in developing the property. This would include a reduction in fair rental value for a limited time period or the use of a property development firm to share in the development costs or similar development incentives. In these cases, it is acceptable for the development firm to realize a reasonable share of the revenue. This method should only be used so long as it is necessary to establish the viability of the development.

(3) In determining what is the FMV, consideration should be given to the current market value of the property and to the going rate for rental of equivalent premises. The obligation to obtain fair rental income from the nonaviation use of surplus airport property relates to the property as acquired from the Government. It does not apply to the income producing potential from buildings and improvements constructed thereon without Federal assistance. Fair rental value may need to be reevaluated if airport land remains vacant while other comparable off airport property is being leased. In small communities, a faulty comparable may have been used. Fair rental/market value is clearly tied to demand and in these cases, consideration should be given to doing a market survey.

(4) Provisions should be made for periodic adjustments of the rental terms based on economic conditions.

**g. Leases Contemplating Substantial Investment.** Where prospective nonaviation tenants plan extensive improvements to leased surplus airport property they will normally seek long-term lease agreements, frequently in excess of 20 years. A fixed rental rate for Federal surplus property may over a period of years become unreasonably less than a fair rental value. FAA should require that leases with a term in excess of 5 years contain a reasonable escalation clause or periodic renegotiation provision to assure that the land is still producing for the airport the income for which it has a potential. The effect of such long-term commitments on defense mobilization requirements for the airport should be considered and, if appropriate, a total release from the NEUP should be obtained. (See Chapter 13, Order 5190.2). In certain circumstances where the land will never be aviation developed a complete release to permit sale of the land may be appropriate.

**h. Subordination of Reversionary Interest of the United States.** The existence of the contingent right of the United States to revert title for default by the airport owner has in some instances discouraged the leasing of revenue-producing surplus property to an income-producing tenant planning to invest substantial sums in construction on the property. If thoroughly justified on the record, the FAA may approve a lease which would protect the lessee's interests in the event of default and reversion of the airport to the Government.

(1) The FAA may, by letter or other written means, assure the grantee/owner and the prospective lessee that the lease will be honored in accordance with its terms for a period long enough to amortize or retire the invested amount but not for the useful life of the improvements. This assurance may not be given in connection with a lease of any property which may, in the foreseeable future, be required for aeronautical purposes or which is still subject to the NEUP provision.

(2) Whenever such action is contemplated it should be coordinated with the regional Assistant Chief Counsel.

**i. Personal Property.** All surplus personal property must be used, or continuously available for use, for airport purposes, during its useful life (not to exceed 1 year). To facilitate accountability the equipment should be clearly marked for identification. FAA provides decals for this purpose. When the personal property is not actually needed at the airport, FAA may consent to its use for another public purpose. It must always be available when needed for the airport. For donable property and related personal property, accountability will terminate 1 year after the transfer or earlier upon determination by FAA that items have outlived their useful life.

## 4-19. USE OF LANDS TRANSFERRED FROM THE UNITED STATES.

a. As compared to surplus property, much more stringent use restrictions apply to properties acquired for airport purposes under Section 16/23/516. The appli-

cable regulation defines airport purposes as uses of the property directly related to the actual operation or the foreseeable aeronautical development of a public airport. There is no authority under this legislation to convey property for the purpose of generating income from nonaviation use. Moreover, there is no authority for the FAA to modify the conditions of a conveyance or to grant release from any of its terms and conditions. A grantee who fails to develop a useful and usable airport or unit thereof on the property conveyed by the United States, within a time specified in the instrument or at the option of the FAA, is not in compliance with the terms of the conveyance. Unless the violation can be cured by granting a reasonable extension of time based upon a written and fully supported request of the grantee, the FAA shall declare a default and exercise the Government's option to revert the property. (See Chapter 8 for information on reversion.)

b. In some instances, Federal lands may be conveyed in standardized units or sections which could result in the transfer of small parcels of land in excess of that requested, or justified under the applicable regulation. Also, Section 23 and Section 516 authorize the transfer of lands for future airport development. In such instances the FAA may consent to the interim use of land acquired from Federal sources for a nonaviation purpose subject to such restrictions and conditions as may protect the national interest. This would include a requirement that any such nonaviation use must produce revenue for the airport and such proceeds shall be used only for airport purposes. This same policy does not apply in consenting to a concurrent use of Section 16, Section 23, or Section 516 land where such use is subordinate to and compatible with the purpose for which the land was conveyed and where the land continues to be used for aeronautical purpose. Other than interim or concurrent use, the FAA cannot allow the use of any of this property for generating income from nonaviation activities.

## 4-20. INCOME ACCOUNTABILITY.

a. **Basic Policy.** In its administration of airport agreements, the FAA is not normally concerned with the internal management or accounting procedures used by airport owners. While all grant agreements contain a provision obligating the sponsor to furnish the FAA with such annual or special airport financial and operational reports as may be reasonably requested, it is the policy of the FAA not to require such reports unless there is a genuine need for the information sought, a capability to effectively use the information, and the information requested can be reported without superimposing on the airport owner a requirement for additional accounting records over those normally required to operate the airport. However, there are several situations in which the FAA, to carry out its responsibilities under law, may solicit and review certain basic financial data on airport administration and operation.

(1) **Property Acquired Under the Surplus Property Act.** Where an airport includes property acquired from the Federal Government under the Surplus Property Act, the law, and frequently the conveyance document itself, authorize use by nonaviation business activity (see paragraphs 4-18a and 4-18d). Such use is justified only when it produces an income which is applied to any airport operation, maintenance and development. This income can also be used to improve and develop the infrastructure (utilities, roads, basic site preparation, etc.) for airport revenue producing land when a determination is made by FAA that all operational and safety needs of the airport are being adequately met and that near term future aeronautical needs can be achieved. The airport owner should be advised that their decision to use these funds for other than direct aeronautical needs may affect the airports' ability to compete for discretionary grant money under the Airport Grant Program. To ensure that such properties are used as intended, the FAA should periodically review the financial transactions of the airport to the extent necessary to make this determination.

(2) **Section 511(a)(12) of the Airport and Airway Improvement Act of 1982.** To ensure that all revenue generated by a public airport is used as intended (including revenue received as a result of the interim use of land acquired for future airport development), the FAA should periodically review the financial transactions of the airport to the extent necessary to make this determination.

(a) **Grants Issued Before December 30, 1987.** Section 511(a)(12) of the AAIA requires that all revenue generated by the airport, if it is a public airport, be used for the capital or operating costs of the airport, the local airport system, or other local transportation facilities owned or operated by the airport owner or operator and directly related to the actual transportation of passengers or property.

(b) **Grants Issued After December 30, 1987.** Section 511(a)(12) of the AAIA, as amended by the Airport and Airway Safety and Capacity Expansion Act of 1987, requires that all revenue generated by the airport, if it is a public airport, be used for the capital or operating costs of the airport, the local airport system, or other local facilities which are owned or operated by the airport owner or operator and directly and substantially related to the actual air transportation of passengers or property. In addition to limiting such facilities to those related to air transporta-

tion, the 1987 Act also included any local taxes on aviation fuel (other than taxes in effect on or before December 30, 1987 the date of the enactment of the Act).

(c) **Exception.**

(i) If the governing statutes controlling the owner or operator's financing in effect before September 3, 1982, provided for the use of any revenue from the airport to support not only the airport but the airport owner's general debt obligations or other facilities, then the limitation on the use of revenue generated by the airport shall not apply.

(ii) Clearly supportable and documented charges made by a governmental entity to reimburse that entity for payments of capital or operating cost of the airport may be allowed. Any charge must be supported by documented evidence. A flat payment "in lieu of taxes" without such documentation is not acceptable. If an indirect charge is levied against the airport in support of capital or operating expenses, the indirect charge must also be levied against other governmental cost centers in accordance with generally accepted accounting procedures and practices.

(iii) The Chief Counsel has determined based on legal history that revenue generated by the airport does not include revenue generating facilities which are unrelated to air operations or services which support or facilitate air transportation. This has been interpreted by the Chief Counsel to include royalties and related revenue from natural gas and would also apply to other similar natural resources. It would also apply to revenues generated by a convention center; however, the land rental paid to the airport by the convention center would be airport revenue if the convention center is located on land acquired with Federal funds or under the Surplus Property Program or land acquired without Federal assistance if shown on the Exhibit A as airport land. This would not be applicable if the revenues were generated from Federal surplus property land where the deed restrictions take precedent.

(3) As noted in paragraph 2–11, Section 16, Section 23, or Section 516 do not permit the conveyance of land for the express purpose of generating revenue. However, if conveyed, they may with FAA consent be used for a nonaviation purpose which is completely subordinate to their prime purpose. As a condition for FAA consent, all income from such use must be applied to airport development and operation and there must be a periodic review of income and expenditure records to confirm that the revenues have been so applied.

(4) Under the guidelines in Chapter 7, the FAA may grant a release from the airport obligations of surplus properties in order to permit their sale and conversion to operational assets which better serve the purpose for which they were initially obligated. As a consequence of such a release, and until the determined fair value of the released property has been fully expended on approved items of airport development, there must be a continuing accountability to FAA of the proceeds of sale or the amounts obligated for reinvestment in airport development.

(5) Section 18a(8) of the Airport and Airway Development Act and Section 511(a)(19) of the AAIA require an assurance that sponsors will maintain a fee and rental structure for facilities and services being provided to airport users which will make the airport as self–sustaining as possible. An opinion from Chief Counsel advises that Section 18a(8) of the Airport and Airway Development Act of 1970 does not require periodic statements indicating the degree to which an airport is or is not self–sufficient. The opinion goes on to say that in cases of noncompliance such statements will be required. Airports field offices shall accept at face value a sponsor's assurance that it will strive for financial self–sufficiency and shall not concern themselves in this matter except in cases of a complaint.

b. **Questionable Financial Data.** When the data provided does not clearly lead to a conclusion or in special circumstances needing audit expertise, the Airports office should request that the Office of the Inspector General (OIG) perform an audit of the airport's books and records or the FAA can contract with an independent Certified Public Accountant (CPA) to perform the audit.

c. **Disposition of Excess Revenues.** The progressive accumulation of substantial amounts of airport revenues may suggest an inquiry as to the reasonableness of user charges and fees. It may also indicate that the aeronautical facilities available to the public are not being expanded commensurate with the growth of aviation. Unless the sustained accumulation of airport revenues can be viewed as building a reserve for periodic renewal of facilities (seal coating, re–roofing, etc.), the community should be urged to convert a reasonable amount of the airport revenues into improvements that would enhance the value of the airport to the community (T–hangars, aircraft parking areas, terminal buildings, etc.). Such improvements may include types of development that are not eligible for grants of funds under the AIP.

d. **Diversion of Funds.** FAA consent to use or lease for nonairport purposes any land at surplus property airports (including property conveyed for revenue

production) does not constitute authority to apply the resulting income other than to maintain, operate, and further develop the airport. Even where the proceeds of such use of airport properties exceed the reasonable costs of meeting the owner's maintenance and operating commitment, any diversion of excess airport revenues to a nonairport purpose constitutes a breach of the terms and conditions of the deed of conveyance, unless specifically approved by the FAA. This approval will not be given at surplus property airports that have received a grant since the enactment of the AAIA of 1982 when the revenue assurance first appeared (except as specified in Section 511(a)(12) of the Act). When a surplus property airport has not received a grant under AAIA of 1982, approval will not be given unless:

(1) Maintenance and operation of the airport is and has been at an acceptable level and fully conforms to all established safety and certification requirements,

(2) There are no violations or defaults of the transfer deed or of subsequent agreements with the Government applicable to the airport,

(3) There are no foreseeable improvements, extensions, rehabilitations or additions to the capital plant that would be desirable to improve aeronautical services to the public or improvements to enhance the nonaeronautical use revenue production capabilities of the airport, and

(4) The airport owner is advised that such action may affect their ability to compete for grant funds other than airport entitlements under the Airport Grant Program.

**4-21. MANAGEMENT OF GRANT ACQUIRED PERSONAL PROPERTY.** Under the ADAP and AIP grant programs various items of personal property were eligible for acquisition. Examples of eligible items are ARFF vehicles and auxiliary equipment, security equipment and radios. The airport owner is required to maintain property records of this equipment and reconcile these records at least every 2 years by physical inventory for the first 6 years after the property was acquired.

**a. Requirements of 49 CFR 18.32.** 49 CFR 18.32 sets forth standards governing the use and disposition of federally-financed personal property. The sponsor's property management procedures must provide for accurate records, biannual inventories, adequate maintenance and control, and proper sales procedures.

**b. Sponsor Inventory System.** 49 CFR 18.32 requires sponsors to maintain property records of equipment during its useful life. The inventory should include:

(1) Description of the property;

(2) Manufacturer's serial number;

(3) Other identification numbers;

(4) Acquisition data and cost;

(5) Source of the property;

(6) Percentage of Federal funds used in the purchase of the property;

(7) Location, use, and condition of the property; and

(8) Ultimate disposition data including sales price, or the method used to determine current FMV if the grantee reimburses the grantor agency for its share.

**c. Determine Sponsor's Equipment Usage.** When a field compliance inspection is made, it should be determined if the sponsor is using the property for the purpose for which it was acquired. The primary means for this review will be the airport owner's inventory system. If the equipment is not being so used, action should be taken for disposition or transfer of the equipment. If the equipment is being used for unauthorized purposes, action should be taken to stop such use.

**d. Methods of Disposition.** 49 CFR 18.32 provides for the disposition of personal property acquired under grant agreement when such property is no longer needed. Disposition will be made as follows:

(1) Any personal property with a current per unit FMV of less than $5,000 can be retained, sold or otherwise disposed of. Any proceeds may be retained by the sponsor. The sponsor must inform FAA of disposition.

(2) Personal property with a current per unit FMV in excess of $5,000 may be retained or sold. If the property is sold, any proceeds, less the cost of selling, shall be applied to eligible project and related development in accordance with Order 5100.38.

(3) Personal property may be used as trade-in for other eligible property. No future accountability is required.

## SECTION 6. USE BY THE GOVERNMENT

**4-22. JOINT USE BY FEDERAL GOVERNMENT AIRCRAFT.** There are three types of agreements under which the Government has the right to joint use of airport facilities, either with or without charges.

**a. Grant Agreements.** The sponsor's assurances, which accompany the project application, provide that all facilities of the airport developed with Federal aid and all those usable for the landing and taking off of aircraft will be available to the United States at all times without charge for use by Government aircraft, in common with others. However, the assurances provide that if such use is deemed substantial, a reasonable share of the cost of operating and maintaining the facilities used, in proportion to the use may be charged. Substantial use is defined in the assurances as:

(1) Five or more Government aircraft are regularly based at the airport or on land adjacent thereto; or

(2) The total number of calendar month operations (counting each landing and each takeoff as a separate operation) of Government aircraft is 300 or more; or

(3) The gross accumulative weight of Government aircraft using the airport in a calendar month (the total operations of Government aircraft multiplied by gross certified weights of such aircraft) is in excess of five million pounds.

**b. P.L. 80-289.** Surplus Airport Property Instruments of Transfer issued under P.L. 80-289 provide that "The United States shall at all times have the right to make nonexclusive use of the landing area (runways, taxiways and aprons) of the airport without charge, except that such use may be limited as may be determined at any time by the Administrator of FAA to be necessary to prevent undue interference with use by other authorized aircraft and provide further that the United States shall be obligated to pay for any damage caused by its use, and if the use is substantial, to contribute a reasonable share of the cost of maintaining and operating the landing area, in proportion to such use." For guidance on substantial use, see a. above.

**c. Regulation 16 Transfer.** Surplus Airport Property Instruments of Transfer issued under WAA Regulation 16 (i.e., prior to the effective date of P.L. 80-289) provide that the Government shall at all times have the right to use the airport in common with others provided that such use may be limited as may be determined by the Administrator of FAA to be necessary to prevent interference with use by other authorized aircraft, so long as such limitation does not restrict Government use to less than 25 percent of the capacity of the airport. They further provide that Government use of the airport to this extent shall be without charge of any nature other than payment for any damage caused.

**d. Negotiation Regarding Charges.** In all cases where the airport owner proposes to charge the Government for use of the airport under the joint-use provision negotiations should be between the airport owner and the using Government agency or agencies.

**4-23. SPACE FOR AIR TRAFFIC CONTROL ACTIVITIES, COMMUNICATIONS, WEATHER AND NAVAIDS.** Other than the rights reserved to the Government for joint-use of airport facilities (paragraph 4-22), the only express obligation to provide space for Government activities is contained in grant agreements. The project application incorporates in the sponsor's assurances certain obligations with respect to providing facilities for air traffic control, weather and communication activities. There are subtle differences in the terms of this assurances under the various grant programs. Therefore, when questions arise regarding the use of space, refer to the most current grant agreement.

a. Under ADAP and AIP space is not required to be furnished rent free. However, the sponsor is required to furnish to the Federal Government without cost such area of land as may be necessary for the construction at Federal expense of facilities to house any air traffic control activities, or weather-reporting activities and communication activities related to air traffic control. This may include utility easements. The airport owner is not required to furnish cost-free-land for parking or roads to serve the facility. (G.C. Opinion dated March 27, 1962)

b. Under AIP grant agreements, FAA has the right to identify needed land area at any time during the life of the grant. Under ADAP, the grant agreement must identify the needed space.

c. There is no specific obligation to provide space for other Government activities such as Post Office, Customs, Immigration, etc. However, the leasing of space at nominal rental rate to such activities which complement or support aeronautical operations will not be viewed as a misuse of surplus property conveyed for revenue purposes.

**4-24. GOVERNMENT USE DURING A NATIONAL EMERGENCY OR WAR.**

**a. Airports Subject to Surplus Property Instruments of Transfer.** The primary purpose of each transfer of surplus airport property under Section 13 of the Surplus Property Act of 1944 was to make the property available for public or civil airport needs. However, it also was intended to ensure availability of the property transferred and of the entire airport for use by the United States during a war or national emergency. Most instruments of disposal of surplus airport property reserved or granted to the United States a right of exclusive possession and control of the airport during a war or national emergency.

**b. Airports Subject to Grant Agreements.** Grant agreements do not contain any provision authorizing military agencies to take control of the airport during a national emergency.

**c. Negotiation Regarding Charges.** Any negotiations by the Government for the right of use of an airport under the national emergency use provision of a surplus airport property instrument of transfer should be between the Government agency requiring such use and the airport owner. The only compliance responsibility FAA has with regard to this provision is that of releasing the property from its application when such action is appropriate. (See Chapter 7.)

# CHAPTER 7. RELEASE, MODIFICATION, REFORMATION OR AMENDMENT OF AIRPORT AGREEMENTS

## SECTION 1. GENERAL GUIDANCE

**7-1. AUTHORITY TO RELEASE, MODIFY, REFORM, OR AMEND.**

**a.** The authority of the Administrator to release, modify, reform or amend all or part of any airport agreement and the legislative basis for such authority are discussed in Chapter 1, paragraph 5 of this Order.

**b.** The Administrator has delegated to regional Airports Division Managers full authority to take any action with respect to their functions and assigned responsibilities, subject only to the limitations set forth in Order 1100.5, FAA Organization-Regions and Centers, Chapter 2, Section 3.

**7-2. GENERAL PRINCIPLES.**

**a.** Within the specific authority conferred upon the Administrator by law, the FAA will, when requested, act to release, modify, reform or amend any airport agreement to the extent that such action will protect, advance, or benefit the public interest in civil aviation. Such action may involve only relief from specific limitations or covenants of an agreement or a complete and total release which authorizes a subsequent disposal of obligated airport property.

**b.** Any property, when described as part of an airport in an agreement with the United States or defined by an ALP, is considered to be "dedicated" or obligated for airport purposes by the terms of the agreement. If any of the property so dedicated is not needed for present or future airport purposes, an amendment to or release from the agreement may be granted in accordance with the guidance contained in this Chapter. The omission of an airport from the NPIAS is not to be construed as a determination by the FAA that such airport has ceased to be needed for present or future airport purposes.

**c.** A decision to release, modify, reform, or amend an airport agreement will be based on the guidelines outlined in paragraphs 7-37a and b below and on the specific factors pertinent to the type of agreement as detailed in the following sections of this Chapter. However, any release which has the effect of permitting the abandonment, sale, or disposal of a complete airport (whether or not such action contemplates the development of a replacement airport facility) must be referred to AAS-1 for ARP-1 approval (see Order 1100.5, Chapter 2, Section 3, paragraph 222h(15)).

**7-3.-7-5. RESERVED.**

## SECTION 2. SURPLUS PROPERTY AGREEMENTS

**7-6. GENERAL.**

**a. Basic and General Policies and Procedures.** FAR Part 155 contains procedures which must be followed to release airport property from surplus property disposal restrictions contained in the conveyance instrument. Owners of surplus airport property should be advised to consult this regulation whenever changes in property use are being contemplated. Changes to surplus property instruments, consistent with the purpose of fostering and promoting the development, improvement, operation or maintenance of the airport are encouraged by the FAA.

**b. Authorized Uses of Surplus Property.** Section 13(g) of the Surplus Property Act of 1944 (as amended by P.L. 80-289) authorizes conveyance of surplus federal property for "airport purposes." Refer to paragraph 4-18 and Appendix 5 for a discussion of both aeronautical property (aviation use)and nonaviation property use for revenue production.

**c. Property Identification.** Very few older deeds of conveyance separately identify nonaviation revenue use property from that transferred for aviation use. The original application for the property and the FAA's (CAA) disposal report initially established these areas. They may now differ however, as the result of changed land use plans approved by the FAA pursuant to the authority of P.L. 81-311 (see paragraph 4-18e). For compliance purposes, it is important to verify changes subsequent to the initial conveyance that has been approved by the FAA.

**d. Land Transferred Under Regulation 16, War Assets Administration.** Prior to the amendment of the Surplus Property Act in 1947 by P.L. 80-289,

surplus Federal properties were conveyed for airport purposes under the procedures of WAA Regulation 16. The conveyance documents under this regulation vary in format but many of them stipulate that existing facilities may be used for compatible nonaviation purposes until such time as the FAA decides they are needed for an aviation purpose. The regulation and the conveyance documents are silent as to the income from such nonaviation use. Income from such property, including the net proceeds of a sale following release, must be applied to the development, improvement, maintenance, or operation of a public airport.

**7-7. RELEASE FROM SPECIFIC CONDITIONS.** The FAA will issue needed releases or corrections to effect the elimination of the restrictions which may have been repealed or modified by laws enacted subsequent to the Act, such as:

**a. Industrial Use Restrictions.** This restriction is contained in certain surplus property conveyances which prohibit the use of the property as an industrial plant, factory or similar facility. P.L. 81-311 repealed this prohibition.

**b. Reservation of Fissionable Material.** This reservation is contained in many surplus property agreements which reserve to the U.S. the right to explore for, mine, and extract fissionable material. Section 68 of the Atomic Energy Act of 1954, as amended, released and quitclaimed to the owner all such rights.

**c. Other Reserved Subsurface Interests.**

(1) **Minerals and Petroleum.** Some surplus property agreements reserve to the U.S. all subsurface minerals and petroleum other than fissionable materials. It has been determined that these reservations may not be released, conveyed or quitclaimed by the FAA under P.L. 81-311. Requests concerning these interests will be referred to the Federal agency controlling or having jurisdiction over them.

(2) **Residual Interest.** Routinely, in disposing of these reserved mineral rights to an approved applicant, the GSA imposes a prohibition against exploring for or extracting such minerals or petroleum in any way that would interfere with the operation and maintenance of the airport. Other Federal agencies would normally do the same. This has the effect of retaining for the Government a residual interest in the subsurface minerals which theoretically could be conveyed to the airport owner under P.L. 80-289. As a matter of policy, the FAA will not recommend to GSA or another Federal agency that the mineral rights reserved to the U.S. (in a surplus airport property deed) be transferred. In those cases where GSA or another Federal agency has already conveyed to other parties the mineral rights so conditioned, the FAA will not recommend conveyance of the Government's residual interest to the airport owner.

**d. National Emergency Use Provision (NEUP).**

(1) The FAA may grant a release of this provision which is often referred to as the recapture clause. However, concurrence of the DOD must be specifically requested and obtained by the FAA when the airport is listed in the current "Airports Required By Department of Defense for National Emergency Use," (see Chapter 13 of current edition of Order 5190.2, List of Public Airports Affected by Agreements with the Federal Government (RIS: AS 5190-1)).

(2) When requesting a release of the recapture clause, the airport listed in Chapter 13 of Order 5190.2 must provide FAA with five scaled drawings and two copies of other exhibits. The regional Airports office will forward the documentation required in paragraph 7-6a to AAS-300 along with four scaled drawings and one copy of the exhibits for processing to DOD.

(3) Upon receipt of the DOD concurrence, AAS-300 will forward the determination to the regional Airports office for release of the NEUP.

**e. Release of Reverter Clause.** Frequently, in order to promote private investment in airport facilities, the owners of surplus airports seek the removal of the provision giving the United States the option to revert title in the event of default. This is an important remedy intended to be reserved to the Government and will normally be released. Any such proposal shall be referred to AAS-300 for consideration.

**f. Release of Obligations for Property Not Received.** The FAA may release an airport owner of all inventory accountability obligations for specific items of property when it is determined that the items were not, in fact, received by the owner even though specified in the instrument of disposal.

**7-8. RELEASE FOR SALE OR DISPOSAL.**

**a. General Policy.** A total release, permitting the sale and disposal of real property acquired for airport purposes under the Surplus Property Act, shall not be granted unless it can clearly be shown that the sale of such property will benefit civil aviation.

(1) If any such property is no longer needed to directly support an airport purpose or activity (including the generation of revenue for the airport), it may be released for sale or disposal upon a demonstration that such disposal will produce an equal or greater benefit (to the airport or another public airport) than

the continued retention of the land. Such a release has the effect of authorizing the conversion of a real property asset into another form of asset (cash or physical improvements) which better serves the purpose for which the real property was initially conveyed. This objective is not met unless an amount equal to the net sale proceeds based on the current FMV of the property is realized as a consequence of the release and such amount is committed to airport purposes.

(2) In cases where an airport has a large amount of revenue production property that has remained undeveloped due to the lack of demand for this kind of property and where there appears to be no prospect for future development, FAA should fully evaluate the merits of either reversion or complete release for sale. This must be coordinated with AAS-300.

**b. Sponsor Owned Land, Leased to Federal Government During WW II, and Deeded Back Via P.L. 80-289.** The FMV requirement discussed in paragraph 7-8a(1) above does not apply when the release involves land owned in fee, leased to the Federal Government for a term of years and then included with other properties and improvements conveyed back to the owner in a surplus property deed. In this case, there is no requirement that the owner account for the net proceeds from the sale or disposal of this particular property. However, FAA should encourage the use of the money for airport development.

**c. Purpose of Release.**

(1) As indicated in paragraph 7-3b(2), the airport owner requesting a release of surplus airport land must identify and justify the reason for which the release is requested. One such justification could be a showing that the expected net proceeds from the sale of the property at its current market value will be required to finance items of airport development and improvement; the need for which is concurred in by FAA. In approving a release on this basis, consideration will be given to the amount of funds already accumulated from prior airport revenues and the amount of land needed to be disposed of to adequately finance the development or improvement items proposed.

(2) FAA recognizes that in some instances, the conversion of unneeded airport land into a more productive asset may be justified even though no specific items of airport development or improvement are immediately required. This occurs at some airports, for instance, where land in excess of present and future aeronautical requirements does not and cannot generate adequate revenues for the airport from rentals and leases in its existing state. Frequently such land has a potential market value (if developed for specific nonaviation uses) far exceeding that indicated by its present rental value. As an example, a tract of undeveloped land at an airport may be capable of yielding only nominal income to the airport from agricultural or grazing leases. Because of its location, it might have a much greater value for compatible industrial development. The proceeds from the sale, if invested at current interest could yield considerably more than its annual rental income. Under these circumstances, a release and sale may be justified.

**d. Monetary Consideration.** A sale and disposal of airport property for less than its FMV is inconsistent with the intent of the statute and shall not be authorized except as discussed in paragraph b. above. See paragraph 7-9 for information on application of sale proceeds.

(1) In determining FMV for a proposed nonaviation use of surplus airport property, the consideration need not be monetary. The value of intangible benefits may be used as an offset against FMV in determining the monetary consideration to be received for the property. For example, conveyance of a property interest in a right-of-way over surplus airport land to a railroad or highway may be consistent with the intent of the law if the resulting track or roadway will directly benefit the airport or enhance its efficiency or utility to a degree commensurate with the value of the property involved. Where intangible benefits are included in the FMV determination, the airport owner must submit:

(a) a plan identifying the intangible benefits to be derived by the airport,

(b) the amount attributed to the intangible benefits, and

(c) the merit of its application as an offset against the FMV in arriving at the monetary consideration.

(d) A plan reflecting the current and future needs for AIP funding of projects. FAA will review the information and make a determination as to the reasonableness of the proposal.

(2) **Determining Land Values.** Subject to the conditions in (1) above, the value to be placed on land for which a release has been requested shall be based on the present appraised value (for its highest and best use) of the land itself and any Federal improvements initially conveyed with the property. In many cases, the original buildings and improvements may have outlived their useful life and a determination may have been made by FAA that no further obligation to preserve or maintain them exists. If they have been replaced under such circumstances, or if addition-

al improvements have been added without Federal financing, the value of such improvements need not be included for purposes of determining the financial commitment of a release granted under the guidance in this paragraph.

**(3) Appraisals.** With the exceptions noted in this subparagraph, a release authorizing the sale and disposal of airport land shall not be granted unless the FMV has been supported by at least one independent appraisal report determined to be acceptable by the FAA. Appraisals shall be made by noninterested and qualified real estate appraiser. If any appraiser is involved in negotiations for the purchase or sale of the property or if there is evidence of collaboration between appraisers, such appraisal reports are invalid and shall not be considered by FAA in determining the FMV of the land. The cost of obtaining appraisals shall be borne by the airport owner but may be considered as an offset in determining net proceeds (Appendix 5) realized from the sale. The requirement for an appraisal may be waived if the FAA determines that:

(a) The approximate fair market or salvage value of the property released is less than $25,000, or

(b) The property released is a utility system to be sold to a utility company and will accommodate the continued airport use and operational requirements, or

(c) It would be in the public interest to require public advertising and sale to the highest responsible bidder in lieu of appraisals.

(4) FAA employees must be sensitive to local economic conditions in the airport's geographical area when they are reviewing FMV issues. The fluctuation in economic conditions can cause considerable variation in FMV at a given time and in a given location.

**e. Consent to Divert Excess Revenue from Surplus Property.** See discussion of Income Accountability under paragraph 4-20c and d.

**7-9. APPLICATION OF PROCEEDS.**

a. FAR Part 155.7(d) requires that any release of airport land to permit its sale or disposal shall be subject to a written commitment obligating the airport owner with respect to an amount equal to the net proceeds of a sale of the property at its current FMV. FAA shall not issue a release without this commitment.

Following a release by FAA based on such a commitment, the airport owner may discount the selling price or give the land away as a subsidy or inducement to attract industrial development or other purposes, provided they are compatible with the airport operations.

b. The net proceeds realized for the sale of surplus property, or the equivalent amount, must be placed in an identifiable interest bearing account to be used for the purposes listed in c. below. The interest and dividends can be used for the operation and maintenance of the aeronautical portion of the airport or, with the concurrence of FAA, the revenue producing property, if it can be clearly shown to enhance the revenue production capability of that property.

c. The obligated amount itself must be used for one or more of the following purposes as agreed to by FAA and reflected in the supporting documentation for the deed of release:

(1) Eligible items of airport development set forth in the current Airport Grant Program and reflected in the airport's Capital Improvement Program (CIP).

(2) Any aeronautical items of airport development ineligible under the grant program.

(3) Retirement of airport bonds which are secured by pledges of airport revenue, including repayment of loans from other Federal agencies for such development

(4) Development of common use facilities, utilities, and other improvements on dedicated revenue production property that clearly enhance the revenue production capabilities of the property.

d. All aeronautical improvements funded by proceeds from such sale will be accomplished in accordance with current applicable FAA design criteria or such State standards that have been approved by the FAA.

**7-10. RELEASES INVOLVING PERSONAL PROPERTY, STRUCTURES OR FACILITIES.**

**a. General Requirements.** Surplus airport property in these categories may be released from all inventory accountability (whether or not the airport at which it is located is included in Chapter 13 of the current edition of Order 5190.2) when it has been determined that such property:

(1) has outlived its useful life.

(2) has deteriorated beyond economical repair or rehabilitation.

(3) is no longer needed.

(4) has been replaced.

(5) is to be traded to obtain similar or other property needed for the airport; or

(6) has been destroyed or lost by fire or other uncontrollable cause and the ensured value, if any, has been credited to the airport fund; or

(7) has been, or should be, removed or relocated to permit needed airport improvement or expansion including salvage or other use elsewhere on an airport.

**b. Utility Systems (Includes Railroad Utilities).**

(1) Utility distribution systems may be released to permit demolition or other disposal when they have deteriorated beyond economical repair or are no longer needed for the airport. Also, where an airport owner is unable to maintain a utility system because of lack of adequately skilled personnel, financial ability, etc., it may be released from restrictions of any applicable surplus property instrument of disposal to permit conveyance of the system to a utility company for continued operation, provided the bill of sale includes the following provisions:

(a) Utility services will be supplied to all present and future occupants of the airport; and

(b) The Government shall have the option to lease or purchase the system under mutually acceptable terms upon military reactivation of the airport, and shall be granted right of entry and use of such system pending its acquisition from the utility company.

(2) In the event the airport or the utility system is subject to the NEUP and the airport is listed in Chapter 13 of the current Order 5190.2, no release of a utility system, whether to permit demolition or a sale to a utility company, shall be granted until the DOD has advised FAA in writing that it has no objection to such release.

**7-11.-7-15. RESERVED.**

## SECTION 3. GRANT AGREEMENTS

**7-16. GENERAL.** This section covers the requirements and procedures to release, cancel or modify any of the sponsor's conditions or assurances as contained in a FAAP/ADAP/AIP grant agreement.

**7-17. RELEASE FROM SPECIFIC CONDITIONS OR ASSURANCES.**

**a. Maintenance Obligation Release.** A release may be granted to an airport owner to remove the obligation to maintain specific areas of an airport. (See paragraph 7-37c(5).)

**b. Consent to Permit Interim Use.** The FAA may consent to the interim use for nonaviation purposes of dedicated aeronautical property whether or not acquired with grant funds. Such consent or approval must be based upon a determination that the property as a whole has not ceased to be used or needed for airport purposes within the meaning of the applicable statute. Consent to such use may be granted under the guidelines outlined in paragraph 7-37a.

**c. Abandonment, Demolition or Conversion of Grant Funded Improvements, Other Than Land.**

(1) Paragraph 2-3 of this Order points out that the sponsor/owner obligation under a FAAP/ADAP/AIP grant agreement remains in full force and effect throughout the useful life of the facilities improved under such FAAP/ADAP/AIP project, but in any event not to exceed the 20-year life of the grant agreement except for the privately-owned airport which requires that the useful life of the improvements will be at least 10 years. This does not apply to land purchased or reimbursed under the grant programs, which has no such 20-year limitation. The FAA has legally determined that the useful life of an airport or airport facility may be determined to have expired when it is no longer used or needed for the purpose for which it was developed, or if the physical useful life of the facility has expired.

(2) The physical useful life of such a facility extends only during the time it is serviceable and useable with ordinary day-to-day maintenance, and is not extended by reconstruction, rehabilitation or major repair of that facility. Under the foregoing guidelines, the determinations as to the expiration of the useful life and physical useful life of such facilities (see paragraph 2-3) is a responsibility of the regional Airports offices.

(3) Releases to permit abandonment, demolition or conversion to another compatible use of FAAP/ADAP/AIP developed or improved facilities shall be approved or granted provided the appropriate regional Airports office determines that:

(a) The grant agreement involved has expired, or

(b) the facility in question is no longer needed for the purpose for which it was developed under FAAP/ADAP/AIP, or

(c) the useful physical life of the facility in question has expired as above defined.

**d. Release from Obligation to Furnish Rent-Free Space or Cost Free Land.** A sponsor may be released from its obligation to furnish rent-free space when space or facilities have been constructed at Federal expense and are actually occupied in areas provided by the sponsor in accordance with section 11(5) of the Federal Airport Act. A release may also be granted from the obligation to furnish areas of land, water or estate therein or rights in buildings as provided by section 18a(6) of the Airport and Airway Development Act of 1970 and section 511(a)(7) of the Airport and Airway Improvement Act of 1982. However, prior to such a release, a determination should be made on the basis of all pertinent facts and circumstances that such area is not needed and will not be needed in the foreseeable future. In this regard, internal elements of the FAA and the National Oceanic and Atmospheric Administration must concur in the release. A release under either circumstance may be accomplished either unilaterally by the FAA waiving its rights or by a formal amendment to the grant agreement. See paragraph 4-23 of this Order.

**7-18. TOTAL RELEASE TO PERMIT SALE AND DISPOSAL.** All land described in a project application and shown on an Exhibit A constitutes the airport property obligated for compliance under the terms and covenants of a grant agreement. A sponsor is obligated to obtain FAA consent to delete any land so described and shown. FAA consent shall be granted only if it is determined that the property is not needed for present or foreseeable public airport purposes. When obligated land is deleted, the Exhibit A and the approved ALP should be revised as appropriate. Where the action involves the deletion of land not acquired with Federal financial assistance, there is no required disposition of net revenues from sale or disposal. However, in view of the ADAP/AIP requirement that airports become as financially self-sustaining as possible, the FAA should encourage the owner to use any net revenues for needed airport development and to consider an exchange of released property for needed property.

**7-19. SALE OR OTHER DISPOSAL OF AIRPORT LAND ACQUIRED WITH FAAP/ADAP/AIP FUNDS.**

**a. Sponsors Not Receiving a Grant After December 30, 1987.**

(1) **Applicability.** This paragraph is applicable to any request for release of part or all of an airport which would permit the sale at the current FMV or other disposal of any airport land acquired with FAAP/ADAP/AIP funds. It also applies to an AIP programming request which may commit the FAA to a subsequent release. A sponsor's request in either case must assure that:

(a) the Government shall be reimbursed (see subparagraph (2) below); or

(b) the total net proceeds will be reinvested in the airport, in a replacement airport, or in another operating public airport (see subparagraph (3) below).

(2) **Reimbursement.** The requirement for reimbursement shall apply only where there is no replacement or operating public airport owned or to be owned by the sponsor (see also paragraph 7-20). However, the sponsor may elect to reinvest the total amount due for reimbursement in any other public airport by a contract between the respective airport owners which has the written concurrence of the FAA. FAA concurrence in such a contract is contingent upon such funds being used for airport development specified in paragraph 7-9c at an airport subject to a grant agreement or equivalent obligation. Except where the applicable grant agreement specifically provides otherwise (a special condition dealing with land acquired for future development or noise), the amount to be reimbursed to the Government shall be a share of the net proceeds of a sale or disposal of the property at its current FMV based on the percentage used to compute the amount of Federal participation under the project(s) in which the land(s) was acquired.

(3) **Reinvestment.** Reinvestment of the total net proceeds (Federal and sponsor share) is required if the sponsor continues to own or control, or will own or control in part or in whole, a replacement or an operating public airport. Reinvestment shall be accomplished by a firm agreement to expend within 5 years or a timeframe satisfactory to the Administrator an amount equal to the total net proceeds from the sale or disposal of FAAP/ADAP/AIP acquired land for specified items of airport improvement in the order of priority established for releases of surplus airport property in paragraph 7-9c. Unlike surplus property, the purposes for which land acquisition is authorized under FAAP/ADAP/AIP projects do not include income production. If reinvestment cannot be accomplished within 5 years or if the net proceeds derived exceed the cost of needed airport development, reimbursement of the Federal prorata share of such excess as in (2) above will be required.

**b. Sponsors Receiving a Grant After December 30, 1987.**

(1) **Land for Airport Purposes (Other than Noise Compatibility Purposes).** Once a sponsor

enters into a grant after December 30, 1987, under the AAIA of 1982, as amended by the Airport and Airway Safety and Capacity Expansion Act of 1987, it will dispose of land at FMV when no longer needed for airport purposes (see paragraph 4–17d). This applies to land purchased under FAAP, ADAP, as well as AIP. There will be retained or reserved any interest or right necessary to ensure that the land will only be used for purposes which are compatible with the noise levels generated by the airport. The portion of the proceeds which is proportionate to the Government's share of the cost of acquisition of such land is to be deposited in the Trust Fund.

(2) **Land for Noise Compatibility Purposes.** Once a sponsor enters into a grant after December 30, 1987, under the AAIA of 1982, as amended by the Airport and Airway Safety and Capacity Expansion Act of 1987, it will dispose of land at FMV when the land is no longer needed for noise compatibility purposes. This applies to land purchased under FAAP, ADAP, or AIP (see paragraph 4–17e). There will be retained or reserved any interest or right necessary to ensure that the land will only be used for purposes which are compatible with the noise levels generated by the airport. The portion of the proceeds which is proportionate to the Government's share of the cost of acquisition of such land is to be deposited in the Trust Fund or may be reinvested in an approved noise compatibility project.

**7–20. RELEASE OF ENTIRE AIRPORT.**

**a. Approval Authority.** The concurrence of the Associate Administrator for Airports (ARP–1) is required before granting any release from the obligations of a grant agreement which would enable a sponsor to abandon or dispose of an entire airport for non-airport purposes. Each request to release an entire airport shall be considered by ARP–1 on a case–by–case basis without limitation to the guidelines contained herein. A copy of the sponsor's request, including exhibits and documents related thereto, and a copy of the regional summary statement (paragraph 7–6a) justifying the action, if recommended, shall be provided.

**b. Replacement Airport.** On receipt of a request to release an entire airport that is to be replaced by another new or existing airport, the applicable requirements of the Airport Improvement Program (AIP) for Authority, Program Policy, Eligibility, and Allowability Criteria, shall be considered in recommending appropriate action. In this situation, the general policy is to treat the proposal as a trade–in of the land and facilities developed with Federal aid at the old airport toward the acquisition and development of better facilities at the new airport. If an airport which accommodates local civil aviation requirements, as well as or better than an existing FAAP/ADAP/AIP airport can be acquired or developed at a cost less than the present market value of federally–financed land and facilities, a complete release can be granted on the old airport provided that the continuing grant obligations are transferred to the new airport. The release would become effective when the new airport is placed in operation. Development costs for the new airport in excess of the value of existing land and facilities at the old airport would be eligible for AIP assistance. In these circumstances, the availability for public–use of a new and better airport is the basis for determining that the old one is no longer needed and that its useful life having expired, the original grant agreement is terminated.

**c. Nineteen Year Disposals.** Except for ADAP and AIP grants for land, most grant agreements expire 20 years after their execution. Following the expiration of such an agreement, provided no other obligations to the Federal Government are involved, the owner may legally abandon and dispose of the airport. Frequently, due to changes in land use or values, an airport sponsor may look forward to an imminent termination of a grant agreement as an opportunity to realize substantial funds from disposal of the airport. In some instances, the sponsor may seek a release on the old airport before the grant agreement has expired with the intent to use the proceeds of the disposal as matching funds for AIP development of a replacement airport. Obviously, such an arrangement is contrary to the trade–in concept of existing policies. Where such a proposal is made, or where the sponsor is apparently deferring needed airport development or replacement in the hope of realizing a substantial windfall when the old grant agreement expires, he should immediately be notified that such actions may preclude Federal assistance for the development of a replacement airport. AIP funds are not assured for the development of a new airport when the community willfully disposes of an adequate functioning public airport upon the termination of its legal obligation to maintain it.

**7–21.–7–25. RESERVED.**

## SECTION 4. AMENDMENT OR MODIFICATION OF SECTIONS 16, 23, AND 516

**7-26. GENERAL.** Release of the conditions in an instrument of conveyance of any lands pursuant to Section 16, Section 23, or Section 516 (refer to the application FARs as discussed in paragraph 7-27b.) is not authorized. They may, however, with the approval of the controlling Federal agency, be amended or modified to provide for a greater or lesser property interest as dictated by the needs of the airport; e.g., change from easement, right-of-way or permit to fee, or vice versa.

**7-27. PROCEDURES.**

**a.** An application with supporting exhibits for amendment or modification of a property interest previously conveyed shall be filed with the FAA. The application should reference the original application and the conveyance instrument.

**b.** FAR Part 153 (FAAP) shall be followed in requesting changes to Section 16 instruments. FAR Part 154 (ADAP) governs Section 23 conveyances and shall also be followed in making original applications for acquisition under Section 516 as well as when requesting an amendment or modification. (See Order 5170.1, Transfer of Federal Lands, Section 23, of Airport and Airway Development Act of 1970.))

**7-28.-7-35. RESERVED**

## SECTION 5. PROCEDURES

**7-36. DOCUMENTATION.**

**a. General Procedures.** FAA release, modification, reformation, or amendment of an airport agreement represents a material alteration of an important contractual relationship that is governed by statutes and which affects the measure of benefits to the public from the operation of a civil airport. All actions must be fully documented. The Airports field office compliance files shall contain the following:

(1) The airport owner's justification for release, modification, reformation, or amendment;

(2) FAA's determination on the request; and

(3) The endorsement of the FAA official authorized to grant the request.

**b. Owner Requests.** Any release, modification, reformation or amendment of an airport agreement must be based on a written request signed by a duly authorized official of the airport owner.

(1) **Number of Copies.** Normally, the original request and supporting material should be submitted to the Airports District/Field Office by the airport owner. Additional copies of the request and supporting material may be required if action is required by the regional office or headquarters. In addition, where DOD concurrence is required, the additional material outlined in paragraph 7-7d will be provided.

(2) **Content of Written Owner Requests.** Although no special form is required, an owner's request must be specific and indicate, as applicable, the following:

(a) What agreement(s) with the United States are involved.

(b) What is requested.

(c) Why the release, modification, reformation or amendment is requested.

(d) What facts and circumstances justify the request.

(e) What requirements of state or local law should be provided for in the language of an FAA issued document if the request is consented to or granted.

(f) What property or facilities are involved.

(g) How the property was acquired or obtained by the airport owner.

(h) What is the present condition and what present use is made of any property or facilities involved.

(i) What use or disposition will be made of the property or facilities.

(j) What is the FMV of the property or facilities.

(k) What proceeds are expected from the use or disposition of the property and what will be done with any net revenues derived.

(l) A comparison of the relative advantage or benefit to the airport from sale or other disposition as opposed to retention for rental income.

(m) A plan identifying the intangible benefits, if any, accruing to the airport, the amount attributed to the intangible benefits and the merit of their application as an offset against the FMV of the property to be released. The plan should also include as a minimum:

(i) a statement of the airport's source and application of funds for the preceding 3 years,

(ii) a statement of future sources and application of funds needed for the continued operation and maintenance of the airport,

(iii) a statement of the financial capability and intent to accomplish the airport development included in the current NPIAS, and

(iv) must be shown to be in accordance with the ALP.

(3) **Exhibits to be Furnished by Owner.**

(a) Each copy of the request will have attached two scaled drawings (see (4) below) showing all airport property and airport facilities which are currently obligated for airport purposes by agreements with the United States. Other exhibits supporting or justifying the request, such as maps, photographs, plans and appraisal reports, shall be attached, as appropriate.

(b) Height data computations (see paragraph 7–37c(3)(c) using a fixed height.

(c) If the release action requested would permit a sale or other disposition of airport property, see paragraphs 7–9 and 7–19.

(4) **Scaled Drawing.** The scaled drawing required to support a request for release need not fully meet the criteria for ALP's, although this is desirable. The drawing serves to graphically explain or depict the effect on the airport if the requested release is granted. It is not the document by which the release is granted and no FAA approval shall be given to any drawing inconsistent with the airport owner's current obligations until a release has been executed in accordance with the guidance contained in this Chapter.

**7–37. FAA ACTION ON OWNER REQUESTS.**

**a. Evaluation.** When a request has been received, supported by the appropriate documentation and exhibits, an evaluation of the total effect of the owner's proposal shall be made. This evaluation shall be based on the general policy stated in paragraph 7–2 and shall include consideration of pertinent factors such as:

(1) The past and present owner's compliance record under all its airport agreements and its actions to make available a safe and usable airport for maximum aeronautical use by the public; and evidence that the owner has taken or agreed to take all actions possible to correct noncompliance situations at the airport, if applicable.

(2) The reasonableness and practicality of the owner's request in terms of aeronautical facilities which are needed and the priority of the need.

(3) The net benefit to be derived by civil aviation and the compatibility of the proposal with the needs of civil aviation.

(4) Consistency with the guidelines for specific types of releases as discussed in this Chapter.

**b. Determinations.** The FAA will not release more than that which the owner requests. The decision to grant or deny the request, based on the above evaluation factors, must be guided by the statutes, regulations and policy applicable to the specific types of agreements involved. In addition, it must be determined if an environmental assessment is required under Order 5050.4, Airport Environmental Handbook. Further, it must be determined that either:

(1) The public purpose for which a term, condition, or covenant of an agreement, or the agreement itself, was intended to serve is no longer applicable, or

(2) The release, modification, reformation or amendment of an applicable agreement will not prevent accomplishment of the public purposes for which the airport or its facilities were obligated, and such action is necessary to protect or advance the interest of the United States in civil aviation, or

(3) The release, modification, reformation or amendment will obligate the airport owner under new terms, conditions, covenants, reservations or restrictions determined necessary in the public interest and to advance the interests of the United States in civil aviation, or

(4) The release, modification, reformation or amendment will conform the rights and obligations of the owner to the statutes of the United States and the intent of the Congress consistent with applicable law.

**c. Completion of Action on Owner's Request.** Upon completion of the review, and following concurrence of the regional office, Washington headquarters, or the DOD, as applicable, the Airports field office will advise the airport owner that its request is granted

or denied. Any special conditions, qualifications or restrictions to an approval shall be included.

(1) **FAA Approval Action.** If the request or an acceptable modification of the request is approved, the necessary instruments or documents will be prepared conforming to the extent possible with the guidance of the Chief Counsel memorandum to all regional counsels dated April 30, 1965 (Appendix 4 to this Order). Parallel action will be initiated to amend all related FAA documents, e.g., NPIAS, ALP, land use plans, airport property map, FAA Form 5010, as required, to achieve consistency with the release. The owner shall thereafter provide the FAA with any acknowledgment (such as a notary) or copies of executed instruments or documents as required for FAA record purposes. The approval procedure may include a FAA letter of intent to approve the request, if so, see paragraph c(4) below.

(2) **Content of Release Document.** The formal release by FAA shall cite the agreements thereby affected and should identify specific areas or facilities involved. The owner shall be notified of the binding effect of the revised obligations.

(3) **Content of Release Document for Sale or Disposal.** A total release permitting sale or disposal of obligated land must specify that the owner is obligated to:

(a) Include in any deed, lease or other conveyance of a property interest to others, a reservation assuring the public right to fly aircraft over the land released, and to cause inherent aircraft noise over the land released. The following language shall be used:

"There is hereby reserved to the (grantor) (lessor) its successors and assigns, for the use and benefit of the public, a right of flight for the passage of aircraft in the airspace above the surface of the premises herein (conveyed)(leased). This public right of flight shall include the right to cause in said airspace any noise inherent in the operation of any aircraft used for navigation or flight through the said airspace or landing at, taking off from or operation on the (official name) Airport."

(b) Include in any deed, lease or other conveyance of a property interest to others a restriction:

(i) Prohibiting the erection of structures or growth of natural objects that would constitute an obstruction to air navigation, and

(ii) Prohibiting any activity on the land that would interfere with or be a hazard to the flight of aircraft over the land or to and from the airport or interfere with air navigation and to communication facilities serving the airport, and

(iii) Incorporating the Sponsors' Title VI Civil Rights Assurance obligations into all leases and other conveyances except fee title deeds. Fee title deeds transfer ownership of the property and it no longer serves an airport purpose. Accordingly, the Sponsors' Civil Rights Assurance obligations are not required to be transferred to the new owner. (DOT General Counsel and Acting Departmental Director of Civil Rights' letter of August 21, 1971, to The Secretary regarding Standard DOT Title VI Assurances.)

(c) These restrictions shall set forth in the instrument of release the applicable height limits above which no structure or growth should be permitted. These limits shall be computed according to the currently effective FAA criteria as applied to the airport. Advisory circulars, design manuals, FAR's, or other such documents shall not be incorporated by reference in the instruments or releases issued by the FAA. Neither should this be done in leases, deeds, or conveyances of property interests used by the airport owner. The specification of actual height limits will avoid a burdensome or confusing encumbrance on the title to the land. When the applicable height limits cannot be computed from available data at the Airports field office, the airport owner shall be required to supply any additional data needed to specify the correct computations.

(4) **FAA Consent by Letter of Intent to Release.**

(a) **Basis for Use.**

(i) Release and disposal of facilities developed through Federal assistance is often necessary to finance replacement facilities. Airport owners may have to assure the availability of the old facilities for disposal in order to obtain responsive proposals to acquire or encumber the existing facilities. The owner may therefore request a letter of intent as to such release. Such a letter may be requested merely to permit the owner to determine the market demand for portions of the available surplus revenue producing airport property.

(ii) The FAA may issue such a Letter of Intent (LOI) to release appropriately conditioned and specifically contingent upon adequate replacement facilities being developed and becoming operable.

(b) **Content.** An LOI issued by the FAA represents a binding commitment and an advance decision to release the property when specific conditions have been accomplished. The use of such a letter is not encouraged. It should only be used when all of the required conditions (as pertinent to the type of release sought as outlined in this Chapter) have been met or

are specifically made a condition of the pledge contained in the LOI. In addition, such a letter of intent should cite any specific understandings reached on anticipated problems in achieving the substitution of airport properties (e.g., who pays for relocation of various facilities and equipment, the cost of abating existing leases). A reasonable time limit on the commitment to release should be specified in the letter of intent.

(5) **Release of Maintenance Obligation.** A release may be granted to relieve an airport owner from a continuing obligation to maintain an improvement to airport property when the improvement is no longer needed for civil aviation requirements, regardless of its existing condition. Such a release:

(a) Does not constitute a release of the land from the other applicable terms and conditions or covenants of the applicable compliance agreements;

(b) Must be conditioned on an agreement to discontinue use when it becomes unsafe for aeronautical purposes.