## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLORADO

Civil Action No. 24-cv-02057-NYW-CYC

CITY OF BOULDER, a home rule municipality established under the Constitution and laws of the State of Colorado,

      Plaintiff,

v.

UNITED STATES OF AMERICA,
FEDERAL AVIATION ADMINISTRATION, an agency of the U.S. Department of Transportation, and
CHRIS ROCHELEAU, in his official capacity as Acting Administrator of the Federal Aviation Administration,[1]

      Defendants.

---

### REPLY TO RESPONSE TO MOTION TO DISMISS (ECF No. 32)

---

J. BISHOP GREWELL
Acting United States Attorney

***Thomas A. Isler***
Assistant United States Attorney
1801 California Street, Ste. 1600
Denver, Colorado 80202
Telephone: (303) 454-0336
Email: thomas.isler@usdoj.gov
*Counsel for Defendants*

---

[1] Pursuant to Federal Rule of Civil Procedure 25(d), when a public officer sued in his official capacity ceases to hold office, his successor "is automatically substituted as a party." The caption has been changed to reflect current agency leadership.

Defendants reply to the City of Boulder's response to the motion to dismiss, ECF No. 32 (filed 1/07/25).

## I.  The City was on notice in 1991 that the permanent easement it acquired with federal funds was "real property."

In its response, the City does not dispute that if the term "real property" in the 1991 grant agreement included easements, then the City's airport obligations did not expire after 20 years. Rather, the City argues that the easement it acquired under that 1991 grant agreement—an easement "in perpetuity" on which the City would "install" and "maintain" a "berm with a mass and slope adequate to provide lateral and subjacent support of an airplane taxiway," *see* ECF No. 1-7 at 1—was not "real property." The City contends that the term "real property" encompassed only acquisitions of "land," not easements. *See* ECF No. 32 at 12-15, 31-32.[2]

Based on that premise, the City argues that the FAA only recently, in 2022, sought to *retroactively* impose new perpetual obligations on the City not contained in previous grants. *Id.* at 3, 11. This retroactivity theory underlies *all* the City's claims.[3] The City argues that because the FAA did not seek to impose these obligations until 2022, *see id.* at 3 & 11, the City has stated timely statutory and constitutional claims.

---

[2] Defendants cite to the City's response by the page numbers in the ECF header.

[3] *See id.* at 12-15 (arguing that the QTA claim did not accrue until recently, based on the theory that the City could not have known in 1991 that its easement was real property); *id.* at 26 (arguing a separation-of-powers violation because the FAA "attempts to impose a retroactive, perpetual obligation on sponsors"); *id.* at 29 ("the FAA's exercise of that authority"—"retroactively impos[ing] perpetual obligations"—"violates the Spending Clause"); *id.* at 33-35 (arguing that the Tenth Amendment was violated because the FAA changed its interpretation of prior grant agreements and did not give the City the opportunity to "withdraw" from the obligations); *id.* at 37 (arguing the FAA violated due process "by unilaterally abrogating the express term of those agreements").

That premise is wrong. As explained in Defendants' motion and below, the authorities that the Court can consider here—including the 1991 grant agreement as well as regulations published in the Federal Register and referenced in the grant agreement itself—established that "real property," as used in the 1991 grant agreement, encompassed easements, and thus the obligations that the City endorsed in 1991 did not expire after 20 years. The FAA has not imposed a retroactive obligation on the City.

A.    **In 1991, property law and relevant regulations defined "real property" to encompass easements.**

Property law has long made clear that easements are a type of real property. *See* ECF No. 26 at 15 (citing cases). This fundamental understanding of property also was reflected in regulations and public notices for federal grants generally, and aviation grants specifically, at the time of the 1991 grant.

In 1974, the FAA issued regulations related to grants under the Airport and Airway Development Act of 1970 providing that: "Real property means land, land improvements, structures and *appurtenances* thereto, excluding moveable machinery and equipment."[4] 39 Fed. Reg. 19348, 19357 (May 31, 1974) (App. L § 2a) (emphasis added); *see also* ECF No. 26 at 15 n.9 (citing App. L § 2a).

In 1977, the Office of Management and Budget ("OMB"), an office of the President that oversees federal agencies, re-published Circular A-102, which sets

_____

[4] The easement that the City acquired in 1991 is an appurtenance. *See Lobato v. Taylor*, 71 P.3d 938, 945 (Colo. 2002) (an "easement appurtenant . . . runs with the land" and "is meant to benefit the property, or an owner by virtue of her property ownership"; "An easement is presumed to be appurtenant . . . ."); *see also* ECF No. 1-7 at 1 (stating the easement "run[s] in perpetuity with the above described property").

"uniform standards governing the utilization and disposition of property . . . acquired in whole or in part with Federal funds . . . ." 42 Fed. Reg. 45828, 45888 (Sept. 12, 1977), *available at* https://www.govinfo.gov/content/pkg/FR-1977-09-12/pdf/FR-1977-09-12.pdf (last visited Feb. 7, 2025); *see also id.* at 45828 ("This Circular promulgates standards for establishing consistency and uniformity among Federal agencies in the administration of grants to" state and local governments). Attachment N to Circular A-102 ("Property management standards") defined "real property": "Real property means land, including land improvements, structures and *appurtenances* thereto, excluding moveable machinery and equipment." *Id.* at 45888, § 2(a) (emphasis added). Thus, OMB established a default rule for grant programs across the federal government that "real property" included easements ("appurtenances") as well as "land." That definition remained operative at the time of the 1991 grant agreement. *See, e.g.*, 23 C.F.R. § 1204.4, Supp. D (Apr. 1, 1992) (republishing Attach. N with the same definition).

  In 1980, the FAA published in the Federal Register the required assurances for grantees on aviation projects, including "Assurance 17," *see* 45 Fed. Reg. 34782, 34798 (May 22, 1980),[5] the assurance at issue in this case, *see* ECF No. 26-1 at 1 § B.1. The Federal Register notice explained that when federal funds were used by grantee to acquire "real property," the assurance did *not* have a 20-year limit: "Assurance 17 has been revised to provide that the 20 year limitation on the effectiveness of the

---

[5] Assurance 17 stated in relevant part: "These covenants shall remain in full force and effect throughout the useful life of the facilities developed under this Project, but in any event not to exceed twenty (20) years . . . . However, these limitations on the duration of the covenants do not apply to the covenant against exclusive rights and *real property acquired with Federal funds*." 45 Fed. Reg. at 34798 (emphasis added).

assurances does not apply to those affecting the use of real property acquired with Federal funds." 45 Fed. Reg. at 34784. The express purpose of the revision to Assurance 17 was to be "consistent with attachment[] N, Property Management Standards, of OMB Circular A-102, which requires that the grantee use that property for the authorized purpose of the original grant as long as it is needed." *Id*. As noted, Attachment N to Circular A-102 defined "real property" to include easements. Nothing in the 1980 notice suggested that Assurance 17's use of "real property" deviated from that in Attachment N. *See id*. at 34792 ("The sponsor shall establish and maintain property management standards in accordance with Attachment N of [OMB] Circular A-102"); *accord* 39 Fed. Reg. 19318, 19319 (May 31, 1974) ("In the interest of Government-wide grant-in-aid program uniformity, deviations from the requirements of OMB Circular A-102 . . . will be permitted only in exceptional cases").

Then, in 1988, the Department of Transportation ("DOT"), of which the FAA is an operating administration, issued regulations governing grants that, once again, defined "real property" as the foregoing authorities did—encompassing easements. In its "Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments," set forth in 49 C.F.R. Part 18 and published in the Federal Register in 1988, the DOT defined "real property" as including easements: "'Real property' means land, including land improvements, structures and *appurtenances* thereto, excluding moveable machinery and equipment." 53 Fed. Reg. 8084, 8089, 1988 WL 274694 (Mar. 11, 1988) (emphasis added), *available at* https://archives.

federalregister.gov/issue_slice/1988/3/11/8025-8103.pdf (last visited on Feb. 7, 2025).[6]

All these rules and public notices were in place when the City adopted the 1991 grant agreement. That agreement thus must be interpreted consistent with this legal background, which made clear that, for federal grants, real property included easements. And the 1991 grant agreement nowhere provided otherwise.

Moreover, the City's own actions acknowledged that it was acquiring real property. In connection with the 1991 grant agreement, the City signed a "Sponsor Certification for Real Property Acquisition," certifying that it was acquiring real property. ECF No. 1-6 at 15-16. The City concedes that it signed the certification because it "agreed to comply with" the Uniform Relocation Assistance and Real Property Acquisition Policies Act of 1970 and that the act was "*expressly* applicable to '[l]ess-than-full-fee interest[s] in real property.'" ECF No. 32 at 14. The City's certification also incorporated regulations that, again, recognized easements as real property: "General requirements on real property acquisition and relocation assistance are in 49 CFR 24." ECF No. 1-6 at 15. 49 C.F.R. Part 24, at Subpart B, which governed "Real Property Acquisition," expressly stated: "the provisions of this subpart apply . . . to the acquisition of permanent easements." *See* 49 C.F.R. § 24.101(b) (Oct. 1, 1990).

In addition, the City "certifie[d]" in the 1991 grant agreement that it would "comply with all applicable Federal laws, regulations, executive orders, policies, guidelines and

---

[6] Other contemporaneous regulations for federal grants employed this uniform definition of "real property." *See, e.g.*, 45 C.F.R. § 2015.3 (Oct. 1, 1990) (Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments); 29 C.F.R. § 1470.3 (July 1, 1990) (same).

requirements," including, among others, the DOT's "Uniform Administrative Requirements for Grants and Cooperative Agreements to State and Local Governments, "49 CFR Part 18." ECF No. 26-1 at 2-3. As noted above, in 1991, those rules defined "real property" to mean "land, including . . . appurtenances." 53 Fed. Reg. at 8089. Thus, the City expressly agreed that it would comply with regulations that defined "real property" to include land improvements and permanent easements.

**B.     These public notices and regulations gave the City notice in 1991, as a matter of law, that it was acquiring real property.**

These authorities not only made clear that the term "real property" in the 1991 grant agreement encompassed easements, but they also put the City on notice, as a matter of law, that its acquisition of a permanent easement through a federal grant was an acquisition of "real property."

"The law in effect when a Government contract is made becomes part of the contract." *Martin v. Bergland*, 639 F.2d 647, 652 (10th Cir. 1981) (quotation marks omitted). And "Congress has provided that the appearance of rules and regulations in the Federal Register gives legal notice of their contents." *Fed. Crop Ins. Corp. v. Merrill*, 332 U.S. 380, 384-85 (1947); *see also* Pub. L. 90-620, 82 Stat. 1276, § 1507 (Oct. 22, 1968) (publication is "sufficient to give notice of the contents of the document to a person subject to or affected by it"), *codified at* 44 U.S.C. § 1507. "Publication in the *Federal Register* is legally sufficient notice to all interested or affected persons regardless of actual knowledge or hardship resulting from ignorance." *Sw. Four Wheel Drive Ass'n v. Bureau of Land Mgmt.*, 271 F. Supp. 2d 1308, 1312 (D.N.M. 2003) (quotation marks omitted), *aff'd*, 363 F.3d 1069 (10th Cir. 2004). Thus, the City, as a

regulated airport sponsor and federal grantee, had legally sufficient notice of the meaning of "real property," as reflected in the pre-1991 public notices.

The City argues that the Court should interpret the 1991 grant agreement as meaning that "real property" encompassed only "land," citing FAA Order 5190.6A, a 1989 guidance document about airport compliance. ECF No. 32 at 12-13. But that Order does not support the City's argument. Order 5190.6A's discussion of the duration of assurances in grant agreements uses the term "real property," not "land." *See* ECF No. 32-2 at 2 § 2-2.a ("there shall be no limit on the duration of the . . . assurances with respect to real property acquired with Federal funds"). And even the use of the term "land" elsewhere in the Order does not show that the FAA understood "real property" to exclude easements. As explained above, regulations *equated* "real property" and "land" and expressly provided that the term *included* appurtenances. *See, e.g.*, 53 Fed. Reg. at 8089 ("*Real property means land, including . . . appurtenances*") (emphasis added); 42 Fed. Reg. at 45888 (same). The use of "land" in Order 5190.6A does not suggest the 1991 grant agreement's reference to "real property" excluded easements.

The City argues that it could not have known before 2022 that its permanent easement was "real property" subject to ongoing obligations. ECF No. 32 at 11. But that meaning was clear in 1991 from federal regulations, rules, and Federal Register notices. *See* ECF No. 32-1 at 12 (Change 2 stating that "[t]he public has been on notice of this"—unlimited duration of AIP grant assurances for real property—"since at least 1980"). The City points to no regulation, rule, or notice showing the opposite.

Indeed, more than a decade earlier, the FAA's 2009 Airport Compliance Manual

stated that "under AIP grants"—the 1991 grant was an AIP grant, *see* ECF No. 1 ¶ 28—

"the duration of the terms, conditions, and assurances do not expire with respect to real

property acquired with federal funds (land and appurtenances, when applicable) . . . ."

ECF No. 26-2 at 6 § 6(h)(1). The City argues that this manual provision announced a

change from previous guidance and governed only *future* grants. ECF No. 32 at 14-15.

But § 6(h)(1) is consistent with pre-1991 law; the manual did not change, rather than

explain, the operative assurance. *See* ECF No. 26-2 at 1 ("The handbook . . . facilitates

interpretation of the assurances by FAA personnel"). And the manual nowhere provided

that its guidance applied only to future grants. *See id.* The City thus was on notice of the

meaning of "real property" in 1991 but certainly no later than 2009.

The City does not identify *any* additional official regulations, rules, or Federal

Register notices in place in 1991 that it claims support its interpretation of "real property"

in the 1991 grant agreement. Rather, pointing to FAA statements from decades later—

2022 and 2023—the City suggests that it may wish to conduct discovery into the parties'

subjective understandings of the term "real property." ECF No. 32 at 13 n.9. But such

discovery would not be relevant to the City's (faulty) premise that its obligations are new

(and thus retroactive). The FAA's recent guidance or individual employees' views would

not alter the meaning of "real property" in the 1991 grant agreement as a matter of law,

based on contemporaneous regulations, rules, and Federal Register notices.

The City suggests that it would have made policy sense to impose narrower

obligations on easements than on fee-simple estates. ECF No. 32 at 13-14. But it

makes perfect sense for the obligation—that the land must be used for airport purposes

as long as needed—to apply to permanent easements acquired to install permanent land improvements just as it did to other types of property. And in any event, this policy argument is contrary to the meaning of "real property" set forth in the above authorities.

In sum, the City was on legal notice in 1991 that its acquisition of a permanent easement with federal funds was a "real property" acquisition and thus that the ongoing assurances that attached to real property acquisitions applied. The consistent premise of all the City's claims—the FAA is now seeking to impose new "retroactive" obligations on the grants—is unsound. That premise is not supported by any of the materials the Court can properly consider on this motion to dismiss, including the 1991 grant agreement, the City's own certifications, and the numerous published official regulations, rules, and Federal Register notices governing federal grants in place in 1991. The City's obligations are not new and retroactive. The City incurred those ongoing obligations when it agreed to accept the 1991 grant. *See* ECF No. 26 at 6-10. Since all the claims rest on this faulty premise, the Court should dismiss them.[7]

## II.     The City fails to state a claim under the Quiet Title Act (Claim 1).

### A.     The Complaint does not allege a dispute of title to airport property.

The City argues that it may state a claim under the QTA without alleging that the United States disputes the City's title to airport property, ECF No. 32 at 5-6, but that

---

[7] The City argues that the Court should determine whether the FAA is imposing retroactive obligations on the 1959 and 1977 grant agreements. ECF No. 32 at 12 n.7. But the Court need not address that question. The obligations associated with the earlier grants do not exceed those that the City incurred in 1991, so analyzing them is unnecessary. And the idea that future land acquisition might change the analysis, *see id.*, is purely hypothetical; the City does not claim to have extinguished the easement.

theory is contrary to the QTA, Tenth Circuit law, and principles of sovereign immunity.

The QTA waives sovereign immunity only "to adjudicate a disputed title to real property in which the United States claims an interest." 28 U.S.C. § 2409a(a). Waivers of sovereign immunity must be "unequivocally expressed" and "construed strictly in favor of the sovereign." *United States v. Nordic Vill. Inc.*, 503 U.S. 30, 33-34 (1992) (quotation marks omitted). Where a "plausible" reading of a statute suggests that Congress did *not* waive sovereign immunity, a contrary interpretation "should not be adopted." *Id.* at 37. Following these principles, the Tenth Circuit held that "for a court to have jurisdiction over a QTA claim, the plaintiff must establish that: (1) the United States 'claims an interest' in the property at issue; and (2) title to the property is 'disputed.'" *Kane Cnty. v. United States*, 772 F.3d 1205, 1210-11 (10th Cir. 2014). The Tenth Circuit expressly rejected a "cloud on title" standard that the Ninth Circuit has used,[8] noting that such an approach is "incompatible with the rule that conditions on a waiver of sovereign immunity are to be specifically observed."[9] *Id.* at 1212.

Under those standards, the City's claim fails. Although the City argues that "the United States claims a property interest in the land comprising the Airport," *see* ECF No. 32 at 7, the United States does *not* claim such a property interest. See ECF No. 26 at 11-12. The City cites no authority that suggests that an obligation to comply with a *regulatory* requirement amounts to a *property* interest. Such a sweeping principle would

---

[8] The City relies primarily on Ninth Circuit and other pre-*Kane County* cases that do not analyze the QTA consistently with *Kane County*. *See* ECF No. 32 at 6-10.

[9] These sovereign immunity principles also foreclose the City's novel claim that the QTA waives sovereign immunity for constitutional claims. *See* ECF No. 32 at 23-24.

treat any city's indefinite zoning restriction on a parcel as a property interest of the city.

And Tenth Circuit cases do not support the City's view. *Kane County* rejected the view that alleging a cloud on title was sufficient to state a QTA claim. 772 F.3d at 1212. *Vincent Murphy Chevrolet Co., Inc. v. United States*, 766 F.2d 449, 450 (10th Cir. 1985), unlike this case, involved express property interests: quitclaim deeds conveyed *by* the United States to the plaintiff, contained restrictions, implicating what interests the plaintiff acquired in the first place. The City also relies on *Affiniti Colorado, LLC v. Eagle-Net Alliance*, 184 F. Supp. 3d 992, 994, 998 (D. Colo. 2016), but there, the Department of Commerce expressly retained a lien against property and even filed financing statements stating that the grantee held the property in trust for the benefit of the government. The City does not allege similar interests by the United States here. It thus fails to plead that its obligation to seek FAA approval before an airport closure constitutes a property interest of the United States.

Moreover, alleging a federal interest would only get the City halfway: it must also allege a dispute of title.[10] The City alleges no dispute of title. The City's claim is not about a dispute of title to real property, but whether the terms of a grant the City accepted decades ago require it to seek regulatory approval before closing its airport. The City characterizes its claim as "seek[ing] to establish that, whatever authority the FAA has, it expires with the term of the City's last FAA grant agreement (i.e., in 2040), and does not continue in perpetuity." ECF No. 32 at 10. This is not a QTA claim about a

---

[10] The City correctly notes that less-than-fee interests can "give rise to a QTA claim," ECF No. 32 at 9-10, but the nature of the real property in dispute does not eliminate the requirement to allege a "disputed title."

dispute of the City's title over that property. The Court should dismiss Claim 1.

### B.    The City's QTA claim is also barred by the statute of limitations.

Even if the City stated a QTA claim, it is time-barred. The twelve-year statute of limitations for a QTA claim begins to run when the plaintiff "'has reason to know that the government claims some type of adverse interest in that land.'" *Rio Grande Silvery Minnow v. Bureau of Reclamation*, 599 F.3d 1165, 1177 (10th Cir. 2010). To show that the City had no reason to know that the government claimed an adverse interest in airport property, the City argues that it only became aware of the FAA's interpretation in 2022. *See, e.g.*, ECF No. 32 at 3. But as explained above, in Part I, the City's theory is contrary to the prevailing regulatory definition of "real property" at the time, including in regulations referenced in the 1991 grant agreement itself, and knowledge of those regulations is imputed to the City as a matter of law. The City had legal notice in 1991 of the meaning of "real property" as used in the 1991 grant agreement sufficient to trigger the statute of limitations in the QTA, regardless of what subjective understanding of the term "real property" the City might now claim. *See* ECF No. 26 at 12-15.

The City also had reason to know that the federal government claimed "some type of adverse interest in the land" no later than 2009, when the FAA's order stated that AIP grant obligations do not expire with respect to easements. *See* ECF No. 26 at 15 n.9. Either way, the statute of limitations has expired on the QTA claim.

### III.   Threshold issues of timeliness, standing, and ripeness require dismissal of the City's constitutional claims.

The City fails to establish that its constitutional claims are timely, that it has standing, or that its claims are ripe for review.

**Timeliness.** The City argues that its claims are not time-barred because they accrued when the FAA stated in 2024 that the obligations under the 1991 grant agreement did not expire after 20 years. ECF No. 32 at 15-16. But if notice of the meaning of the 1991 grant agreement triggered the statute of limitations, those claims accrued in 1991, when the City had legal notice of the meaning of "real property." The claim is now barred under 28 U.S.C. § 2401(a). *See* ECF No. 26 at 16-17; *see also supra* Part I. In any event, the City's claim accrued no later than 2009, when the FAA stated that AIP grant assurances do not expire with respect to easements acquired with federal funds. *See* ECF No. 26 at 16-17; *see also* ECF No. 26-2 at 6 § 4.6(h)(1). Under the City's own theory, the claims are now time-barred.

**Standing.** In the response, the City does not argue that it has decided, in any reasonably concrete way, to close the airport in or after 2040. Unless the City does so—unless the City's actions or concrete plans are impermissible under the FAA's view of the grant agreements—the City cannot establish standing.

To satisfy Article III standing requirements, an injury "must be concrete and particularized and actual or imminent, not conjectural or hypothetical." *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 158 (2014) (quotation marks omitted). "An allegation of future injury may suffice if the threatened injury is certainly impending, or there is a substantial risk that the harm will occur." *Id.* (quotation marks omitted). The City does not satisfy this standard. The City seeks an advisory opinion to inform its planning for airport property. And even if the City had already resolved to close to the airport, which it has not, any closure could not occur for at least 15 years, during which

time the City's plans, or the FAA's approach to airport closures, could change. The City's concern is hypothetical, not concrete, imminent, or certainly impending.

A cause of action accrues when "'*the loss or damage occurs*.'" *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 810 (2024). "'[I]f an act is not legally injurious until certain consequences occur, it is not the mere doing of the act that gives rise to a cause of action, but the subsequent occurrence of damage or loss as the consequence of the act . . . .'" *Id.*

The City argues that it is presently suffering three injuries, but none persuasively establishes standing. First, the City contends that the imposition of retroactive obligations is a cognizable injury, ECF No. 32 at 16, but, as explained above, the City's obligations are not retroactive. Second, the City contends that the conditions interfere with its ability to dispose of the airport, *id.* at 17, but that injury is not imminent or traceable to the challenged grant agreements, because the City cannot dispose of the airport property for another 15 years based on other *undisputed* obligations. Third, the City contends that the FAA's conditions placed on future grants are "an unconstitutional federal funding offer," *id.*, but none of the City's claims here concerns *future* grants, and, regardless, the City pleads that it stopped applying for federal grants, which would impose new obligations for a period of years, further delaying any real-world impact of the interpretation of past grants. *See* ECF No. 1 ¶ 3. None of these injuries imposes a present, imminent, or certainly impending burden on the City.

The cases relied upon by the City, ECF No. 32 at 17, all presented—unlike here—an immediate threat of harm based on concrete action by the parties. *See, e.g.,*

*Von Kerssenbrock-Praschma v. Saunders*, 48 F.3d 323, 324 (8th Cir. 1995)
(challenging the present lawfulness of a statute that prevented the plaintiff from devising
his farm in a will that he had already executed); *Mindock v. Dumars*, No. 18-cv-3240-
RBJ, 2019 WL 2173931, at *3 (D. Colo. May 20, 2019) (challenging a restrictive deed
that was presently limiting the plaintiff's ability to cash out of his interests); *Ass'n of Am.
RRs. v. DOT*, 38 F.3d 582, 585 (D.C. Cir. 1994) (challenging a final rule that had been
adopted and presently imposed administrative burdens on the plaintiff). Even in *Arizona
v. Yellen*, 34 F.4th 841, 849 (9th Cir. 2022), the state had taken "all requisite steps" to
violate a challenged statute and final rule, including passing a $1.9 billion tax cut. None
of these cases involved events as uncertain or as distant as those alleged here.

The City does not allege that it has sustained damage or that it has been, or will
imminently be, commandeered in violation of the constitution. It pleads only that the
grant agreements might produce injury in the future, depending on its yet-unknowable
plans, come 2040 or beyond. The City lacks standing because it fails to allege that it
has, or imminently will, suffer an injury for which it seeks redress.

*Ripeness.* For the same reasons, even if the City had standing, the claims are
not prudentially ripe. The City has not decided to close the airport. If, over the next 15
years, the City decided to continue airport operations, none of the rulings it seeks in this
action would be necessary. Currently, the dispute is not ripe for adjudication.

The City suggests that merely making a *request* to be released from an
obligation or to close the airport is itself a hardship, ECF No. 32 at 22, but, again, the
City does not allege that it has decided to close the airport or that it has, or ever will

need to, make such a request. Regardless, the Court must evaluate "the hardship to the parties of withholding court consideration." *Nat'l Park Hosp. Ass'n v. Dep't of Interior*, 538 U.S. 803, 808 (2003). The City fails to explain *why* merely requesting release is a hardship or what actual burden it would place on the City. The City also fails to explain why such a hardship would outweigh the hardship to the FAA of not being involved in the closure of an airport, which could impact civil aviation. *See* ECF No. 26 at 22-23.

The City also argues that the claims should be adjudicated now, because its claims might be time-barred in the future. ECF No. at 21-22. But, as Defendants have shown, the City fails to state a claim under the QTA as a matter of law, and the claim is already time-barred, so postponing review would not impose a hardship for purposes of the QTA. As for the constitutional claims, the claims either are already time-barred or they have not yet accrued, as explained above. The City's claims would not become time-barred before they accrue, to the extent they can be presented here at all. Further, any FAA order on a request to close the airport would be judicially reviewable under 49 U.S.C. § 46110(a), regardless of whether the present claims are barred, reducing any hardship. The City fails to show a hardship based on any statutes of limitations.

The City also argues that if its claims are adjudicated years from now, and the City's view "does not prevail," then its airport expenditures in the meantime "will have been in vain." ECF No. 32 at 22. But the fact that the City's legal position might be *wrong* is not a hardship. *See* ECF No. 26 at 18-19. Rather, the City must show that some hardship could be avoided if the City *prevailed* on its claims now. The cases the City relies upon did not present ripe controversies because the plaintiffs' legal positions

might be *incorrect*; the plaintiffs presented ripe claims because favorable decisions without delay would avoid some hardship to the plaintiffs. *See* ECF No. 32 at 23 (citing cases). Here, if the City were to prevail on its claims, it would not change its conduct; the City still would forgo federal grants to avoid new mandatory compliance periods and preserve its option to close the airport after 2040. The City does not identify an avoidable hardship. *See* ECF No. 26 at 21-24.

## IV.    The City fails to state a claim for a constitutional violation.

The constitutional claims should be dismissed on several grounds: as time-barred, for lack of standing, for lack of ripeness, or for failure to state a claim—including that they are all based on the incorrect premise that the FAA is imposing new, retroactive obligations on the City, *see supra* Part I & n.2. Without repeating those arguments, Defendants address a few additional points below.

### A.    The City does not plead a separation-of-powers violation (Claim 2).

The City has not shown that the FAA exceeded its statutory authority. Congress gave the FAA authority to impose ongoing assurances in connection with grants. It authorized the FAA to make grants to meet "future needs of civil aeronautics." 28 U.S.C. § 2204(a) (1988), to require assurances that airports will be available to the public and the United States in the future, 49 U.S.C. §§ 2210(a)(1), (a)(3), (a)(6) (1988), and to create and modify grant assurances as the Secretary deems necessary. 49 U.S.C. §§ 2210(b), (f) (1988); § 2211(a); § 2218(a); *see also* ECF No. 26 at 26-29. In addition, the FAA established a procedure by which any airport sponsor may seek closure of an airport or to be released from an obligation, *see* ECF No. 26 at 9, 35, 37, and Congress

has provided for judicial review in the Court of Appeals of such a decision. 49 U.S.C.

§ 46110(a). The City does not explain why ongoing or indefinite obligations fall outside

of this delegated authority, given such oversight.[11]

Regardless, the City clarifies that it is "*not* ask[ing] the Court to consider whether

the FAA acted within its delegated authority when it modified the grant assurances in

1980." ECF No. 32 at 27. Thus, the City *does not challenge* the relevant assurance

here, Assurance 17, or its embodiment in the 1991 grant agreement, ECF No. 26-1 at 1

§ B.1, in its separation-of-powers claim. Rather, the City urges the Court to focus *only*

on earlier agreements, clarifying that the claim "challenges the FAA's assertion that its

*pre-1980 grant agreements* do not mean what they say." ECF No. 32 at 27 (emphasis

added). But the Court need not analyze the pre-1980 grant agreements for two reasons.

First, claims seeking contract interpretation are not judiciable, *see infra*, Part IV.D; ECF

No. 26 at 20 & n.10. Second, the City does not plausibly contend that the 1959 and

1977 grants impose any obligations beyond those imposed by the 1991 grant

agreement, which the City does not challenge in its separation-of-powers claim. Under

the doctrine of constitutional avoidance, the Court should decline to adjudicate this

---

[11] The City argues that it would be "bizarre" for Congress to require privately-owned
public-use airports to function for at least 10 years while allowing the FAA to impose
perpetual obligations on publicly owned airports. ECF No. 32 at 29. But setting a
*minimum* duration for assurances for privately-owned airports does not imply a
*maximum* for publicly owned airports. Regardless, Congress has delegated broad
authority for the FAA to create or modify assurances, as explained above. The City's
citation to *State of West Virginia v. U.S. Department of Treasury*, 59 F.4th 1124 (11th
Cir. 2023), does not suggest a different outcome. ECF No. 32 at 28. In that case, the
court held that conditions imposed by a tax offset provision in the American Rescue
Plan Act was not ascertainable. *Id*. at 1132. This case presents no analogous situation.

claim. *See Nw. Austin Mun. Util. Dist. No. 1 v. Holder*, 557 U.S. 193, 197 (2009) ("Our
usual practice is to avoid the unnecessary resolution of constitutional questions.").

**B.     The City fails to plead a Spending Clause violation (Claim 3).**

The City contends that it lacked notice that the easement acquired in the 1991
grant agreement constituted real property, or at least that the 1991 grant agreement
was ambiguous. ECF No. 32 at 31-32. But in Spending Clause cases, the "clear and
unambiguous" standard presumes that a contracting party knows background rules,
including guidance published in the Federal Register. Courts thus have concluded that
funding conditions are unambiguous based in part on "the agency's authorized
regulations." *Okla. v. U.S. Dep't of Health & Human Servs.*, 107 F.4th 1209, 1218 (10th
Cir. 2024) (citing *Bennett v. Ky. Dep't of Educ.,* 470 U.S. 656, 670 (1985), and *Davis v.
Monroe Cnty. Bd. of Educ.*, 526 U.S. 629, 643 (1999)), *petition for certiorari docketed*,
No. 24-437 (Oct 28, 2024); *cf. Fed. Crop Ins. Corp.*, 332 U.S. at 384-85; *Sw. Four
Wheel Drive Ass'n*, 271 F. Supp. 2d at 1312; *Martin*, 639 F.2d at 652. As explained
above, numerous background rules made clear that "real property" included easements
in the 1991 grant agreement. *See supra* Part I. Later statements by the FAA did not and
cannot create ambiguity that affected the City's decision to accept the grant in 1991.

**C.     The City fails to plead a Tenth Amendment violation (Claim 4).**

The City's Tenth Amendment claim fails because the City had the choice to accept
funding and the associated conditions at the time of contracting. *See supra*
Part I. The City argues that the Tenth Amendment has been violated because it must
continue operating the airport. ECF No. 32 at 32. But the City concedes that it has not

yet been forced to operate the airport against its will and that it will not for at least 15 more years. The City fails to allege it has been subject to any unlawful commandeering.

The City also protests that there is "no opportunity for the City to *ever* withdraw from its obligation to operate the Airport." *Id.* at 34. But this argument ignores the process for seeking airport closure or release from an obligation. *See* ECF No. 26 at 9, 35, 37. Since the City has not requested closure or release, and the FAA has not issued a final agency decision on such a request, the City cannot plausibly show that it is being unlawfully commandeered into operating the airport. *See* ECF No. 26 at 32-35.

### D.      The City fails to plead a due process violation (Claim 5).

The City's disagreement about the meaning of the 1991 agreement does not support a due process claim. First, this claim simply advances the City's view of the meaning of the 1991 agreement. If this claim raises constitutional issues, so would any claim alleging competing contract interpretations. But the United States has not waived sovereign immunity in the APA for such claims. *See* ECF No. 26 at 20 & n.10. Second, the City contends that it "was afforded *no* process in the abrogation of its interest" in its interpretation of the 1991 agreement. ECF No. 32 at 37. But, as explained above, the City was on notice as a matter of law of its obligations under the 1991 grant agreement. Third, the City does not plausibly show that it lacks procedural due process. The FAA has a process for the City to seek airport closure or release from an obligation, subject to judicial review. *See* ECF No. 26 at 37. The City fails to explain why such process is constitutionally deficient to protect any alleged property interests.

Defendants respectfully request that the Court dismiss the Complaint.

Dated: February 7, 2025.                    J. BISHOP GREWELL
                                            Acting United States Attorney

                                            s/ Thomas A. Isler
                                            **Thomas A. Isler**
                                            Assistant United States Attorney
                                            1801 California Street, Ste. 1600
                                            Denver, Colorado 80202
                                            Telephone: (303) 454-0336
                                            Email: thomas.isler@usdoj.gov
                                            *Counsel for Defendants*

**CERTIFICATE OF SERVICE**

I hereby certify that on February 7, 2025, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which will serve all counsel of record:

Luis Angel Toro
Megan Riley Scott
Samantha R. Caravello
Teresa Taylor Tate
Veronique M. Van Gheem
William Eric Pilsk
Steven Lloyd Osit
*Counsel for Plaintiff*

s/ Thomas A. Isler
**Thomas A. Isler**
Assistant United States Attorney