**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Judge Nina Y. Wang**

Civil Action No. 24-cv-02057-NYW-CYC

CITY OF BOULDER,

     Plaintiff,

v.

UNITED STATES OF AMERICA,
THE FEDERAL AVIATION ADMINISTRATION, and
BRYAN BEDFORD, in his official capacity as Administrator of the Federal Aviation Administration,[1]

     Defendants.

---

## MEMORANDUM OPINION AND ORDER

---

This matter is before the Court on the Defendants' Motion to Dismiss (or "Motion").

[Doc. 26]. The Court has reviewed the Motion, the related briefing, and applicable case

law and concludes that oral argument would not materially assist in the resolution of the

Motion. For the reasons set forth herein, the Motion to Dismiss is respectfully **GRANTED**.

## BACKGROUND

The City of Boulder ("Plaintiff" or the "City") is considering the closure and

redevelopment of the Boulder Municipal Airport (or "Airport") in 2040. *See* [Doc. 1 at

¶¶ 1–3]. However, the Federal Aviation Administration ("FAA") has informed the City that

---

[1] Under Rule 25 of the Federal Rules of Civil Procedure, "[a]n action does not abate when
a public officer who is a party in an official capacity dies, resigns, or otherwise ceases to
hold office while the action is pending. The officer's successor is automatically substituted
as a party." Fed. R. Civ. P. 25(d). Accordingly, the Clerk of Court is **DIRECTED** to update
the case caption to reflect the substitution of Director Bedford for former Director
Whitaker.

it must operate the Airport beyond 2040 and indefinitely unless the FAA approves its closure.  [*Id.* at ¶ 4].  The City disagrees with the FAA's position.  [*Id.* at ¶ 5].

A series of grant agreements executed over several decades form the foundation of the Parties' dispute.  The City purchased the property that is now known as the Boulder Municipal Airport in 1943.  [*Id.* at ¶ 18].  Years later, in 1958, the City applied for and obtained a grant from the Civil Aeronautics Administration, the FAA's predecessor agency, to acquire "clear zone easements" on each end of the Airport runway, as well as property identified as "Parcel A" (the "1959 Grant Agreement").  [*Id.* at ¶ 19].  The City acquired Parcel A in fee simple in 1959 and acquired the "clear zone easements" through a 1963 order of condemnation.  [*Id.* at ¶¶ 20–21].[2]  The 1959 Grant Agreement states that it "shall remain in full force and effect throughout the useful life of the facilities developed under [the Airport's development projects] but in any event not to exceed twenty years from the date of" the Agreement's acceptance.  [*Id.* at ¶ 22]; *see also* [Doc. 1-1 at 4].[3]

In 1977, the City applied for and obtained a federal grant through the Airport

---

[2] The eastern clear zone easement was later extinguished because the City acquired the property underlying that easement.  [Doc. 1 at ¶ 21].

[3] The Court may consider the Grant Agreements when ruling on the Motion to Dismiss. In reviewing a facial attack on subject matter jurisdiction, the Court's analysis is typically limited to the sufficiency of the complaint, similar to its review on a Rule 12(b)(6) motion to dismiss. *Colo. Mont. Wyo. State Area Conf. of NAACP v. U.S. Election Integrity Plan*, No. 22-cv-00581-PAB, 2022 WL 1266612, at *3 (D. Colo. Apr. 28, 2022).  And in reviewing a Rule 12(b)(6) motion to dismiss, the court can consider documents attached to or referenced in the complaint, so long as they are central to the plaintiff's claims and no party disputes their authenticity. *Brokers' Choice of Am., Inc. v. NBC Universal, Inc.*, 861 F.3d 1081, 1103 (10th Cir. 2017).  Because the review of a Rule 12(b)(1) facial attack mirrors a Rule 12(b)(6) review, the Court concludes that it may consider authentic documents attached to the Complaint that are central to the City's claims.  *See Cole v. Goossen*, 402 F. Supp. 3d 992, 1003 (D. Kan. 2019) ("[C]onsideration of documents attached to or referenced in a complaint generally do not convert a facial attack [on subject matter jurisdiction] to a factual one." (citation omitted)).

Development Aid Program ("ADAP") to acquire "an 8.45-acre parcel for the protection of aircraft on approach to the Airport's runway" (the "1977 Grant Agreement").  [Doc. 1 at ¶ 24].  The City obtained that parcel in fee simple.  [*Id.* at ¶ 25].  The 1977 Grant Agreement similarly states that it will "remain in force and effect throughout the useful life of the facilities developed under the Project but in any event not to exceed twenty years from the date of" the Agreement's acceptance.  [*Id.* at ¶ 26]; *see also* [Doc. 1-4 at 9].

In 1980, the FAA revised its standard grant assurances "to provide that the 20-year limitation on the effectiveness of the assurances does not apply to those affecting the use of real property acquired with Federal funds."  [Doc. 1 at ¶ 30 (quoting 45 Fed. Reg. 34,782, 34,784 (May 22, 1980))].  Later, in 1991, the City obtained an easement over privately owned land adjacent to the Airport to maintain a berm in support of a taxiway.  [Doc. 1 at ¶¶ 28–29, 39]; *see also* [Doc. 1-7 at 1].  The City applied for and secured a federal grant through the Airport Improvement Program ("AIP") to obtain the easement (the "1991 Grant Agreement").  [Doc. 1 at ¶ 28]; *see also* [Doc. 1-6].  The 1991 Grant Agreement did not include the durational language included in the 1959 or 1977 Grant Agreements.  [*Id.* at ¶ 32].  Instead, it "incorporates by reference the AIP grant assurances promulgated by the FAA."  [*Id.*].  In 1991, those assurances provided:

> The terms, conditions and assurances of the grant agreement shall remain in full force and effect throughout the useful life of the facilities developed or equipment acquired for an airport development or noise program implementation project, or throughout the useful life of the project items installed within a facility under a noise program implementation project, but in any event not to exceed twenty (20) years from the date of acceptance of a grant offer of Federal funds for the project.  However, there shall be no limit on the duration of the assurance against exclusive rights or the terms, conditions, and assurances with respect to real property acquired with Federal funds.

[*Id.*].  The City construed the language "with respect to real property acquired with Federal

funds" to only include the acquisition of land, such that it did not include its acquisition of the easement.  [*Id.* at ¶ 33].  The City takes the position that the 1991 Grant Agreement expired on September 20, 2011.  [*Id.* at ¶ 35].

Among other obligations, the City's grant assurance obligations require it to keep the Airport open.  [*Id.* at ¶ 42].  The City can only close the Airport if the FAA releases the City from its grant obligations.  [*Id.*].  The FAA "has explained that it will only consider releasing an airport sponsor . . . where this is a net benefit to civil aviation" and that "it would not consider the closure of the Airport to benefit civil aviation."  [*Id.*].

Over the years, the City has continually accepted federal grant funds to help offset the cost of maintaining the Airport.  [*Id.* at ¶ 40].  However, the City last accepted an FAA grant on May 21, 2020, and has "stopped accepting FAA grants so as to not restart the 20-year clock on its federal grant assurance obligations," with the intent of not restarting the 20-year clock on federal grant assurance obligations.  [*Id.* at ¶¶ 3, 41, 43].  The City believes that, without federal and state grant fund assistance, it "may cost more than $41 million to operate and manage the Airport in accordance with the City's federal grant assurance obligations through the expiration of its most recent grant agreement with the FAA."  [*Id.* at ¶ 44].

On December 9, 2022, the FAA "issued 'Change 2' to FAA Order 5190.6B, *Airport Compliance Manual*, which establishes the FAA's interpretation and administration of the federal grant assurances."  [*Id.* at ¶ 45]; *see also* [Doc. 32-1].  Change 2 added language stating, for the first time, that the FAA's assertion that an airport sponsor's acceptance of any ADAP or AIP grant after 1980 obligates the sponsor to maintain its airport in perpetuity if property had ever been acquired with federal assistance.  [Doc. 1 at ¶ 45].

The City asserts that "Change 2 establishes the FAA's position that an airport sponsor's acceptance of any modern FAA grant agreement operates to revive and retroactively modify the duration of all prior grant agreements under which land was acquired for airport purposes."  [*Id.*].   It also asserts that Change 2 is inconsistent with the City's understanding as to when its federal grant obligations would expire (20 years after it last accepted federal grant money—May 21, 2040).  [*Id.* at ¶ 46].  While Change 2 states that the public has been on notice of the FAA's position on perpetual airport obligations "since at least 1980," the City points out that "the FAA's 1980 modification of the ADAP grant assurances did *not* purport to retroactively modify the duration of earlier grant agreements."  [*Id.* at ¶ 48].

City officials met with the FAA in August 2023 to discuss the City's desire to close the Airport.  [*Id.* at ¶ 49].  The FAA indicated it was not willing to release the City from its grant assurance obligations and that "such grant assurance obligations would apply in perpetuity."  [*Id.*].  In 2024, the FAA "confirm[ed] its position that because the City had accepted an AIP grant after 1980, it was obligated to maintain the Airport in perpetuity," citing Change 2 as the basis for its position.  [*Id.* at ¶ 51].

The City claims that it "faces a quandary as a result of its desire to consider closing and redeveloping the Airport" in that it can forgo federal funds through expiration of the most recent grant agreement in 2040, but there remains a risk that the FAA will continue to prohibit the Airport's closure after the 2040 expiration.  [*Id.* at ¶ 52].  In an effort to avoid that possibility and ascertain its obligations post-2040, the City sued the FAA, the United States, and the FAA Administrator (collectively, "Defendants").   The City brings five claims:  (1) a claim under the Quiet Title Act, 28 U.S.C. § 2409a(a); (2) a constitutional

claim alleging a violation of the separation of powers doctrine; (3) a constitutional claim alleging a violation of the Spending Clause; (4) a constitutional claim alleging a violation of the Tenth Amendment's anti-commandeering doctrine; and (5) a Fifth Amendment due process claim.  [*Id.* at ¶¶ 53–87].  It requests that the Court:

a.  Declare the 1959 Grant Agreement, the 1977 Grant Agreement, and the 1991 Grant Agreement to have each expired and to be of no further force and effect;

b.  Declare that the City is not obligated to keep the Airport open after the expiration of its last grant agreement with the FAA on May 21, 2040;

c.  As applied to the City, declare the FAA's position described in in Paragraph 4.3(a) of Change 2 and the March 20, 2024 letter regarding the perpetual duration of the 1959 Grant Agreement, the 1977 Grant Agreement, and the 1991 Grant Agreement unconstitutional, in violation of the Separation of Powers doctrine;

d.  As applied to the City, declare the FAA's position described in Paragraph 4.3(a) of Change 2 and the March 20, 2024, letter regarding the retroactive extension of the 1959 Grant Agreement, the 1977 Grant Agreement, and the 1991 Grant Agreement, by virtue of having accepted subsequent AIP grants, in excess of the FAA's statutory authority and unconstitutional, in violation of the Spending Clause and the Fifth and Tenth Amendments to the U.S. Constitution;

e.  Enjoin the Defendants from taking any action to enforce the 1959 Grant Agreement, the 1977 Grant Agreement, and/or the 1991 Grant Agreement, or otherwise prevent the City from exercising its right to close the Airport after its obligations under later grant agreements expire;

f.  Award the City the costs of this action and reasonable attorney's fees; and

g.  Award such other and further relief as the Court determines is just and proper.

[*Id.* at 18].

Defendants have moved to dismiss the entire lawsuit, [Doc. 26], and the Motion to

Dismiss is fully briefed, [Doc. 32; Doc. 35].  The Court considers the Parties' arguments

below.

## LEGAL STANDARDS

Federal courts have limited jurisdiction and "possess only that power authorized

by Constitution and statute . . . which is not to be expanded by judicial decree."  *Kokkonen*

*v. Guardian Life Ins. Co. of Am.*, 511 U.S. 375, 377 (1994).  "A court lacking jurisdiction

cannot render judgment but must dismiss the cause at any stage of the proceedings in

which it becomes apparent that jurisdiction is lacking."  *Basso v. Utah Power & Light Co.*,

495 F.2d 906, 909 (10th Cir. 1974).  The "fundamental principle" of federal courts' subject

matter jurisdiction "is the 'constitutional limitation of federal-court jurisdiction to actual

cases or controversies.'"  *Shields L. Grp., LLC v. Stueve Siegel Hanson LLP*, 95 F.4th

1251, 1279 (10th Cir. 2024) (quoting *Brown v. Buhman*, 822 F.3d 1151, 1163 (10th Cir.

2016)).

A party may move to dismiss a claim for lack of subject matter jurisdiction under

Rule 12(b)(1).  *See* Fed. R. Civ. P. 12(b)(1).[4]  "Dismissal under Rule 12(b)(1) is not a

judgment on the merits of the plaintiff's claim.  Instead, it is a determination that the court

lacks authority to adjudicate the matter."  *Creek Red Nation, LLC v. Jeffco Midget Football*

---

[4] A party may bring either a facial attack or a factual attack on the Court's subject matter
jurisdiction.  *Baker v. USD 229 Blue Valley*, 979 F.3d 866, 872 (10th Cir. 2020).  A facial
attack assumes the plaintiff's allegations are true and challenges their sufficiency to
establish jurisdiction; a factual attack goes beyond the complaint's allegations and
"adduces evidence to contest jurisdiction."  *Id.*  Neither side characterizes Defendants'
arguments as facial or factual.  Because the arguments the Court relies upon concern
only the allegations in the Complaint, as opposed to factual disputes between the Parties,
the Court construes Defendants' challenge as a facial attack.

*Ass'n, Inc.*, 175 F. Supp. 3d 1290, 1293 (D. Colo. 2016) (citing *Castaneda v. INS*, 23 F.3d 1576, 1580 (10th Cir. 1994)).

## ANALYSIS

Defendants seek dismissal of all of the City's claims.  *See* [Doc. 26].  With respect to the Quiet Title Act (or "QTA") claim, they contend that (1) the Court lacks jurisdiction over the claim; and (2) the claim is barred by the QTA's 12-year statute of limitations.  [*Id.* at 10–15].  As for the City's constitutional claims, Defendants assert that (1) the City's constitutional claims are untimely—or alternatively, have not yet accrued, [*id.* at 16–18]; (2) the City lacks standing to bring its constitutional claims, [*id.* at 18–19]; (3) the claims are barred by sovereign immunity, [*id.* at 19–20]; and (4) the constitutional claims are not prudentially ripe, [*id.* at 21–24].  Defendants also contend that the City cannot state any constitutional claim under Rule 12(b)(6).  [*Id.* at 25–37].

## I.    The Quiet Title Act

"The United States, as sovereign, is immune from suit save as it consents to be sued, and the terms of its consent to be sued in any court define that court's jurisdiction to entertain the suit."  *United States v. Sherwood*, 312 U.S. 584, 586 (1941) (citations omitted).  Without a valid waiver of sovereign immunity, a federal court does not have jurisdiction.  *Sw. Four Wheel Drive Ass'n v. Bureau of Land Mgmt.*, 363 F.3d 1069, 1071 (10th Cir. 2004).  The QTA provides that "[t]he United States may be named as a party defendant in a civil action under this section to adjudicate a disputed title to real property in which the United States claims an interest."  28 U.S.C. § 2409a(a).  The QTA thus waives the federal government's sovereign immunity against "suits seeking to quiet title to certain federal lands."  *Sw. Four Wheel Drive Ass'n*, 363 F.3d at 1071.  The plaintiff

bears the burden of proving a waiver of sovereign immunity. *Bork v. Carroll*, 449 F. App'x 719, 721 (10th Cir. 2011).

Based on the plain language of the statute, "[f]or a court to have jurisdiction over a QTA claim, the plaintiff must establish that: (1) the United States 'claims an interest' in the property at issue; and (2) title to the property is 'disputed.'" *Kane Cnty. v. United States* (*Kane County I*), 772 F.3d 1205, 1210–11 (10th Cir. 2014) (citing *Leisnoi, Inc. v. United States*, 267 F.3d 1019, 1023 (9th Cir. 2001)), *abrogated on other grounds by Wilkins v. United States*, 598 U.S. 152 (2023).[5]

Defendants argue that the City cannot meet either of the two elements of sovereign immunity waiver. [Doc. 26 at 11–12]. First, they assert that "the FAA's regulation of the airport is not a property interest," so the United States has not claimed an interest in the Airport land. [*Id.* at 11]. They also contend that "the City does not allege a dispute of *title* within the meaning of the QTA" because it "does not allege an unresolved dispute of *ownership* between the City and the United States with respect to any airport property." [*Id.* at 12].

The City responds that "QTA actions are not limited to disputes of ownership or fee simple title," citing several cases in support. [Doc. 32 at 6]. The City maintains that the federal government's retention of significant control over the Airport land is a sufficient federal interest in the property for QTA purposes. [*Id.* at 7–8]. It also asserts that, at the very least, the federal burdens imposed by the Grant Agreements "constitute an easement in favor of the United States, which give[s] rise to a[] QTA claim." [*Id.* at 8]; *see*

---

[5] *Kane County I* was abrogated to the extent it held that the QTA's statute of limitations is a jurisdictional prerequisite to suit. *See Wilkins*, 598 U.S. at 165.

*also* [*id.* at 9–10 (citing cases)].  Notably, the City appears to focus in on the "claims an interest" requirement, without expressly or clearly discussing the "disputed title" requirement.  *See* [*id.* at 5–10].

>     **A.     The United States's Claim of Interest**

Defendants contend that this element is not met because the QTA permits adjudication only of competing *property* interests, and the "FAA's regulation of the airport is not a property interest."  [Doc. 26 at 11]; *see also* [*id.* (arguing that the City fails to allege facts "showing that the United States has a *property* interest in the land")].  They expound on this argument in their Reply, asserting that in the *Kane County I* decision, the United States Court of Appeals for the Tenth Circuit ("Tenth Circuit") "rejected the view that alleging a cloud on title was sufficient to state a QTA claim."  [Doc. 35 at 11–12].  The City construes the "claims an interest" requirement more broadly, arguing that "[t]he statutory pleading requirements confirm that the United States need not claim ownership of the property in dispute, but rather may claim a 'right, title, or interest' therein."  [Doc. 32 at 5 (quoting 28 U.S.C. § 2409a(d))].  It argues that "the Tenth Circuit has recognized that QTA actions are not limited to disputes of ownership or fee simple title."  [*Id.* at 6].  Respectfully, the Court concludes that neither side's arguments are completely on point.  Below, the Court briefly recites the relevant authority before weighing the Parties' various arguments.[6]

**The Quiet Title Act.**  As mentioned above, the QTA waives sovereign immunity in cases "to adjudicate a disputed title to real property in which the United States claims an

---

[6] A comprehensive and thorough examination of relevant Tenth Circuit case law is set out in *Kane Cnty. (2) v. United States* (*Kane County II*), No. 2:10-cv-01073, 2024 WL 3760024, at *19–25 (D. Utah Aug. 9, 2024).

interest." 28 U.S.C. § 2409a(a). Aside from comprising one of two requirements for sovereign immunity waiver, the United States's claim of interest also serves to trigger the QTA's statute of limitations, which expires 12 years after "the plaintiff or his predecessor in interest knew or should have known of the claim of the United States." *Id.* § 2409a(g). Interpretations of a "claim" for purposes of § 2409a(g) have been relatively broad, with the Tenth Circuit describing a "claim" as "some interest adverse to the plaintiff's." *Knapp v. United States*, 636 F.2d 279, 283 (10th Cir. 1980).

**Knapp.** In *Knapp*, the Tenth Circuit was asked to review whether the plaintiff's QTA claim was barred by the statute of limitations. *Id.* at 280. The Tenth Circuit ultimately rejected the lower court's decision that a null deed could not constitute a "claim" of interest for purposes of § 2409a. *Id.* at 282. It stated that "[w]hether the interest claimed amounts to legal title in the United States is irrelevant if it constitutes a cloud on the plaintiffs' title." *Id.* All that was required to start the limitations period, in the Tenth Circuit's view, was that the government claimed "some interest adverse to the plaintiff's." *Id.* at 283.

**Rio Grande Silvery Minnow.** The case of *Rio Grande Silvery Minnow (Hybognathus amarus) v. Bureau of Reclamation* arose out of a decades-long water irrigation project that involved the transfer of certain property from the Middle Rio Grande Conservancy District ("MRGCD") to the United States, with the United States providing financial assistance to the project. 599 F.3d 1165, 1169–75 (10th Cir. 2010). Eventually, a title dispute arose, and the MRGCD sought to quiet title to a reservoir, certain dams, and other property tracts. *Id.* at 1174. The district court ruled that the MRGCD's claims were time-barred under the QTA's statute of limitations, reasoning that the MRGCD had known of the federal government's claim of interest since the early 1950s, when the

MRGCD understood that it was required to convey title to the United States before the Bureau of Reclamation's work on the project. *Id.* at 1175, 1178.

In affirming that decision, the Tenth Circuit again relied on the "cloud on title" standard, recognizing that "the United States need not assert a full legal title in the disputed property for the limitations period to accrue; the claimed adverse interest in the title of the property merely must be substantial enough to create a cloud on title." *Id.* at 1176; *see also id.* at 1179 (considering whether the evidence showed that "the United States[] asserted possession of *some* property interest that was substantial and adverse enough to cloud title of those properties"). In other words, to claim an interest in property, "the United States need not assert that it holds title in fee simple to the property." *Id.* at 1176. This is consistent with the QTA's requirement that the plaintiff's complaint "set forth with particularity the nature of the right, title, or interest which the plaintiff claims in the real property, the circumstances under which it was acquired, and *the right, title, or interest* claimed by the United States." 28 U.S.C. § 2409a(d) (emphasis added).

Although *Knapp* and *Rio Grande* concerned whether the plaintiffs' QTA causes of action were timely under § 2409a(g), these decisions still provide helpful and binding guidance to this Court with respect to the "claims an interest" element for sovereign immunity under § 2409a(a). The Court could locate no Tenth Circuit authority holding that the "claim" of the United States referenced in § 2409a(g) is different than the United States's "claim" of interest referenced in § 2409a(a). And because "identical words and phrases within the same statute should normally be given the same meaning," *FCC v. AT & T Inc.*, 562 U.S. 397, 408 (2011) (quotation omitted), the Court finds it appropriate to rely on this line of cases in deciding whether a claim of interest exists for sovereign

immunity purposes under § 2409a(a).

Moreover, and importantly, a QTA claim accrues "when the plaintiff has a complete and present cause of action." *Gabelli v. SEC*, 568 U.S. 442, 448 (2013) (quotation omitted). "[A] cause of action does not become complete and present for limitations purposes—it does not *accrue*—until the plaintiff can file suit and obtain relief." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 810 (2024) (cleaned up). Indeed, the Supreme Court has "rejected the . . . position that the [statute of limitations] can run even before a plaintiff's 'civil action against the United States matures.'" *Id.* at 822 (quoting *Crown Coat Front Co. v. United States*, 386 U.S. 503, 514 (1967)). If different standards apply to when the United States's claim of interest starts the limitations period and when the claim of interest is sufficient to demonstrate the government's waiver of sovereign immunity, then a claimant's cause of action could accrue—and even extinguish—before the plaintiff is actually able to assert a QTA claim. As explained by the *Kane County II* court, "[t]o the extent Tenth Circuit caselaw were to allow the QTA's statute of limitations to run before it is possible to bring suit under the QTA," i.e., before the United States "claims an interest" in the property for sovereign immunity waiver under § 2409a(a), "that would be contrary to the basic principles stated in *Corner Post, Inc.*" *Kane Cnty. (2) v. United States* (*Kane County II*), No. 2:10-cv-01073, 2024 WL 3760024, at *20 (D. Utah Aug. 9, 2024).

Therefore, the Tenth Circuit's decisions in *Knapp* and *Rio Grande*—which "set forth a consistent interpretation of the Quiet Title Act" and have not been expressly reversed or overruled, *see id.* at *22—remain binding on this Court and provide guidance on the "claims an interest" element of the QTA's sovereign immunity waiver.

*Kane County I.*   The *Kane County I* opinion is just one of a series of judicial decisions issued in a longstanding dispute over Kane County, Utah's rights-of-way on federally owned roads.  772 F.3d at 1209.  On this occasion, the Tenth Circuit was tasked with deciding whether the government had or had not waived sovereign immunity over the plaintiff's QTA claims.  *Id.* at 1210.  At issue was whether the "disputed title" element had been satisfied—*not* whether the United States had "claim[ed] an interest" in the property at issue.  *Id.* at 1210–11.

Framing the issue as one of first impression, *see id.* at 1211, the Tenth Circuit rejected the use of the "cloud on title" standard for the "disputed title" element of the QTA's sovereign immunity waiver, finding that this standard "provides little guidance to parties as to what constitutes a title dispute and could lead federal courts to issue advisory opinions," *id.* at 1212.  The Tenth Circuit held that to satisfy the "disputed title" element, "a plaintiff must show that the United States has either expressly disputed title or taken action that implicitly disputes it."  *Id.*  It further explained that "indirect action or assertions that actually conflict with a plaintiff's title will suffice" to meet this standard, but "actions . . . that merely produce some ambiguity regarding a plaintiff's title are insufficient to constitute 'disputed title.'"  *Id.*  Underlying the Tenth Circuit's holding was "the established principle that waivers of sovereign immunity are to be read narrowly and conditions on the waiver are to be 'strictly observed.'"  *Id.* at 1211 (quoting *Block v. North Dakota ex rel. Bd. of Univ. & Sch. Lands*, 461 U.S. 273, 287 (1983)).

But as recognized by *Kane County II*, *Kane County I* did not disturb the Tenth Circuit's earlier decisions finding that the statute of limitations can be triggered by claim of interest constituting a cloud on title.  *Kane Cnty. II*, 2024 WL 3760024, at *24; *see also*

*Starzynski v. Sequoia Forest Indus.*, 72 F.3d 816, 819 (10th Cir. 1995) ("One panel of the [Tenth Circuit] cannot overrule the decision of another panel in the absence of en banc reconsideration or an intervening decision of the United States Supreme Court.").  Indeed, in later deciding whether certain QTA claims were untimely, the *Kane County I* court reiterated that all that is required to start the limitations period is "reasonable awareness that the Government claims some interest adverse to the plaintiff's," which reflects the broader understanding of the meaning of a "claim."  *See Kane Cnty. I*, 772 F.3d at 1215 (first quoting *George v. United States*, 672 F.3d 942, 944 (10th Cir. 2012); and then quoting *Knapp*, 636 F.2d at 283).[7]

In sum, the Court finds that (1) earlier Tenth Circuit decisions like *Knapp* and *Rio Grande* provide guidance as to the meaning of the "claims an interest" element of the government's sovereign immunity waiver; (2) those decisions remain binding on this Court; and (3) the *Kane County I* decision rejected the "cloud on title" approach for the "disputed title" element, but not the "claims an interest" element.  The Court is thus respectfully unpersuaded by Defendants' reliance on *Kane County I* to argue that "[t]he Tenth Circuit expressly rejected a 'cloud on title' standard" for the "claims an interest" element.  *See* [Doc. 35 at 11–12].

A claim of interest in property "means an assertion of 'some interest adverse to the

---

[7] In recent years, the Tenth Circuit has continued to use or rely on similar language when addressing the QTA's statute of limitations.  *See, e.g.*, *Thiessen v. United States*, No. 21-2053, 2022 WL 1409563, at *2 (10th Cir. May 4, 2022) ("Knowledge of the claim's full contours is not required [to start the statute of limitations].  All that is necessary is a reasonable awareness that the Government claims some interest adverse to the plaintiff's." (quoting *Knapp*, 636 F.2d at 283)); *Graham v. United States*, No. 24-1164, 2025 WL 1233526, at *2 (10th Cir. Apr. 29, 2025) ("It is enough if the plaintiff or her predecessor knew or should have known of the existence of some assertion—*some* claim—by the government of an adverse right." (quoting *George*, 672 F.3d at 947)).

plaintiff's.'"  *George*, 672 F.3d at 946 (quoting *Knapp*, 636 F.2d at 283).  While Defendants

focus much on whether the United States claims a "property" (as opposed to some other

type of) interest in the Airport land, they do not cite any case law particularly helpful to

their argument.  *See* [Doc. 26 at 11–12].  Here, the City alleges that (1) "the United States

claims a perpetual interest in the property comprising the Airport," (2) this interest

"intrudes on the City's sovereign authority to regulate the use of land and dispose of its

property," and (3) this "asserted interest constitutes a clear and substantial cloud on the

City's legal title to the property comprising the Airport."  [Doc. 1 at ¶¶ 15, 55–56].  The

Court finds that Plaintiff has adequately alleged that the United States has asserted "some

interest adverse to" the City's, so as to satisfy the first requirement of the QTA's sovereign

immunity waiver.  *Knapp*, 636 F.2d at 283.

### B.    Disputed Title

At its core, though, the QTA waives the government's sovereign immunity only "to

adjudicate a disputed title."  28 U.S.C. § 2409a(a).  In other words, even if the United

States claims some interest adverse to the plaintiff's, if the disagreement does not involve

a "disputed title," then there is no waiver of sovereign immunity and no federal jurisdiction.

*Kane Cnty. I*, 772 F.3d at 1210–11.

The City does not expressly address this element, focusing instead on whether

there is "a disputed property interest."  [Doc. 32 at 5]; *see also* [*id.* at 6 (arguing that "a

range of interests . . . giv[e] rise to cognizable QTA claims")].  But the *Kane County I* court

emphasized that the United States has only waived sovereign immunity as to disputes of

title, i.e., situations where "the United States has either expressly disputed title or taken

action that implicitly disputes it."  772 F.3d at 1212.  "Under this standard, . . . indirect

action or assertions that actually conflict with a plaintiff's title will suffice," but "actions of the United States that merely produce some ambiguity regarding a plaintiff's title are insufficient to constitute 'disputed title.'" *Id.*

There is minimal case law explaining what type of indirect actions or assertions meet this standard. In other circuits, "[c]ourts have typically 'equated the requirement of a disputed title with disputed ownership.'" *McMaster v. United States*, 177 F.3d 936, 941 (11th Cir. 1999) (quoting *Dunbar Corp. v. Lindsey*, 905 F.2d 754, 759 (4th Cir. 1990) and collecting cases). "[T]he words of the statute 'permit adjudications only when the title or ownership of real property is in doubt' as between the plaintiff and the United States." *Id.* (quoting *Cadorette v. United States*, 988 F.2d 215, 223 (1st Cir. 1993)). The Complaint does not expressly allege that the United States has disputed the City's ownership of the land comprising the Airport or that the United States claims title or ownership of that property. *See* [Doc. 1].

The City does allege that "[t]he FAA's asserted interest places the City's fee simple title to the property comprising the Airport in dispute." [*Id.* at ¶ 62]. And in support of its due process claim, it alleges that the FAA's asserted interest "allows it to control the disposition of all property comprising the Airport," which "unlawfully deprive[s] the City of its fee simple ownership." [*Id.* at ¶ 86]. However, viewing the Complaint as a whole, the Court respectfully concludes that there are insufficient factual allegations to plausibly establish that the United States has actually "taken action that implicitly disputes" the City's title. *Kane Cnty. I*, 772 F.3d at 1212. Although the United States has informed the City of its position that the City's grant obligations are perpetual, [Doc. 1 at ¶¶ 49, 51], the City nevertheless acknowledges that it is grant obligated to maintain the Airport until at

least 2040, based on its acceptance of federal funds in 2020, [*id.* at ¶ 52]. The City's present obligations are undisputed, and at best, the Complaint alleges that there is a possibility or likelihood that the United States will take some action to prohibit the Airport's closure *in 2040*, not now or any time in the past. *See, e.g.*, [*id.* at ¶ 15].

This case is somewhat analogous to *Michigan Property Ventures, LLC v. United States*, No. 2:14-cv-10215-RPJ-LJM, 2014 WL 2895485 (E.D. Mich. June 26, 2014). In that case, the United States recorded with a county register of deeds certain affidavits that recognized the plaintiff's property could be traceable to proceeds of mortgage fraud, bank fraud, or wire fraud, and could be subject to forfeiture. *Id.* at *1. The landowner sued under the QTA to "clear title" to its property so that the property could be sold, arguing that the United States's "contingent interest" recorded in the affidavits created a cloud on title and rendered its title unmarketable. *Id.* at *2, *5. The court concluded that there was no dispute of title, and no waiver of sovereign immunity, because "[a]lthough the [a]ffidavits seem[ed] to reserve the United States' right to make a claim to the Properties at issue sometime in the future, . . . such a reservation does not in and of itself constitute a title dispute." *Id.* at *6; *see also Alaska v. United States*, 201 F.3d 1154, 1164–65 (9th Cir. 2000) (no disputed title even though the United States had reserved its right to start a dispute because although "[t]here may well be a dispute at some time," the United States had not yet disputed title).

As pleaded, the dispute arises not from a title dispute, but from the Parties' disagreement as to the effect, interpretation, and propriety of Change 2, as well as the interpretation of the various Grant Agreements. *See, e.g.*, [Doc. 1 at ¶¶ 55–62]; *see also* [*id.* at ¶ 63 ("The City requests that the Court quiet title in the property comprising the

Airport _by declaring_ _that the 1959 Grant Agreement, 1977 Grant Agreement, and 1991_
_Grant Agreement have each expired, and the FAA has no continuing interest in the Airport_
_thereunder_." (emphasis added)];[8] _Fuqua v. United States_, No. 5:09-cv-00212-TBR, 2010
WL 1883468, at *1, *3–4 (W.D. Ky. May 11, 2010) (finding no disputed title where the
plaintiff sought a judicial determination about the scope of restrictive covenants, as this
amounted to "an attempt to reform [a] deed," not a dispute over title or the validity of the
government's easement); _Mizer v. United States_, No. 4:20-cv-00324-DKG, 2024 WL
2272706, at *6 (D. Idaho May 20, 2024) ("[T]he USFS' exercise of regulatory or
supervisory actions over the diversions and ditches running across United States' land,
alone, does not evidence a disputed title. . . .  To show a disputed title, Plaintiff must
demonstrate the USFS has taken a position in conflict with a third party regarding title—
such as proposing actions in a BA or other official statement by the United States
demonstrating its position that the claimed rights-of-way do not exist."), _appeal docketed_,
No. 25-449 (9th Cir. Jan. 22, 2025).

The FAA's position may have created some ambiguity as to the City's Airport
operation obligations come 2040, and the Court understands the City's desire for a judicial
determination of this issue.  However, this ambiguity is insufficient to constitute a
"disputed title" for purposes of the QTA.  _Kane Cnty. I_, 772 F.3d at 1213; _see also Mizer_,

---

[8] The City asserts that "[a]t a minimum, the burdens imposed on the City's fee ownership
of the Airport by virtue of the grant agreements constitute an easement in favor of the
United States, which give[s] rise to an QTA claim."  [Doc. 32 at 8].  The Tenth Circuit has
instructed that "[t]he legislative history of 28 U.S.C. § 2409a indicates that Congress
intended easements to be included in the real property rights adjudicated in a quiet title
action."  _Kinscherff v. United States_, 586 F.2d 159, 161 (10th Cir. 1978).  However, the
Complaint contains no allegations that the United States holds either an express or
implied easement over the property, _see_ [Doc. 1], and the City does not sufficiently
develop its argument so as to establish the existence of an easement or a disputed title.

2024 WL 2272706, at *5 ("[T]he mere possibility that the USFS may at some point initiate ESA consultation of Plaintiff's claimed pre-FLPMA rights-of-way, and thereby assert it has discretion and control, does not establish a present disputed title.").

"[W]aivers of sovereign immunity are to be read narrowly and conditions on the waiver are to be 'strictly observed.'" *Kane Cnty. I*, 772 F.3d at 1211 (quoting *Block*, 461 U.S. at 287). Without some developed argument from the City explaining the exact nature of the supposed "disputed title" at issue in this case, the Court cannot conclude that the City has met its burden to demonstrate a waiver of the government's sovereign immunity. Accordingly, the Court concludes that it lacks subject matter jurisdiction over Plaintiff's QTA claim. The Motion to Dismiss is respectfully **GRANTED** to the extent it seeks dismissal of that claim.[9]

## II.   Constitutional Claims

With respect to the City's constitutional challenges, Defendants contend that these claims should be dismissed for lack of jurisdiction under Rule 12(b)(1) and failure to state a claim under Rule 12(b)(6). [Doc. 26 at 16–37]. The Court respectfully finds Defendants' arguments on standing dispositive and limits its analysis accordingly.

"The Supreme Court's standing jurisprudence contains two strands: Article III standing, which enforces the Constitution's case-or-controversy requirement, and prudential standing, which embodies judicially self-imposed limits on the exercise of federal jurisdiction." *Wilderness Soc'y v. Kane Cnty.*, 632 F.3d 1162, 1168 (10th Cir. 2011) (en banc) (cleaned up). Article III standing is a jurisdictional prerequisite to suit

---

[9] And because there is not yet a concrete title dispute, the Court would similarly find that Plaintiff's QTA claim has not yet accrued. *See Kane Cnty. II*, 2024 WL 3760024, at *19–20; *Corner Post, Inc.*, 603 U.S. at 810, 822.

and requires "(1) an 'injury in fact,' (2) a sufficient 'causal connection between the injury and the conduct complained of,' and (3) a 'likel[ihood]' that the injury 'will be redressed by a favorable decision.'"  *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 157–58 (2014) (alterations in original) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992)).  The plaintiff bears the burden of establishing standing.  *Colo. Outfitters Ass'n v. Hickenlooper*, 823 F.3d 537, 544 (10th Cir. 2016).  Here, Defendants argue that the City has not adequately established an injury in fact, and even if it had done so, any such injury would not be redressable by a favorable decision.  [Doc. 1 at 18–19].[10]

*Injury in Fact.*  "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'"  *Spokeo, Inc. v. Robins*, 578 U.S. 330, 339 (2016) (quoting *Lujan*, 504 U.S. at 560).  The requirement that an injury be "concrete" means that the injury must "be 'real' rather than 'abstract.'"  *Lupia v. Medicredit, Inc.*, 8 F.4th 1184, 1190 (10th Cir. 2021) (quotation omitted).  That is, "it must actually exist."  *Spokeo*, 578 U.S. at 340.  And an injury is "imminent" if the "threatened injury is certainly impending, or there is a substantial risk that the harm will occur."  *Susan B. Anthony List*, 573 U.S. at 158 (quotation omitted).  The party invoking the Court's federal jurisdiction bears the burden of establishing standing.  *Id.*

The City argues it has been injured in two main ways.  First, it asserts that the

---

[10] "[S]tanding is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press and for each form of relief that they seek."  *TransUnion LLC v. Ramirez*, 594 U.S. 413, 431 (2021).  However, both Defendants and Plaintiff assert their standing arguments as to Plaintiff's constitutional claims collectively.  *See* [Doc. 26 at 18–19; Doc. 32 at 16–19].  The Court thus presumes that the Parties raise the same arguments with respect to each constitutional claim and each type of relief requested.

City's retroactive imposition of an unending obligation to operate the Airport "interfere[s] with the City's ownership and disposition of its property." [Doc. 32 at 16–17]. It acknowledges that "the City is already bound by the FAA's restrictions through 2040," but insists that this "is of no matter" because "the FAA's policy adds to that regulatory burden." [*Id.* at 17].

The Court is respectfully unpersuaded by this argument. The City concedes that its existing obligations under the most recent grant agreement, which it accepted in 2020, remain in effect until 2040, [Doc. 1 at ¶¶ 41–43, 52; Doc. 32 at 17], and it does not challenge those obligations through this lawsuit. Instead, it asks the Court to declare that *after* 2040, these obligations will no longer exist. Stated differently, as alleged in the Complaint, the City's obligations will remain unchanged for the next 15 years *regardless* of the outcome of this lawsuit, and only *after* 2040 could the City actually be injured by any "interference with the City's ownership and disposition of its property," should the United States prohibit the Airport's closure as the City expects it will. [Doc. 32 at 17]. The City further concedes that it "is considering the closure and redevelopment of the Airport," [Doc. 1 at ¶ 1], but alleges no facts that indicate it has taken any concrete steps other than the cessation of its acceptance of federal funding toward the Airport's closure. *See generally* [*id.*]. Respectfully, the Court cannot conclude that the possibility of an injury 15 years in the future is an actual injury—or an imminent or certainly impending one—even if the City believes that the FAA's recent interpretation will extend its regulatory burdens at that time.

The City also argues that it has been injured because it is unable "to accept federal funding free from unconstitutional conditions," reasoning that if it accepts any further FAA

grant funds, this "would amount to [the City's] consent to be bound by the unlawful policy expressed in Change 2."  [Doc. 32 at 17–18]; *see also* [*id.* at 17 ("Being faced with an unconstitutional federal funding offer gives rise to an injury for Article III standing purposes.")].  This purported injury is not alleged or contemplated in the Complaint.  The City does not allege that, without the obligations imposed by Change 2, it would accept federal grant funds, such that it has been forced to choose between accepting allegedly unconstitutional terms and forgoing federal grant assistance.  Rather, the City alleges that its decision to cease accepting federal grants occurred prior to the FAA's issuance of Change 2, explaining that it "elected to forego any further federal grant funds . . . [so] that it may choose to close and redevelop the Airport, with or without the FAA's permission, when its most recent grant agreement expires in 2040."  [Doc. 1 at ¶ 15]; *see also* [*id.* at ¶¶ 41, 43, 52].  This assertion is insufficient to demonstrate an injury in fact.[11]

---

[11] Moreover, Plaintiff's cited authority is distinguishable.  The City cites *Arizona v. Yellen* for the proposition that a "theory of injury based upon having a right to an unambiguous funding offer from the government" may be "sufficient for standing purposes."  [Doc. 32 at 18–19 (citing *Arizona v. Yellen*, 34 F.4th 841, 852–53 (9th Cir. 2022))].  In that case, Arizona challenged a provision in the American Rescue Plan Act ("ARPA") that prohibited states from using federal grants issued in response to the COVID-19 pandemic to offset state tax revenue reductions.  *Arizona*, 34 F.4th at 845–46.  The state argued that it had standing to sue based on a "sovereign injury theory of standing," asserting that the challenged ARPA provision "prevent[ed] [it] from being able to exercise its choice voluntarily to accept ARPA funds and understand the consequences of agreeing to ARPA's conditions" and "threaten[ed] Arizona's sovereign prerogative to tax its residents as it sees fit."  *Id.* at 851 (quotation omitted).  The Ninth Circuit agreed, concluding that "Arizona ha[d] alleged sufficiently concrete and particularized harms to its ability to exercise its sovereign prerogatives, intangible as those prerogatives may be," *id.* at 852, and had demonstrated that it would "face serious consequences in losing control over its taxing policies and being held to a funding offer that it [did] not understand," *id.* at 853.

Like other claimants, states are bound by Article III's standing requirements, including that the injury alleged must be actual or imminent.  *Saginaw Cnty. v. STAT Emergency Med. Servs., Inc.*, 946 F.3d 951, 957 (6th Cir. 2020).  It is clear to this Court that the state in *Arizona v. Yellen* had alleged an actual or imminent injury, as it had accepted federal funds through ARPA and was suing to enjoin the federal defendants

***Redressability.***   Even assuming that the City could identify an actual and imminent injury in fact, the City has not demonstrated that its alleged injuries are redressable.  An injury is redressable if it is likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 561.  "[I]t must be the effect of the court's judgment on the defendant that redresses the plaintiff's injury, whether directly or indirectly."  *Nova Health Sys. v. Gandy*, 416 F.3d 1149, 1159 (10th Cir. 2005).   To determine whether an injury is redressable, courts consider "the relationship between the judicial relief requested and the injury suffered."  *California v. Texas*, 593 U.S. 659, 671 (2021) (quotation omitted).

The City asserts that a Court order "declaring FAA's assertion of a perpetual obligation to operate the Airport unconstitutional" would redress its injuries "by removing the uncertainty regarding the City's title and ability to dispose of its property, eliminating the additional regulatory burden of a perpetual obligation, and permitting the City to accept new FAA grant funding—if it chooses to do so—without consenting to the unlawful condition asserted in Change 2."   [Doc. 32 at 18–19].   The Court is respectfully unpersuaded by this argument.  "[F]or a declaratory judgment to redress an injury-in-fact, as opposed to serving as an advisory opinion, it must provide something other than the 'emotional satisfaction' of a favorable ruling."  *Lutter v. JNESO*, 86 F.4th 111, 129 (3d Cir.

---

from recouping any of those dispersed funds.  34 F.4th at 847.  The City does not allege this same sort of an actual or imminent injury here.  Furthermore, while the City alleges that "the FAA's asserted interest intrudes on the City's sovereign authority to regulate the use of land and dispose of its property," [Doc. 1 at ¶ 15], the City spends no time arguing that the "sovereign injury" or "sovereign interest" theory of standing may be invoked by a city or applies in this case, *see* [Doc. 32 at 16–19], and demonstrating the doctrine's application would require much more than the singular citation offered by Plaintiff in its Response, *see* [*id.* at 17–18]; *see also Tennessee v. Dep't of Educ.*, 104 F.4th 577, 591–93 (6th Cir. 2024) (explaining the sovereign interest standing doctrine and its requirements in detail).

2023) (quoting *Ashcroft v. Mattis*, 431 U.S. 171, 172 (1977)).  "[A] declaratory judgment must provide conclusive resolution of a concrete controversy related to a prospective course of action by one of the adverse parties."  *Id.*  As explained above and as alleged in the Complaint, the City concedes that any "additional regulatory burden" will not be realized until 2040, when the most recent grant agreement expires and *if* the United States continues to maintain that the Airport must be operated in perpetuity.  Moreover, the City does not allege any present intention to accept federal grants, instead resolving to not accept any additional funds until 2040.  [Doc. 1 at ¶ 52].  Because any declaratory relief the Court could issue would not have any real-world impact until 2040—beyond providing the City satisfaction of a favorable ruling—the Court finds that the City has not demonstrated that it has an injury that would be redressed by a favorable decision.

Because the City has not met its burden to establish its standing, the Motion to Dismiss is respectfully **GRANTED** as to the City's constitutional claims.

## CONCLUSION

For the reasons set forth above, **IT IS ORDERED** that:

(1)    Defendants' Motion to Dismiss [Doc. 26] is **GRANTED**;

(2)    Plaintiff's Quiet Title Act claim is **DISMISSED without prejudice** for lack of subject matter jurisdiction;

(3)    Plaintiff's constitutional claims are **DISMISSED without prejudice** for lack of subject matter jurisdiction;

(4)    Defendants are entitled to their costs pursuant to D.C.COLO.LCivR 54.1; and

(5)     The Clerk of Court is directed to close this case.


DATED:  September 15, 2025              BY THE COURT:

_____
Nina Y. Wang
United States District Judge